1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION

3      UNITED STATES OF AMERICA,        Case No. 1:10-cr-0150-SO
                                        Cleveland, Ohio
4                Plaintiff,             Wednesday, October 10, 2012
                                        Thursday, October 11, 2012
5          VS.

6      AUDREY BARBARA ROVEDO,
       VINESH DARJI,
7      TERENCE SASAKI,

8              Defendants.

9          TRANSCRIPT OF **TESTIMONY OF CARMEN CATIZONE** FROM
         JURY TRIAL BEFORE THE HONORABLE SOLOMON OLIVER, JR.,
10           CHIEF UNITED STATES DISTRICT JUDGE

11     APPEARANCES:

12     For the Government:      Edward F. Feran
                                Rebecca C. Lutzko
13                              Assistant United States Attorneys
                                801 West Superior Avenue
14                              400 U.S. Court House
                                Cleveland, Ohio   44113
15                              216-622-3600

16     For the Defendants:      (Continued to Page 2.)

17

18

19

20

21     Official Court Reporter:  Heidi Blueskye Geizer, RMR-CRR
                                  United States District Court
22                                801 West Superior Avenue
                                  Cleveland, Ohio   44113
23                                216-357-7092

24

       Proceedings recorded by mechanical stenography, transcript
25     produced by computer-aided transcription.

```
 1    For the Defendants:

 2    Audrey Barbara Rovedo:     Robert J. Gorence
                                 Gorence & Oliveros
 3                               1305 Tijeras Avenue, NW
                                 Albuquerque, NM 81702
 4                               505-244-0214

 5    Vinesh Darji:             Kevin J. Darken
                                 Cohen, Foster & Romine
 6                               Ste. 1000
                                 201 East Kennedy Blvd.
 7                               Tampa, FL 33602
                                 813-225-1655
 8
                                 John R. Hightower, Jr.
 9                               McIntyre, Panzarella, Thanasides
                                 Ste. 1000
10                               201 East Kennedy Blvd.
                                 Tampa, FL 33602
11                               813-899-6059

12    Terence Sasaki:           Jerome A. Milano
                                 Milano Weiser
13                               2639 Wooster Road
                                 Rocky River, OH 44116
14                               440-356-2828

15                               Megan J. Rha
                                 Duejong Kim
16                               Rha & Kim
                                 Ste. 200
17                               215-45 Northern Blvd.
                                 Bayside, NY 11361
18                               718-321-9797

19                         -   -   -   -   -

20

21

22

23

24

25
```

Catizone - Direct (By Mr. Feran)

1          MORNING SESSION, WEDNESDAY, OCTOBER 10, 2012

2     *   *   *   *   *   *

3                    THE COURT:  Call your next witness.

4                    MR. FERAN:  Your Honor, we would call Carmen

5     Catizone.

6                    THE COURT:  Come right ahead to the witness

7     stand you see on my left, and as soon as you step up there,

8     before you take your seat, my deputy will swear you in.

9                    (The witness is sworn.)

10                   THE COURT:  Mr. Feran.

11                   MR. FERAN:  Thank you, Your Honor.

12          DIRECT EXAMINATION OF CARMEN CATIZONE

13     BY MR. FERAN:

14     **Q.**    Good afternoon, sir.

15     **A.**    Good afternoon.

16     **Q.**    I would like you to begin by stating your full name,

17     and spelling your last name for the court reporter.

18     **A.**    Carmen Catizone, C-A-T-I-Z-O-N-E.

19     **Q.**    It is pronounced "Catizone"?

20     **A.**    Yes.  Yes, sir.

21     **Q.**    Mr. Catizone, what is your current occupation?

22     **A.**    I'm a pharmacist, as well as executive director of the

23     National Association of Boards of Pharmacy.

24     **Q.**    How long, sir, have you been a pharmacist?

25     **A.**    Since 1983.

Catizone - Direct (By Mr. Feran)

1    **Q.**    And how long have you been the executive director of

2    the National Association of Boards of Pharmacy?

3    **A.**    I joined the organization in 1985 and have been

4    executive director since 1988.

14:21:40  5    **Q.**    And, sir, what are your duties as the executive

6    director?

7    **A.**    I oversee the staff and implement policies that are

8    directed by the individual state Boards of Pharmacy.

9    **Q.**    How is this position selected, sir?

14:21:57 10    **A.**    There's a national search that was conducted, and

11    candidates were then screened and qualified, and I was

12    selected from that screening process.

13    **Q.**    The National Association of Boards of Pharmacy, this

14    is known by the acronym NABP; is that correct?

14:22:13 15    **A.**    Yes, sir.

16    **Q.**    All right, sir.  So we're not here all night, I'm

17    going to refer to this by NABP if that's okay with you.

18    **A.**    Sure.

19    **Q.**    Prior to becoming executive director of NABP did you

14:22:24 20    have any other positions at the organization?

21    **A.**    When I first joined them I was the test and

22    measurement director, so I oversaw all of the competency

23    programs, the national licensure exam that all the states

24    require, as well as the state law exams that 47 states

14:22:41 25    require.

Catizone - Direct (By Mr. Feran)

1    **Q.**    Sir, how big is your organization?

2    **A.**    It consists of the 50 state Boards of Pharmacy, the

3    provinces of Canada, the states of Australia, New Zealand,

4    and South Africa.

14:22:55 5    **Q.**    And what does your organization do, sir?

6    **A.**    We help the states protect the public health.

7    **Q.**    Are individual pharmacists members of your

8    organization?

9    **A.**    Pharmacists, pharmaceutical companies, pharmacies, are

14:23:10 10    not members of our association.  Only state agencies that

11    have the legal authority to regulate pharmacies and

12    pharmacists and technicians can be members of our

13    association.

14    **Q.**    So for example, Mr. Catizone, some of your members

14:23:25 15    would be, for example?

16    **A.**    The Ohio State Board of Pharmacy, the Illinois Board

17    of Pharmacy.  All of the state agencies that regulate

18    pharmacy.

19    **Q.**    Does your organization have a lobbying component to

14:23:36 20    it, sir?

21    **A.**    No, sir.  Based upon our status with the IRS we're

22    prevented from lobbying, and all we can do are charitable

23    and educational activities.

24    **Q.**    Mr. Catizone, I would like to talk, if we could, about

14:23:51 25    your educational background.  If we could focus on that for

Catizone - Direct (By Mr. Feran)

1    a minute, sir.  Could you please describe for the Ladies and

2    Gentlemen of the Jury briefly your education?

3    **A.**    I received my bachelor of science in pharmacy from the

4    University of Illinois, and my master's of science and

14:24:07 5    pharmacy administration also from the University of

6    Illinois.

7    **Q.**    Are you a registered pharmacist, sir?

8    **A.**    Yes, sir, in Illinois.

9    **Q.**    In the state of Illinois.  Tell us about your

14:24:18 10    professional experience after graduating from pharmacy

11    school.

12    **A.**    I practiced for 14 years as a pharmacist in a large

13    chain as well as in a hospital, and also practiced in a

14    nursing home facility, and while in graduate school became

14:24:37 15    involved in studies with the Food and Drug Administration

16    and other research projects.

17    **Q.**    And what area of the country did this take place, sir?

18    **A.**    In the midwest, the Chicago area.

19    **Q.**    Where are you from, sir, where is your hometown?

14:24:51 20    **A.**    Chicago.

21    **Q.**    In addition to your practice -- how long did you

22    practice, sir, in the community and hospitals and

23    institutional settings?

24    **A.**    14 years.

14:24:59 25    **Q.**    In addition to your educational background,

Catizone - Direct (By Mr. Feran)

1   Mr. Catizone, can we talk about, are you the recipient of

2   any honors or awards?

3   **A.**   I've been recognized by the commissioner of the Food

4   and Drug Administration on two occasions, received a special

14:25:13 5   citation from the District of Columbia, and then various

6   awards from the college from which I graduated, as well as

7   professional associations for pharmacist of the year.

8   **Q.**   Mr. Catizone, through your training and experience,

9   sir, have you developed a particular expertise in the areas

14:25:30 10   of pharmacies operating on the Internet?

11   **A.**   Yes, sir.

12   **Q.**   Can you tell us about them, Mr. Catizone?

13   **A.**   Sure.  I became involved in this area in 1997, when we

14   became aware of entities trying to sell prescription drugs

14:25:44 15   on the Internet without a prescription.  We then developed

16   an accreditation program, and since 1997 we've been actively

17   involved in researching, helping the states regulate

18   Internet pharmacies, educating the public about what

19   pharmacies they should utilize, and educating legislators

14:26:05 20   and states about how best to regulate Internet pharmacies.

21   **Q.**   When you say we, Mr. Catizone, who are you referring

22   to?

23   **A.**   Myself and NABP, the organization that I serve.

24   **Q.**   And if you could, sir, describe the functions of the

14:26:17 25   NABP more.

Catizone - Direct (By Mr. Feran)

1    **A.**    We have three primary functions.  One is competence

2    assessment, which means we prepare the licensure exams that

3    the states require to determine whether or not pharmacists

4    are competent to practice.

5    14:26:32    We also maintain a licensure transfer program for

6    pharmacists for the states, so that every pharmacist who

7    wants to transfer from one state to another utilizes that

8    system.  We do all of the disciplinary clearing for the

9    states and submit that information so the states can make a

10   14:26:50   decision, and then we have accreditation programs for

11   wholesalers, pharmacies, and Internet pharmacies.

12   We've accredited over 30,000 retail pharmacies, over

13   600 wholesale distributors, and about half -- about 50 or so

14   Internet pharmacies, and advertisers on Google and

15   14:27:09   Microsoft.

16   **Q.**    You stated that this research that you conducted,

17   Mr. Catizone, began in 1997?

18   **A.**    Yes, sir.

19   **Q.**    And is it continuing, sir?

20   14:27:16   **A.**    Yes, sir.

21   **Q.**    And can you very briefly, sir, explain the researching

22   of these Internet pharmacies?

23   **A.**    What we do is we through our accreditation program we

24   actually visit pharmacies, inspect their policies and

25   14:27:34   procedures, and inspect those pharmacies to make sure they

Catizone - Direct (By Mr. Feran)

1    are in compliance with state and federal laws and the

2    standards we've developed.

3        We also actively search the Internet, and to date

4    we've reviewed over 9,000 Internet sites, and of those 9,000

14:27:48 5    sites we have found that 97 percent of those sites are

6    operating illegally or fraudulently.

7    **Q.**    Has your organization, NABP, come out with a general

8    position statement with regard to dispensing and prescribing

9    over the Internet, sir?

14:28:05 10    **A.**    Yes, sir.

11    **Q.**    Can you tell us about that?

12    **A.**    The position is quite simply that an Internet pharmacy

13    is held to the same laws, regulations, and standards as a

14    traditional brick and mortar pharmacy, and that Internet

14:28:19 15    pharmacy has to insure that there's a valid prescription,

16    that the prescription is appropriate for the patient, and

17    that there's no fraud occurring, before that pharmacy can

18    dispense that prescription.

19    **Q.**    Mr. Catizone, has NABP come out with a recent

14:28:35 20    statement regarding Internet pharmacies?

21    **A.**    Yes.  Continuously we issue statements about Internet

22    pharmacies.

23    **Q.**    And was there a recent statement made regarding

24    Internet pharmacies, sir?

14:28:45 25    **A.**    I'm sorry --

Catizone - Direct (By Mr. Feran)

1   **Q.**    I'll strike that.  Sir, are you familiar with the

2   Controlled Substance Act?

3   **A.**    Yes.

4   **Q.**    And can you tell us how you're familiar with that?

14:28:58 5   **A.**    As a pharmacist and as a student becoming a pharmacist

6   you are taught pharmacy law throughout the program, and the

7   main tenets of pharmacy law are the federal laws, which

8   consist of the Controlled Substance Act and the Food, Drug,

9   and Cosmetic Act, as well as state laws and regulations

14:29:17 10   where you may be practicing.  And those courses, I said, are

11   throughout the curriculum, as well as special courses to

12   pharmacy laws that every pharmacist must take.

13       The pharmacist must also pass a state law exam in

14   every state in which they want to practice, and they must

14:29:35 15   maintain their continuing education in both the clinical

16   aspects of pharmacy practice as well as pharmacy law.

17   **Q.**    So you studied this in pharmacy school, sir?

18   **A.**    Yes, sir.

19   **Q.**    Are you familiar with the term CLE?

14:29:50 20   **A.**    Yes.

21   **Q.**    Continue Legal Education -- Continuing Pharmacy

22   Education?

23   **A.**    CPE.

24   **Q.**    Can you tell us what that consists of?

14:29:59 25   **A.**    Sure.  Every state requires Continuing Pharmacy

Catizone - Direct (By Mr. Feran)

1    Education.  Every pharmacist must complete a number of hours

2    of continuing education in order to renew their license.

3    **Q.**    You talked about the Controlled Substance Act.  Can

4    you define, Mr. Catizone, what a controlled substance is and

14:30:15  5    what a noncontrolled substance is?

6    **A.**    Yes.  There are two categories of drugs, there are

7    prescription drugs and nonprescription drugs or

8    over-the-counter drugs.  Within the prescription drug class

9    there's a special class of drugs called controlled

14:30:31  10   substances.  And because these drugs have a high tendency to

11   cause addiction, abuse, and harm, they are regulated

12   differently and more stringently than just a prescription

13   drug.

14          And within the controlled substance category are five

14:30:48  15   different classes of drugs:  Schedule I has no medical value

16   and is the most dangerous of the schedules, and that would

17   include products like heroin.

18          Schedule II has a medical value, but of the legitimate

19   products that can be prescribed and dispensed it's the most

14:31:06  20   dangerous because of the toxicity, abuse, and addiction

21   potential.  What you would find in this category would be

22   products like morphine or oxycodone.

23          Schedule III, going down the schedule, is not as

24   dangerous as Schedule II, but clearly more dangerous than

14:31:24  25   Schedules IV and V.  And within Schedule III you would have

Catizone - Direct (By Mr. Feran)

1    combination products like hydrocodone and Tylenol or

2    hydrocodone and aspirin.

3         Schedule IV, again going down, is less dangerous than

4    III, but more dangerous than V, and those are products that

14:31:41  5    would treat anxiety, such as Valium or Xanax.

6         And then Schedule V are still controlled because

7    there's a potential, but the potential is not as great as

8    the upper schedules.  And you may have products that you can

9    buy over the counter from the pharmacist if you sign a log,

14:31:58  10    and those may be products to treat a cough or to treat

11    diarrhea.

12    **Q.**    So hydrocodone is classified as a Schedule III drug,

13    sir?

14    **A.**    Yes, sir.

14:32:06  15    **Q.**    Now, those are the controlled substances.  Are you

16    familiar with noncontrolled substances?

17    **A.**    Yes, sir.

18    **Q.**    Can you explain what a noncontrolled substance is?

19    **A.**    Within that prescription drug category, a

14:32:17  20    noncontrolled substance may be something that's used to

21    treat diabetes or high blood pressure, or an infection,

22    something that doesn't have any potential for abuse or

23    addiction.

24         So you may have like amoxicillin, you may have

14:32:31  25    products Torsemide that helps relieve water and helps reduce

Catizone - Direct (By Mr. Feran)

1    blood pressure, those types of medications.

2    **Q.**    Mr. Catizone, are you familiar with the types of

3    products or substances that a pharmacy typically

4    distributes?

14:32:45  5    **A.**    Yes.

6    **Q.**    Can you tell us what those are, sir, and define them

7    for us, please?

8    **A.**    Sure.  Based upon my experience as a pharmacist and

9    the information I've seen over the years, a typical pharmacy

14:32:56  10    will dispense products for diseases such as asthma,

11    diabetes, high blood pressure, and then perhaps pain

12    medications or other controlled substances.

13        The usual mix of prescription drugs that are

14    controlled and noncontrolled that is documented in the

14:33:14  15    literature averages about 92 to about -- 92 to about 98

16    percent that are noncontrolled substances to the controlled

17    substances a typical pharmacy would dispense may be anywhere

18    in the range from 8 to 10 percent total.

19        So a pharmacy would go 92 to 90 percent of regular

14:33:36  20    noncontrolled, and 8 to 10 percent of controlled substances.

21    **Q.**    So Mr. Catizone, let's focus on the 8 to 10 percent of

22    the controlled substances if we could.  Are these all in a

23    particular drug class or are they in different drug classes?

24    Can you explain that to us, sure?

14:33:53  25    **A.**    Sure.  It would be a mix of drugs.  You would have

Catizone - Direct (By Mr. Feran)

1    patients that would come in for pain medications, patients

2    that might come in for antianxiety drugs, or medications

3    they may need to help them sleep.  So within that 8 to 10

4    percentage it would also be a mix of products.

14:34:10  5    **Q.**    What would be some of the common names, sir, in the 8

6    to 10 percent of controlled substances that we would

7    recognize and a pharmacy would distribute?

8    **A.**    Some of the brand names might be products like Vicodin

9    or Lortab, you may have Valium or Xanax, you may have

14:34:27  10    Ambien, products to help patients sleep.

11    **Q.**    Mr. Catizone, have you given presentations on the

12    topic of Internet pharmacies?

13    **A.**    Yes, sir.

14    **Q.**    Can you tell us about that, sir?

14:34:40  15    **A.**    I've been able to present before both the U.S. House

16    and U.S. Congress, and have presentations before the Board

17    of Pharmacy or the state legislature in every state except

18    for Alaska.

19    **Q.**    So you've been to every state except for Alaska to

14:34:57  20    present at the Boards of Pharmacy?

21    **A.**    Yes, sir.

22    **Q.**    So Alaska is still on your bucket list, sir?

23    **A.**    It's on my list.

24    **Q.**    What has your presentation been before the House and

14:35:05  25    Senate for the state pharmacy boards?  For what purpose did

Catizone - Direct (By Mr. Feran)

1    you appear in front of them, sir?

2    **A.**    We were asked to present to educate them about

3    Internet pharmacies, some of the things we were observing,

4    and suggestions we had for regulating Internet pharmacies.

14:35:19 5    **Q.**    What were some of the suggestions you had to regulate

6    Internet pharmacies?

7    **A.**    Our suggestions were that the laws of the state needed

8    to be enforced, and so we needed more resources for the

9    states; that Internet pharmacies are regarded the same as

14:35:32 10    traditional brick and mortar pharmacies, and that there's an

11    important interplay between federal and state laws to make

12    sure Internet pharmacies are properly regulated.

13    **Q.**    We'll get back to the law part in a moment, sir.  Have

14    you spoken on national TV or radio on the topic of Internet

14:35:53 15    pharmacies?

16    **A.**    Yes, sir.

17    **Q.**    Can you tell us about that, sir?

18    **A.**    I've been able to appear on such programs as Oprah,

19    The Today Show, Good Morning America, all the major evening

14:36:03 20    news programs, as well as local and national news programs.

21    CNN, and other local programs.

22    **Q.**    And when you appeared on these various shows,

23    Mr. Catizone, what did you talk about?

24    **A.**    The dangers of Internet pharmacies that are operating

14:36:19 25    illegally or rogue pharmacies, and then advice for consumers

Catizone - Direct (By Mr. Feran)

1    on how to identify legitimate pharmacies and how to use the

2    Internet safely.

3    **Q.**    And what time period, Mr. Catizone, were you appearing

4    on Oprah and CNN and Good Morning America? What time period

14:36:35 5    are we talking about, sir?

6    **A.**    Probably 1999 to the present.

7    **Q.**    And the same question regarding your testimony before

8    the House and the Senate and various state pharmacy boards.

9    **A.**    Yes, sir.

14:36:43 10   **Q.**    What time period are we talking about there, sir?

11   **A.**    The same time period, sir.

12   **Q.**    Sir, have you ever published articles in the area of

13   Internet pharmacies?

14   **A.**    Yes.

14:36:53 15   **Q.**    Can you tell us about that?

16   **A.**    I have about a hundred publications and presentations.

17   Most of them are on Internet pharmacy.  They've appeared in

18   refereed journals.  They've also appeared in the *Wall Street*

19   *Journal* and other national and local publications, *Reader's*

14:37:09 20  *Digest*, *Consumer Reports*, various consumer educational

21   magazines, newspapers, and other periodicals.

22   **Q.**    You say professional journals, sir?

23   **A.**    Yes.

24   **Q.**    Can you explain what a professional journal is?

14:37:22 25   **A.**    A professional journal is something that has to be

Catizone - Direct (By Mr. Feran)

1    reviewed by an independent panel to make sure that

2    information is credible and it's not promotional in any way,

3    and I've been able to publish in some of those journals, as

4    well.

14:37:32  5    **Q.**    And, sir, were you the author of these articles?

6    **A.**    Yes.

7    **Q.**    Sir, have you ever testified as an expert in federal

8    court?

9    **A.**    Yes, sir.

14:37:39  10    **Q.**    And can you tell us how many times?

11    **A.**    Approximately 12 times.

12    **Q.**    Can you tell us, sir, some of the various federal

13    courts you've testified in?

14    **A.**    I've testified in Minnesota, California, Illinois, a

14:37:53  15    number of different states.

16    **Q.**    Mr. Catizone, are you being compensated for your

17    testimony today?

18    **A.**    No, sir.

19         MR. FERAN:  Your Honor, at this time I would

14:38:04  20    ask that Mr. Catizone be qualified as an expert in the area

21    of Internet pharmacy.

22         THE COURT:  He may, he may testify.

23         MR. FERAN:  Pardon me, Your Honor?

24         THE COURT:  I said I will admit him to

14:38:15  25    testify.

Catizone - Direct (By Mr. Feran)

1          MR. FERAN:  Thank you, Your Honor.  As an

2    expert in Internet pharmacy and pharmacy practice, Your

3    Honor.  Thank you, Judge.

4          THE COURT:  All right.

14:38:26   5    **Q.**    Let's talk about, Mr. Catizone, you talked earlier

6    about graduating from the University of Illinois with your

7    bachelor's and your pharmacy degree.  Is that correct, sir?

8    **A.**    Yes, sir.

9    **Q.**    And after that, after you graduated did you take a

14:38:38  10    test to become a pharmacist?

11    **A.**    Yes, sir.

12    **Q.**    Can you tell us very briefly about that, sir?

13    **A.**    Every pharmacist is required to take a national

14    licensure exam that tests their competence to practice, and

14:38:48  15    it focuses on areas of practice that affect patients'

16    health, clinical areas, as well as a state law exam, so I

17    took the Illinois state law exam.

18    **Q.**    And for example, when you took the Illinois law exam,

19    sir, was there state law on your test?

14:39:01  20    **A.**    It was both state and federal law that a pharmacist is

21    responsible for and needs to know.

22    **Q.**    And what state law was on your exam, sir?

23    **A.**    Illinois.

24    **Q.**    Sir, have you developed a knowledge as to state

14:39:13  25    requirements for each state of the United States?

Catizone - Direct (By Mr. Feran)

1    **A.**    Yes.  We also serve as a resource for the states and

2    for Congress and the Senate, so we have all of the state

3    practice acts and regulations in a computer database that we

4    use all the time to provide information to research

14:39:30  5    questions or to provide information for task forces or

6    committees we may have.

7    **Q.**    Mr. Catizone, can you tell us briefly, prior to your

8    testimony today did you review various documents in advance

9    of your testimony?

14:39:48  10   **A.**    Yes, sir.

11   **Q.**    Can you summarize, sir, what some of those documents

12   were.

13   **A.**    I reviewed a number of documents pertaining to

14   undercover purchases that the government made, those

14:39:58  15   documents were actually written reports, transcripts of the

16   phone conversations, the actual tapes of the phone

17   conversations.  I review various reports summarizing

18   prescription data and summarizing the distribution of

19   products prepared by the government, as well as actual

14:40:17  20   prescriptions dispensed by the pharmacies that were involved

21   in this case.

22   **Q.**    Mr. Catizone, let's segue here and talk about an

23   individual wants to open up a pharmacy.  Can you tell us

24   generally speaking what they have to do to do this?

14:40:32  25   **A.**    They have to file an application with the state, and

Catizone - Direct (By Mr. Feran)

1    there are a number of requirements that that individual or

2    that pharmacist has to comply with involving having a

3    licensed pharmacist responsible for that pharmacy, as well

4    as meeting all the requirements for security, securing the

14:40:50  5    drugs, and then dispensing the drugs, in accordance with all

6    the state and federal laws and regulations.

7    **Q.**    So state and federal law comes into play here?

8    **A.**    Yes, sir.

9    **Q.**    Now, you mentioned the word pharmacy.  Is there a

14:41:04  10   difference between a brick and mortar and an Internet

11   pharmacy?

12   **A.**    No, sir, the same requirements in terms of their

13   compliance with state and federal laws.

14   **Q.**    You talked about registration requirements, sir?

14:41:16  15   **A.**    Yes.

16   **Q.**    Are pharmacies required to register with the DEA?

17   **A.**    If they're going to be dispensing controlled

18   substances, which I mentioned earlier, they would register

19   with the DEA, and they register with the state, as well.

14:41:30  20   **Q.**    Can you explain, Mr. Catizone, why registration with

21   the DEA is required for distributing controlled substances?

22   **A.**    The regulation of controlled substances comes under

23   federal and state jurisdiction.  The federal jurisdiction is

24   the Controlled Substance Act, and under that act it calls

14:41:47  25   for the DEA to register pharmacies, doctors, and other

Catizone - Direct (By Mr. Feran)

1    registrants so that the DEA has direct involvement and

2    oversight of activities involving controlled substances.

3    **Q.**    If a pharmacy, Mr. Catizone, has to desire to

4    distribute controlled substances, is DEA registration

14:42:05  5    required?

6    **A.**    It's not required.

7    **Q.**    Now, you talked about DEA registration.  You talked

8    about applications, sir.  Can you tell us about that?

9    **A.**    An application they would file with the state, it

14:42:17  10    could be a paper or electronic application.  It sets out the

11    requirements that that pharmacy needs to comply with and

12    demonstrate to the state that it's met prior to that

13    pharmacy actually being issued a registration or permit and

14    actually being able to practice.

14:42:30  15    **Q.**    So these are the general requirements by

16    state -- these requirements, excuse me, vary by state, sir?

17    **A.**    Yes, they do, but not significantly.  They're pretty

18    similar from state to state.

19    **Q.**    Did your organization, NABP, launch an Internet

14:42:46  20    pharmacy program to distinguish between legitimate and

21    illegitimate pharmacies?

22    **A.**    Yes, we did.

23    **Q.**    Can you tell us about that, sir?

24    **A.**    Sure.  In 1999 we launched the Verified Internet

14:42:59  25    Pharmacy Prescription Site program, VIPPS.  V-I-P-P-S.  What

Catizone - Direct (By Mr. Feran)

1   it does is requires Internet pharmacies to submit

2   documentation to us.  It shows us their compliance with

3   state and federal laws and standards of practice, as well as

4   all the policies and procedures that that pharmacy has in

14:43:16  5   effect.

6       So for example, one of the criteria talks about making

7   sure that they have licensed pharmacists responsible for the

8   pharmacy.  That pharmacy has to have a procedure in place to

9   verify the license of that pharmacist before they can hire

14:43:32  10   that pharmacist and allow them to run the pharmacy.

11       We then physically inspect every aspect of that

12   pharmacy.  If it has a call center, if it has a distribution

13   center, or if it's even just one pharmacy that has all those

14   operations within its one site, we physically send

14:43:51  15   inspectors out there to verify that what they're doing is

16   exactly what they've told us in their application.

17   **Q.**   You talked, sir, about the legitimacy of a

18   prescription.  Can you explain that?

19   **A.**   Sure.  One of the responsibilities that a pharmacist

14:44:03  20   has is that they have to make sure that the prescription is

21   valid before they can dispense it.  And there are generally

22   three areas that the pharmacist has to look at before they

23   can dispense that prescription.  One, is it a valid

24   prescription.  And the way the pharmacist determines if it's

14:44:20  25   a valid prescription is whether or not that patient has a

Catizone - Direct (By Mr. Feran)

1    valid relationship with a physician or a doctor.

2         And the way that's established further is that that

3    patient has to have a medical condition.  The physician or

4    doctor has to have conducted a medication history and a

14:44:41  5    face-to-face physical examination, and then there has to be

6    some logical connection between the medical condition, the

7    medication history, and the examination that the physician

8    has provided.  That's one area.

9         The second area is to make sure that the medication is

14:44:59 10    appropriate for the patient.  You wouldn't want the

11    physician to prescribe medications for a child that were at

12    adult doses because those medications would hurt the child,

13    or medications that the patients may be allergic to.  So the

14    pharmacist has a responsibility to make sure that those

14:45:18 15    prescriptions are appropriate for that patient.

16         And then finally, the pharmacist has a responsibility

17    to make sure there's no fraud or diversion occurring.  If

18    the patient maybe stole prescription blanks, forged the

19    doctor's signature, or if there was not a valid relationship

14:45:35 20    and a pharmacist suspected there was some fraud or

21    diversion, the pharmacist has to act in that situation to

22    call the doctor or not fill the prescription, but make some

23    sort of professional judgment.  And if there's a suspicion

24    of fraud or diversion there's also a responsibility to

14:45:51 25    report that to the DEA and to the Board of Pharmacy or other

Catizone - Direct (By Mr. Feran)

1    local authorities.

2    **Q.**    Now, Mr. Catizone, during what time frame in the

3    distribution process does this analysis take place?  The

4    relationship, the validity of the medication to the patient,

14:46:12  5    and no fraud, what part of the prescription distribution

6    process does that take place?

7    **A.**    All of that has to occur before the pharmacist

8    dispenses the medication to the patient.

9    **Q.**    And was this in place, sir -- what years was this in

14:46:24 10    place?

11    **A.**    This has been in place for traditional brick and

12    mortar pharmacies and Internet pharmacies as far back as

13    practice exists, and some of the research I conducted from

14    2001 moving forward, it was specifically addressed for

14:46:44 15    Internet pharmacies in at least 15 states.  And that

16    requirement is still in place and has been expanded to just

17    about all of the states, if not all of the states.

18    **Q.**    Originally in 15 states, sir?

19    **A.**    Yes.

14:46:57 20    **Q.**    When you say originally, what time frame are we

21    talking about here?

22    **A.**    In 2001 and 2005 were specific Internet references

23    even though those standards existed prior to that, because

24    an Internet pharmacy would be considered a pharmacy in all

14:47:12 25    practical purposes, and you have to follow the same

Catizone - Direct (By Mr. Feran)

1    requirements.

2    **Q.**    Mr. Catizone, you talked about 15 states.  What are

3    some of the states that this three-bullet criteria was in

4    place for?

14:47:22  5    **A.**    North Carolina, Florida, Texas, Indiana, to name just

6    a few.

7    **Q.**    You talk about the valid relationship, sir.  And can

8    you further explain to us what you mean by a valid

9    relationship in the context of a prescription in a

14:47:44  10   pharmacist dispensing situation?

11   **A.**    I just mentioned what the pharmacist has to do to

12   validate that there's a valid prescription patient

13   relationship.  That responsibility falls on the pharmacist

14   as well to ascertain that.  So if there's a question, if

14:47:57  15   they think that there isn't a relationship, the patient has

16   to call the doctor and verify that.  If it doesn't exist

17   then the pharmacist cannot fill that prescription.

18   **Q.**    What steps, Mr. Catizone, have you taken if you are

19   concerned about the validity of a relationship?

14:48:15  20   **A.**    The steps that are required under the VIPPS program

21   and within all the practice acts and regulations is to

22   validate that prescription directly with the doctor, as well

23   as to insure that that patient is a legitimate patient, and

24   to verify the identity and validity of that patient, as

14:48:34  25   well.

Catizone - Direct (By Mr. Feran)

1  **Q.**    Now, these rules, sir, are placed on brick and mortar

2  and Internet pharmacies?

3  **A.**    Yes, sir.

4  **Q.**    Are you familiar with the term, Mr. Catizone,

14:48:43  5  corresponding responsibility?

6  **A.**    Yes, sir.

7  **Q.**    Can you tell us what that is?

8  **A.**    That's the responsibility where I just mentioned that

9  the pharmacist has the same responsibilities as the doctor

14:48:52  10  in determining that the prescription is valid and the

11  patient is valid, and that the medication is appropriate for

12  that patient.

13  **Q.**    We're talking about VIPPS.  How does that VIPPS

14  pharmacist insure that a patient-physician relationship

14:49:03  15  exists with every prescription?  Can you explain that, sir?

16  **A.**    Sure.  For a VIPPS Internet pharmacy the prescriptions

17  have to be sent to the pharmacy directly from the doctor's

18  office or phoned in by the doctor.  Patients are not allowed

19  to send their prescriptions to the Internet pharmacy.

14:49:19  20  They're not allowed to complete and select medications off

21  of a form or questionnaire.  That would violate the

22  criteria, as well as state and federal laws.  And if there's

23  any question about the validity of that doctor-patient

24  relationship the VIPPS pharmacy has to call and document

14:49:37  25  that verification.

Catizone - Direct (By Mr. Feran)

1   **Q.**    Why is this, sir?

2   **A.**    One, prescription drugs are generally dangerous, and

3   that's why they're controlled.  It requires a doctor's

4   prescription and a pharmacist to dispense it.  And

14:49:49 5   controlled substances are even more dangerous than that, and

6   therefore there's the additional stringent requirements to

7   help people from being harmed by these products.

8   **Q.**    Now, we're talking about VIPPS.  How many VIPPS are

9   there, sir, in the United States?

14:50:01 10   **A.**    There are 32 VIPPS pharmacies, and they range from

11   multistate pharmacies like CVS.com or Walgreens.com that

12   have 5,000 and 6,000 pharmacies, to individual pharmacies

13   that simply have one site, one pharmacist.

14   **Q.**    Now, let's stay with CVS for example.  Is that a VIPPS

14:50:20 15   pharmacy, sir?

16   **A.**    Yes, sir.

17   **Q.**    Now, there are how many CVSs throughout the United

18   States?

19   **A.**    Approximately 6,000.

14:50:25 20   **Q.**    Now, do they count as one in the VIPPS category of

21   pharmacies?

22   **A.**    Yes, sir.

23   **Q.**    So when you say 32, a large chain would count as one

24   VIPPS pharmacy for purposes of discussion?

14:50:34 25   **A.**    Correct.

Catizone - Direct (By Mr. Feran)

1    **Q.**    And is there a financial requirement or a financial

2    component to VIPPS?

3    **A.**    Yes.  We charge a fee for the pharmacies based upon

4    the size of their operation, so one pharmacy would pay us a

5    fee of about $3,000 for a three-year period, the larger

6    pharmacies may pay anywhere between 8 to $10,000, and that's

7    for multistate operations.  And it's actually a revenue loss

8    for us, for each accreditation we lose money on that

9    process, so it's something that we subsidize and provide for

10    the state boards and patients so there's a way of

11    identifying safe and legitimate pharmacies.

12    **Q.**    And becoming a member of VIPPS, Mr. Catizone, what

13    does your organization offer to the pharmacies?

14    **A.**    It's the accreditations process.  They have to meet

15    the standards and laws and demonstrate that, and what they

16    receive is simply recognition that they've met those

17    standards, and they are a legitimate and safe pharmacy.

18    **Q.**    Mr. Catizone, do you have to be a member of VIPPS to

19    distribute controlled substances over the Internet?

20    **A.**    No.  There are a number of pharmacies that perhaps may

21    advertise on the Internet or may use the Internet for their

22    patients.  If they're not using, getting prescriptions from

23    other states or other patients, there's no requirement.  The

24    only requirement is that both Google and Microsoft will not

25    allow a pharmacy to advertise on Google or Microsoft unless

Catizone - Direct (By Mr. Feran)

1    they're accredited by us because of the problems they

2    encountered with rogue pharmacies and because of the value

3    they've seen in our accreditation program.

4    **Q.**    Sir, you mentioned earlier that 97 percent of online

14:52:23 5    pharmacies were illegal.  Is that correct?

6    **A.**    Yes, sir.

7    **Q.**    Are you familiar with a rogue pharmacy?

8    **A.**    Yes, sir.

9    **Q.**    What do you know that to be, sir?

14:52:29 10    **A.**    That's a term that's been coined and applied to those

11    Internet pharmacies that are operating illegally or not

12    operating legitimately.

13    **Q.**    And for example, sir, how did this occur?

14    **A.**    The primary reason that we have found for these

14:52:45 15    pharmacies to be classified as rogue or illegal is that

16    they're offering medications without a valid prescription or

17    they're located outside of the United States, or they're

18    dispensing drugs that have not been approved by the Food and

19    Drug Administration.

14:53:00 20    **Q.**    You mentioned, Mr. Catizone, valid prescription.  Can

21    you define a valid prescription for us?

22    **A.**    I did, it was the components we talked about earlier

23    about the patient has a medical condition, that there's a

24    medication history, a physical examination face to face, and

14:53:18 25    a connection between the medical condition and the

Catizone - Direct (By Mr. Feran)

1      prescription.

2      **Q.**    What are some of the things, Mr. Catizone, that would

3      make a prescription suspicious?

4      **A.**    Based upon, again, the research that we've done, some

5      of the things that would be red flags for pharmacists would

6      be whether or not that prescription and patient and

7      pharmacist were located in the same area.  So that if a

8      pharmacist saw a prescription for a doctor for patients that

9      were located in different states and there did not appear to

10     be a relationship between that doctor and patient, that

11     would be a red flag.

12          Prescriptions that are written for different patients

13     for the same drug, the same quantity, the same strength,

14     would be a red flag because no two people are alike, and the

15     dosages would vary with individuals with almost any

16     medication.

17          Sending prescriptions for multiple patients to the

18     same address, again, without verifying why that existed, as

19     well as having medications written by a doctor for multiple

20     patients with so many on one day or multiple days that there

21     doesn't appear to be an opportunity for that doctor to

22     establish a relationship with that patient.

23          Those are some of the signs.

24     **Q.**    These are the signs of prescriptions, sir, which are

25     suspicious?

31

Catizone - Direct (By Mr. Feran)

1    **A.**    Yes, sir.

2    **Q.**    Sir, who has to do the medical history and the

3    examination and prescribe the medication?  Who does that?

4    **A.**    That would be conducted by the physician or the

14:55:03  5    physician assistant, or the physician's agent that's

6    directly supervised by that physician.

7    **Q.**    We talked earlier, sir, about the types of drugs the

8    pharmacies distribute.  Let's talk about the different types

9    of pharmacies.  Can you define for us what the term mail

14:55:25 10    order means?

11    **A.**    Sure.  Mail order is a pharmacy that's located in one

12    state but then may ship prescriptions to another state.

13    What separates a mail order pharmacy from an Internet

14    pharmacy, again, based upon our accreditation program and

14:55:42 15    our experiences, is that the mail order pharmacies have a

16    defined patient population.  You have to be a member of a

17    health care plan that that pharmacy will serve, or perhaps

18    where you work had signed on with that pharmacy, so people

19    have to go to that mail order to get their prescriptions

14:56:00 20    filled.  So the mail order knows their patients and only

21    patients that are members of those plans or that have been

22    approved by that mail order can actually use that service.

23    **Q.**    Can you give us an example, Mr. Catizone, of a mail

24    order situation?

14:56:14 25    **A.**    Sure.  Express Scripts or Medco are two of the largest

Catizone - Direct (By Mr. Feran)

1    mail orders.  You cannot simply go to their websites and try

2    and register and become a patient of those sites.  Your

3    health care plan or your employer must qualify you, and then

4    you will have access because they'll issue you an ID number

14:56:35  5    and other qualifying information for you to be able to use

6    those pharmacies.

7    **Q.**    Based on your training and experience, what type of

8    drugs do mail order pharmacies typically distribute?

9    **A.**    They'll primarily distribute noncontrolled substance

14:56:48  10    medications, because for a controlled substance if there's

11    an immediate need for that patient, if the patient is in

12    pain or suffering from some other condition that requires a

13    controlled substance, they'll generally refer them to a

14    local pharmacy that they have a relationship with or that's

14:57:03  15    close to the patient or convenient for the patient to

16    utilize.

17    **Q.**    Let's talk about specialty pharmacies, if we could.

18    Strike that.  I want to go back to mail order, sir.  The

19    doctor-patient relationship, based on your experience, how

14:57:20  20    is it established?

21    **A.**    The same requirement as brick and mortar.  So the mail

22    order pharmacy has to document the doctors that are

23    prescribing and they have to establish that there's that

24    valid relationship.  And if the mail order pharmacy has any

14:57:34  25    questions they have to call that doctor and verify that

Catizone - Direct (By Mr. Feran)

1    prescription, and document all those interactions.

2    **Q.**    Let's talk, Mr. Catizone, about specialty pharmacies.

3    Are you familiar with that term, sir?

4    **A.**    Yes.

14:57:47 5    **Q.**    What is a specialty pharmacy?

6    **A.**    A specialty pharmacy has been Ted dedicated because

7    they dispense special drugs, drugs that require special

8    preparation or drugs that require special administration or

9    require special monitoring of the patient.

14:58:06 10    So for example, a specialty pharmacy would distribute

11    hemophilia products, medication for patients whose blood

12    don't clot.  Because those medications may cost $16,000 a

13    month for one patient, they have to be prepared and they

14    have a very short expiration period for that period to

14:58:24 15    utilize that medication.  And because with a hemophiliac the

16    condition changes and the medication has to be constantly

17    adjusted, that specialty pharmacy has to have expertise in

18    that area and be able to prepare and dispense those drugs to

19    make sure the patient gets the right medication.  It's not

14:58:43 20    something they just walk into a typical pharmacy, give them

21    a prescription, and expect them to have that medication.

22    **Q.**    What's hemophilia, for the record, sir?

23    **A.**    It's a disorder where people's blood won't clot, and

24    it causes them to bleed.

14:58:57 25    **Q.**    Sir, do pain medications, hydrocodone, fall into the

Catizone - Direct (By Mr. Feran)

1    specialty pharmacy category?

2    **A.**    No, sir.

3    **Q.**    Can you explain that, sir?

4    **A.**    Pain medications are one of the areas again that

14:59:11  5    pharmacists are trained in and are trained to dispense.

6    There are no pain medications that require special

7    preparation.  The regulations, the training about how to

8    dispense and monitor controlled substances, are very clear.

9    They're supposed to be used for a short time period for

14:59:29  10    pain.  If a person has chronic pain then they should be

11    involved in a special pain management program with a

12    certified pain management physician, and there has to be

13    very special monitoring of that patient.

14    **Q.**    Sir, are you familiar with the term closed door,

14:59:47  15    closed shop?

16    **A.**    Yes.

17    **Q.**    Can you tell us what that is?

18    **A.**    Closed pharmacy is simply a pharmacy that doesn't

19    accept walk-ins or people that would come into that pharmacy

14:59:57  20    to dispense prescriptions, and they may be providing

21    prescriptions or medicines to a nursing home or an assisted

22    living facility.  They would prepare the medications, put

23    them in what people call blister packs or other reminders,

24    and then send those over to the pharmacy for the pharmacist

15:00:13  25    to dispense to other patients or residents that may be in

Catizone - Direct (By Mr. Feran)

1    that assisted living care facility.

2    **Q.**    And an example of a closed-door pharmacy distribution

3    would be to?

4    **A.**    Again, a nursing home, so it would be the whole gamut

15:00:27  5    of medications that patients in a nursing home would

6    require.

7    **Q.**    Mr. Catizone, as a pharmacist, are you familiar with

8    the federal and state law and regulations and standards of

9    practice?

15:00:36  10    **A.**    Yes, sir.

11    **Q.**    Can you tell us about that, sir?  Can you explain

12    those?

13    **A.**    I mentioned earlier the two federal laws that govern

14    the manufacture of drugs, whether drugs are safe and

15:00:49  15    effective, and then the Controlled Substance Act, which

16    talks about the distribution and special requirements of

17    controlled substances.  And then the state acts regulate

18    pharmacists and pharmacies as to what they must do for

19    patients.

15:01:00  20    **Q.**    If we could stop there.  So the federal laws that

21    we're talking about, Mr. Catizone, just so we're clear here,

22    are what, sir?

23    **A.**    The Food, Drug, and Cosmetic Act and the Controlled

24    Substances Act.

15:01:11  25    **Q.**    And those two acts are federal, and then you mentioned

Catizone - Direct (By Mr. Feran)

1  state laws, sir?

2  **A.**    Every state has an individual state practice act, as

3  well as regulations in relation to the laws.

4  **Q.**    And we have federal law, we have state law.  Is there

15:01:29  5  an interplay between these laws, sir?

6  **A.**    Yes.  If we take the term valid prescription, what it

7  says at the federal law is that in order for a prescription

8  to be dispensed there must be a valid prescription.  So

9  federal law sets the requirement that there must be a valid

15:01:46 10  prescription, but then it defers to state law, because the

11  states regulate the practices of pharmacy medicine in their

12  state to actually define what is a valid prescription.  And

13  the states have defined what is a valid prescription, the

14  things I mentioned earlier, through laws and regulations, as

15:02:06 15  well as to standards of practice that have resulted from

16  court decisions or other documents or other processes that

17  have said this is a standard of care that applied to a valid

18  prescription, and helps define what a valid prescription is.

19  **Q.**    And prior to testifying here today, Mr. Catizone, have

15:02:26 20  you reviewed Florida state law applicable to this case?

21  **A.**    Yes, sir.

22  **Q.**    And can you tell us, sir, about that?

23  **A.**    I have reviewed some regulations that pertain to the

24  dispensing of controlled substances, pain management,

15:02:49 25  defining what controlled substances are, defining what a

Catizone - Direct (By Mr. Feran)

1    prescription is, and what a valid prescription is.

2    **Q.**    And what time frame, sir, are we talking about here?

3    **A.**    The Florida regulations again were enacted sometime

4    between 2001 and 2002.

15:03:22    5                MR. FERAN:  Your Honor, permission to

6    approach?

7                THE COURT:  You may.

8    **Q.**    Sir, I'm handing you for identification purposes as

9    Government's Exhibit 999-D.  Do you recognize that,

15:03:35  10  Mr. Catizone?

11   **A.**    Yes, sir.  It's one of the documents I reviewed.

12   **Q.**    And can you explain, sir, what that document is?

13   **A.**    The title of it is Standards of Practice for the

14   Dispensing of Controlled Substances for Treatment of Pain.

15:03:46  15  **Q.**    And is that a standard or federal law, sir?

16   **A.**    This is a standard -- this is a requirement of state

17   law.

18   **Q.**    And what state are we talking about?

19   **A.**    The state of Florida.

15:03:55  20  **Q.**    And what law number is that, sir?

21   **A.**    Board Regulation 64 B 16-27 dot 831.

22   **Q.**    And are you familiar with that, sir?

23   **A.**    Yes.

24   **Q.**    Can you tell us, sir, how you are familiar with it?

15:04:09  25  **A.**    I reviewed it for this case.

Catizone - Direct (By Mr. Feran)

1    **Q.**    And Mr. Catizone, you have testified, you stated, in

2    49 of 50 states?

3    **A.**    Yes.

4    **Q.**    Have you testified before the Florida Board of

15:04:23  5    Pharmacy?

6    **A.**    Yes, sir.

7    **Q.**    Sir, what are the requirements in that law for the

8    dispensation -- for the distribution of a controlled

9    substance?

15:04:31  10    **A.**    It sets out things that the pharmacist needs to

11    question about a prescription, and some of those things are

12    whether or not there's a frequent loss of controlled

13    substance medications.  So if a patient keeps saying I lost

14    my prescription or my dog ate my prescription, that the

15:04:47  15    controlled substances medications are only prescribed for a

16    patient and the patient, so that somebody is not trying to

17    use some other identity or steal a patient's identity.

18        When one person presents controlled substances with

19    different patients' names and if the same or similar

15:05:06  20    controlled substance medication is prescribed by two or more

21    prescribers at the same time, you may have a patient that

22    may be seeing multiple doctors or you may have a patient

23    that receives the same medications from different doctors.

24        If the patient always pays with cash and always

15:05:23  25    insists on a brand name product.  And if this occurs, the

Catizone - Direct (By Mr. Feran)

1    regulation is quite clear that what steps the pharmacist has

2    to take, and the pharmacist then has to ask for

3    identification.  They're supposed to photocopy that, and

4    then they're supposed to verify the prescription with the

15:05:43  5    prescriber.

6    **Q.**    Sir, I'm going to show you Government's Exhibit 999-A.

7    Sir, do you recognize that?

8    **A.**    Yes, I do.  It's a document that I've reviewed for

9    this case.

15:06:24  10    **Q.**    Can you tell us about that, sir?

11    **A.**    It's provided by the Federation of State Medical

12    Boards, which is a similar organization that to the

13    organization that I work for.  And what it is, it's a

14    compilation of the disciplinary actions that states have

15:06:39  15    taken against physicians involved in Internet prescribing

16    and the reasons for the actions that those states took, and

17    it's a listing state by state.

18        I'm familiar with this because we work hand in hand

19    with the federation to prepare this document.  We share

15:06:58  20    information on pharmacists with them and pharmacies, they

21    share information with us on physicians, and then we both

22    circulate that information to our respective members.  So

23    this information goes to all the state medical boards, the

24    information we compile goes to all the state pharmacy

15:07:14  25    boards.

Catizone - Direct (By Mr. Feran)

1    **Q.**    And on that document, Mr. Catizone, are there a number

2    of states listed?

3    **A.**    Yes, sir.

4    **Q.**    If you could page through that, is one of the states

15:07:22  5    the state of Florida?

6    **A.**    Yes, sir.

7    **Q.**    And is one of the states Ohio?

8    **A.**    Yes, sir.

9    **Q.**    What is the date of that document, sir?

15:07:42  10    **A.**    Some of these actions date back to 1999 in Ohio and

11    continue to 2006.  This was actually updated in 2008, but

12    the actions go as far back as that.

13    **Q.**    As far back as 1999?

14    **A.**    Yes, sir.

15:07:57  15    **Q.**    Let's talk about Florida for a second.  Can you focus

16    on that?

17    **A.**    Sure.

18    **Q.**    Can you tell us, Mr. Catizone, about Florida?

19                    MR. DARKEN:  Your Honor, can we get a copy of

15:08:06  20    the document?

21    **Q.**    Mr. Catizone, can you tell us about Florida, sir?

22    **A.**    Sure.  There are numerous actions that the board has

23    taken action.  For example, the board issued a statement in

24    December 1998 that a physician prescribing Viagra without

15:08:40  25    being licensed in Florida will be criminally liable.  They

Catizone - Direct (By Mr. Feran)

1    imposed a $10,000 fine on the physician prescribing through

2    the Internet without having face-to-face contact or

3    evaluation.  They suspended the license --

4              MS. KIM:  Your Honor, can we be heard, please?

15:08:56  5    May we approach?

6              THE COURT:  Sure.

7              (Proceedings had at side-bar:)

8              MR. DARKEN:  This is the document.

9              MS. RHA:  This is Megan Rha with Dr. Sasaki.

15:09:24 10   Just a couple of things, Judge.  First of all, I've never

11   seen this before, and second of all, Mr. Catizone seems to

12   be testifying on behalf of the Federation of State Medical

13   Boards --

14             THE COURT:  Hold on a second.

15:09:38 15             (Proceedings had in open court:)

16             THE COURT:  Feel free to stretch, and we're

17   going to take a break in a few minutes, but feel free to

18   stretch right now.

19             A JUROR:  Thank you.

15:09:53 20             (Proceedings had at side-bar:)

21             THE COURT:  Go ahead.

22             MS. RHA:  Yes.  He's here representing NABP,

23   and I understand that, but this line of questioning seems to

24   be it appears that he is testifying on behalf of FSMB, which

15:10:09 25   is the Federation of State Medical Boards.  So on those two

Catizone - Direct (By Mr. Feran)

1    grounds I am objecting to his testimony along this line of

2    questioning, Judge.

3              MR. DARKEN:  This is Kevin Darken for Darji.

4    I have two concerns in addition to what Ms. Rha said.  One

15:10:27  5    is that this document is hearsay.  It's just we don't know

6    who prepared it, we don't know where the data came from, so

7    I object on that grounds.

8         And secondly, this is the two-page expert report we

9    received from the government.  That's all it is.  And

15:10:53 10    there's nothing about this document in those two pages.  So

11    I object under Rule 16, inadequate disclosure.

12              MR. GORENCE:  For the record, Ms. Rovedo joins

13    those objections.

14              MS. LUTZKO:  Your Honor, I would response on a

15:11:17 15    couple points.  First of all, as to hearsay, Mr. Catizone

16    just testified that he and his organization worked with the

17    Federation of State Medical Boards in preparing this

18    document and providing it then to the local pharmacy boards

19    and their various members, and so he has personal

15:11:33 20    familiarity with this document, number one.

21         Number two, the defendants have in this case, as you

22    know, brought up the Federation of State Medical Boards and

23    tried to get in pieces/parts of what that Federation of

24    State Medical Boards has put out regarding the Internet.

15:11:51 25    They've unfairly characterized what their position is in

Catizone - Direct (By Mr. Feran)

1    step after step after step, and so it's only fair to

2    complete the picture here.

3        They also -- this witness, while he's not from this

4    Federation of State Medical Boards, they were

15:12:08  5    cross-examining people with the Federation of State Medical

6    Boards documents that these people had -- people who were

7    also not from that organization, and had not read, and were

8    again pulling out pieces/parts of those documents.

9        Further then, Your Honor, with respect to the law, the

15:12:27 10    government in its report and then further in the notice as

11    directed by the Court did state -- I'm sorry -- did state

12    the specific laws regarding Florida that upon which Dr.

13    Catizone is going to opine, as well as upon the fact that he

14    is going to rely on federal laws and other laws more

15:12:51 15    generally with respect to the other 50 states.

16        This is a case that is about distributions via the

17    Internet all over the country, and this general knowledge of

18    the defendant that the witness has is clearly relevant, and

19    it's not any -- they can cross him on it if need be.

15:13:13 20            MR. MILANO:  Judge, may I be heard on this?

21    This document, Your Honor, we can't cross anybody on.  This

22    document that they're having him go through is hearsay on

23    its face.  He's not a keeper of the record, we don't know

24    where this document came from.  It's some sort of an

15:13:24 25    Internet thing.

44

Catizone - Direct (By Mr. Feran)

1      When Miss Lutzko says we examined people on various

2    documents of various agencies, it was either on the laws of

3    Florida or a generally recognized position paper of this

4    organization which was signed by the organization, and the

15:13:38  5    witness, Dr. Nelson, adopted it as knowing about it.  But

6    this particular document, Judge, is a synopsis of what may

7    have happened in front of a medical board.  No one knows who

8    wrote this synopsis, no one knows what the facts are in this

9    synopsis.  There's no indicia of reliability.

15:13:56  10            THE COURT:  So the only way it would come in,

11    if it comes in this way, so I need to know whether this is

12    what the purpose is, we've been pretty broad across the

13    board in terms of what the relevant, so-called relevant

14    agencies, government agencies' positions were.  I think that

15:14:25  15    the reason that people have been probing that is not to show

16    that necessarily the activity is wrong, but whether they had

17    knowledge that it was wrong or not wrong, so whether it is

18    or not.

19      The issue is, is this something that people would have

15:14:50  20    been knowing about, would likely to have been informed

21    about, would have likely been on their radar screen

22    generally.  That's the way I think you are approaching the

23    issue.  So it is not -- I mean, he can't just read the

24    report if all it was was somewhere in the United States or

15:15:11  25    somewhere in Florida somebody was disciplined for not having

Catizone - Direct (By Mr. Feran)

1   face-to-face.  That would just be equating to legal

2   decisions.  But if the notion is that the people who are

3   regulated somehow would normally have been expected to see

4   these things, they could take that into consideration.  They

15:15:31  5   could obviously decide, no, that's not me, I'm not going to

6   abide by that, or I think they're wrong, but it would relate

7   to whether or not they'd have knowledge.

8       To me, that's my question, frankly, of hearsay, it's a

9   question of whether the interpretation of the law is right

15:15:52  10   or wrong, then would they have been on notice that the board

11   was taking a position -- the board was taking a position

12   that this wasn't correct.  And so that's how I see it.

13                MR. MILANO:  But however, Judge, this is much

14   more, much more truncated than that.  It's not as if they're

15:16:17  15   introducing the medical board opinion which says this and

16   people could have known about and seen the facts and could

17   have accepted or rejected them.  The reason this is

18   unacceptable hearsay, this is just a synopsis made by an

19   unidentified third party of what the medical board said.  No

15:16:34  20   one could have seen this synopsis --

21                THE COURT:  Now, what we need to know is we

22   need to hear the foundation on his knowledge.  I think he's

23   testified to some of it, how it was prepared.  It doesn't

24   matter, it's not the accuracy, it's the question is, is this

15:16:57  25   the kind of document that would get disseminated.  It could

Catizone - Direct (By Mr. Feran)

 1    be wrong, it could be these blurbs.  And why I say it's not

 2    the hearsay, it's not that they were right, but I think, you

 3    know, you can get a curative instruction if you want, but

 4    that's the way I see it.

15:17:20  5              MR. MILANO:  My suggestion is that

 6    this -- first of all, he's not a member of this

 7    organization.

 8              THE COURT:  He doesn't have to be if he's a

 9    person who can testify that that's the kind of document that

15:17:32 10   he's familiar with.  There's no reason, because a person can

11    testify to that who has some position in the profession who

12    is prepared to testify about what people normally receive in

13    the profession.  As lawyers you could testify about what

14    people as early as X date, there were these opinions being

15:17:54 15   disseminated in bar journals, or whatever, so a person who

16    kept up with what was going on would know that.  That's all

17    I'm saying.

18              MR. MILANO:  Understood, Judge.  And if they

19    had the actual medical board action, that would be

15:18:08 20   different.  But what if --

21              THE COURT:  It doesn't matter.

22              MR. MILANO:  But in terms of the synopsis,

23    this says without having a face-to-face relationship.  What

24    if there's another fact in there and he didn't have a

15:18:20 25   face-to-face relationship, and they didn't review medical

Catizone - Direct (By Mr. Feran)

1    records.

2              THE COURT:  The only question is, this is

3    limited, this is information for a limited purpose because

4    it's obvious you can cross-examine on something like this.

15:18:31  5    The question is whether factually all that is right because

6    that's not where we're going.  The question is, can he show

7    that this is something which would have been -- you know,

8    you could point out, well, nobody would rely on that because

9    there's not enough facts there, but that's the way I see it.

15:18:50 10         Lay the foundation, and if you lay a proper

11    foundation -- if not, then we have to move on.  Let's take a

12    break.

13              MR. DARKEN:  Your Honor, for the record, I

14    object, number one.  Number two, the government represented

15:19:03 15    to the Court earlier it was going to introduce the full

16    federal -- I mean Federation of State Medical Boards

17    document.  Is that coming in?

18              MS. LUTZKO:  I'm not sure.  I'm not sure

19    what -- I didn't make any representations in Court.

15:19:15 20              MR. DARKEN:  Mr. Feran did.

21              MS. LUTZKO:  To the Court?  We may have

22    discussed it with you, but we did not represent to the

23    Court.

24              MR. DARKEN:  No, when we were up here.  Mr.

15:19:23 25    Feran said he was going to admit --

Catizone - Direct (By Mr. Feran)

1          MR. FERAN:  Are you talking about the one

2     you've been talking about the last two days with Dr. Nelson?

3          MR. DARKEN:  Yes.

4          MR. FERAN:  I'm going to have the witness read

15:19:31  5     the entire section that having been parsed out --

6          MR. DARKEN:  That's fine.

7          THE COURT:  Okay.

8          MR. DARKEN:  Are we taking a break?

9          THE COURT:  Now.

15:19:56 10          (Proceedings had in open court:)

11          THE COURT:  I could have given you a longer

12     break if I had anticipated it, so you get 15 minutes now.

13     You could have had maybe 25 if I had thought about it,

14     right?  Okay?

15:20:10 15          A JUROR:  Okay.  15.

16          THE CLERK:  All rise.

17          (Recess had.)

18          (Proceedings in the presence of the Jury:)

19          THE COURT:  Okay.  Just before I see counsel

15:42:42 20     again, because I understand there's a request, let me just

21     give everybody the schedule.

22          The lawyers know the schedule already, I think they

23     may have forgotten based upon one thing Mr. Feran said the

24     other day, I think.  So this week and next week we're

15:43:03 25     following the same format.  Those are both short weeks, and

Catizone - Direct (By Mr. Feran)

1       then after that we're back on a full schedule.

2           So tomorrow, I already told you this much, we are

3       meeting for one half day.  We're going to 12:30.  All right?

4       So you should be here ready at 8:30.

15:43:30  5           Is that a problem?

6                   ALL:  No.

7                   THE COURT:  I thought I saw a face there that

8       showed a problem.  Okay.  So Friday we're not going to hold

9       court.  You knew that.

15:43:41 10           Okay.  Just as we missed this Monday, we'll miss next

11      Monday.  We'll start on Tuesday.  We'll go Wednesday, and

12      we'll go a half a day on Thursday.  And then after that the

13      following week will be a full five days.

14           Now, let me tell you that I do give this case a

15:44:02 15      priority.  When we get to a point in trying a case, that's

16      what I do.  I've cleared off everything that I possibly

17      could.  You know that I have a lot of other cases, but I

18      also in my position as Judge on the Court, as Chief Judge I

19      have a number of responsibilities both in and out of the

15:44:21 20      district, and there are just some things that I had to do

21      that were previously scheduled and important enough that I

22      had to try to accommodate them.  But I thought also this

23      gives in a long trial everybody some chance to catch their

24      breath, and if there are things you need to do you can get

15:44:44 25      them done.

Catizone - Direct (By Mr. Feran)

1          So that's the schedule, and after next week, which

2     will be exactly the same as this week, we'll have the full

3     five days schedule.  All right?  It's the same as this week.

4     So you will have Tuesday, Wednesday, half a day Thursday,

15:45:08  5     not Friday.  Okay.  That's what I mean.

6          Okay.  Counsel, I don't know -- Mr. Darken?

7               (Proceedings at side-bar:)

8               THE COURT:  You asked to come again.

9               MR. DARKEN:  Your Honor, maybe you can take my

15:45:34 10    highlighted copy and I could take your clean copy.

11         May I begin, Your Honor?

12              THE COURT:  If you want me to read this, let

13    me look.

14              MR. DARKEN:  I've only highlighted the Florida

15:46:00 15    section, and I started to highlight the other sections, but

16    that middle column is rife with criminal indictments,

17    criminal guilty pleas, other types of announcements of

18    indictments, and I asked Mr. Feran and Ms. Lutzko are they

19    planning to introduce this document, and they indicated they

15:46:25 20    were.  And so that's what they're planning to get the jury

21    to see.  And I cannot have a fair trial for my client, as is

22    his constitutional right, if that document goes to the jury.

23    There is just no way.  And the case is going to be reversed

24    if there's a conviction, and we're going to be back here

15:46:46 25    retrying this case.

Catizone - Direct (By Mr. Feran)

1              THE COURT:  Are you going to promise reversal

2      on me before I even make a ruling?

3              MR. DARKEN:  I'm feeling good.

4              THE COURT:  Of course, I'm intimidated by

15:46:56  5      that.

6              MR. DARKEN:  I'm feeling good, Your Honor.

7          That is just so prejudicial, it is just showing all

8      these people were indicted, pled guilty, convicted at trial.

9              THE COURT:  Okay.

15:47:15 10              MR. DARKEN:  That whole column should be

11      redacted.  If any of this is going to go to the jury none of

12      the criminal stuff should go back to the jury, for sure.

13      And there's no need, there's no purpose.  It is just totally

14      prejudicial.

15:47:29 15              THE COURT:  Okay.  Well, just let me -- does

16      the government feel a need to put in all the criminal

17      indictments, and so forth, as opposed to these other medical

18      board actions?

19              MS. LUTZKO:  Your Honor, I would say that the

15:47:59 20      argument is the same as far as whether or not this was

21      disseminated to the public and to the state boards.

22      However, I think we would be agreeable, even though it's

23      certainly relevant conduct -- I'm sorry -- it's relevant

24      information that was made available to the public about the

15:48:17 25      problems in these types of distributions, we would be

Catizone - Direct (By Mr. Feran)

1    agreeable to removing that column.

2              THE COURT:  I don't think it's irrelevant.  I

3    would agree with you, I think it is more a 403 issue.  I

4    think some of it might be relevant, depending.  You have to

15:48:38  5    go through them and see whether whatever is in the

6    conviction or the indictment would be detailed enough that

7    one could get any notice as about their own conduct.  That

8    would be a concern, as well, I mean, to just put them all

9    in.  So if you would redact that, that would solve our

15:49:03 10   problem, potential problem, because as Mr. Darji says, he

11   would go straight to the circuit.

12             MS. LUTZKO:  Well, we would disagree with him

13   on that point.  We would nonetheless agree to redact it.

14             THE COURT:  Right.  If you have a legal

15:49:18 15   position that would make sense stick with it, but there's no

16   reason to unnecessarily have problems.

17             MS. LUTZKO:  And we will agree to do that.

18             THE COURT:  All right.

19             MR. MILANO:  Judge, just so the record is

15:49:32 20   clear, on behalf of Mr. Sasaki, we object to the whole

21   document.

22             MR. DARKEN:  So do I, Your Honor.

23             THE COURT:  I understand.  You had done that,

24   and I thought we were ready to go.

15:49:40 25             MR. MILANO:  We are, Judge.  And I don't want

Catizone - Direct (By Mr. Feran)

1    to argue it again, I just thought this might look like a

2    compromise.

3                    THE COURT:  I understand.

4                    MR. DARKEN:  I just read it over the break,

15:49:48  5    and that's why I came back.  I hadn't read that middle

6    section before we broke.

7                    THE COURT:  I'm glad you had an opportunity, I

8    am sincerely glad you had an opportunity to do so.

9                    (Proceedings had in open court:)

15:50:16 10                    THE COURT:  All right.  Mr. Feran, you may

11   proceed.

12            Sir, you're still under oath.  Do you understand?

13                    THE WITNESS:  Yes, sir.

14                    MR. FERAN:  Thank you, Your Honor.

15:50:21 15   **Q.**    Sir, before the break we were talking about

16   Government's Exhibit 999-A.  Is that correct Mr. Catizone?

17   **A.**    Yes, sir.

18   **Q.**    And this is -- and you recognize this exhibit,

19   Mr. Catizone?

15:50:31 20   **A.**    Yes, I do.

21   **Q.**    How are you able to do that, sir?

22   **A.**    This is a document that we work collaboratively with

23   the federation on.

24   **Q.**    With the federation?  Who is the federation, sir?

15:50:43 25   **A.**    The Federal of State Medical Boards, the organization

Catizone - Direct (By Mr. Feran)

1    that prepares this document.

2    **Q.**    And when you say we, who are you referring to, who is

3    we?

4    **A.**    NABP, the organization I work for.

15:50:53 5    **Q.**    You stated you worked collaboratively with the two

6    organizations?

7    **A.**    Yes.

8    **Q.**    Can you explain that, sir?

9    **A.**    Sure.  Information is shared between the pharmacy

15:51:03 10    boards as well as the medical boards.  That information is

11    compiled by the federation, distributed to the medical

12    boards, and we also then distribute information to the

13    pharmacy boards.

14         You'll note in the report there's a particular

15:51:16 15    notation that once a board received the letter from NABP

16    identifying the website www.myviagarascript.com that the

17    Board of Pharmacy investigated the site and sent a cease and

18    desist warning letter to Ancona Drug Solutions in Florida,

19    so there's that interaction/collaboration throughout this

15:51:37 20    document and with all the disciplinary actions.

21    **Q.**    And you have drafted documents like this in the past,

22    sir?

23    **A.**    Yes.

24    **Q.**    And the date of this document is what, Mr. Catizone?

15:51:46 25    **A.**    2008.

Catizone - Direct (By Mr. Feran)

1    **Q.**   And had you drafted documents similar to this prior to

2    2008?

3    **A.**   Yeah, our clearinghouse has been in existence since

4    1940.

15:51:56  5    **Q.**   And I don't want to go through this in great detail,

6    sir, but what's the general purpose of this document?

7    **A.**   To inform other medical boards of actions that are

8    occurring in other states.

9    **Q.**   Is this document disseminated, sir?

15:52:10 10    **A.**   Yes.

11    **Q.**   And to who, and how?

12    **A.**   It's disseminated to all the medical boards.

13    **Q.**   And how is it disseminated?

14    **A.**   I'm not really sure.  I think they provide it on their

15:52:21 15   website and they mail it to the medical boards.  It's not a

16   document we distribute.

17    **Q.**   Sir, I want to focus your attention to Government's

18   Exhibit 999-C.

19          MR. FERAN:  Permission to approach, Your

15:52:34 20   Honor?

21          THE COURT:  You may.

22          MR. FERAN:  Thank you.

23    **Q.**   Do you recognize that, sir?

24    **A.**   Yes.

15:53:01 25    **Q.**   Mr. Catizone, can you tell us what 999-C is?

Catizone - Direct (By Mr. Feran)

1    **A.**    It's a document outlining various actions that states

2    have taken against Internet pharmacies.

3    **Q.**    This document is labeled Internet Prescribing for

4    Physicians.  Is that correct, sir?

15:53:43 5   **A.**    Yes, it is.

6    **Q.**    And on the second page of this document it states,

7    Prescriptions approved based on responses to an online

8    questionnaire.  Is that correct, Mr. Catizone?

9    **A.**    Yes, sir.

15:53:55 10   **Q.**    And you have seen this document before, Mr. Catizone?

11    **A.**    Yes, I have.

12    **Q.**    And what is the purpose of this document, sir?

13    **A.**    It's an information source for pharmacy boards and

14    medical boards about activities occurring in regard to

15:54:09 15   internet pharmacies.

16    **Q.**    And it talks about regulatory requirements,

17    enforcement actions, and enforcement.  Is that correct, sir?

18    **A.**    Yes, sir.

19    **Q.**    And what is, in summation, the prescription approval

15:54:23 20   based on online questionnaires, what is the summary of that,

21    sir?

22    **A.**    The two conclusions are, one, that there must be a

23    face-to-face physical examination to establish a

24    relationship; and two, prescriptions based solely on

15:54:38 25   questionnaires are not valid prescriptions.

Catizone - Direct (By Mr. Feran)

1  **Q.**    There's authority cited.  Is that correct, sir?

2  **A.**    Yes.

3  **Q.**    Can you tell us about that?

4  **A.**    There's authority noting individual states, as well as

15:54:47  5  the FDA and the Department of Justice, all the federal

6  agencies that I mentioned that are involved with the laws

7  and regulations.

8  **Q.**    So there's the state medical board and the FDA is both

9  cited?

15:54:58  10  **A.**    Yes.

11  **Q.**    And it talks about a bona fide physician-patient

12  relationship?

13  **A.**    Yes, sir.

14  **Q.**    Mr. Catizone, I want to focus your attention to

15:55:10  15  Government 999.  Sir, what is the date on the last exhibit,

16  if you would tell me, please?

17  **A.**    2004, April 6.

18  **Q.**    999, Mr. Catizone, for the record, I'm handing you

19  999.  Are you familiar with that, sir?

15:55:32  20  **A.**    Yes, I am.

21  **Q.**    And can you tell us, Mr. Catizone, how you are

22  familiar with that?

23  **A.**    The document is again produced by the Federation of

24  State Medical Boards, it's entitled the Model Guidelines For

15:55:46  25  the Appropriate Use of the Internet in Medical Practice.

Catizone - Direct (By Mr. Feran)

1    It's a document that was prepared by the federation in 2002,

2    and a document that we worked with the federation on and

3    submitted comments to them.

4    **Q.**    And what is the purpose of this document,

5    Mr. Catizone?

6    **A.**    It was to provide guidance to physicians and to

7    medical boards about the practice of Internet pharmacy and

8    telemedicine, and how physicians should practice that

9    particular niche.

10   **Q.**    Sir, did you participate in the drafting of this

11   document?

12   **A.**    Participated in commenting on this document.

13   **Q.**    And in relation to commenting on this document, sir,

14   can you tell us about how you commented on this document?

15   What does that mean?

16   **A.**    Sure.  The federation sent to us a draft, and I

17   personally reviewed the draft and prepared comments back

18   based upon the regulations and requirements and pharmacy

19   boards, and sent that information back to the federation, as

20   well as giving our opinion on behalf of the association as

21   to what we felt would be suitable standards of practice

22   based upon pharmacy standards, laws, and regulations.

23   **Q.**    And Mr. Catizone, are you scheduled to testify

24   relating to this document?

25   **A.**    I'm sorry, I didn't hear the question.

Catizone - Direct (By Mr. Feran)

1    **Q.**    Are you scheduled to give commentary on this document,

2    sir?

3    **A.**    No.

4    **Q.**    Sir, on the third page, Model Guidelines for the

15:57:04  5    Appropriate Use of the Internet in Medical Practice, do you

6    see that?

7    **A.**    Yes, sir.

8    **Q.**    The page that's numbered page 2, do you see that, sir?

9    **A.**    Yes.

15:57:09  10    **Q.**    All right.  It's the second paragraph.  It states,

11    "The board recognizes."  Do you see that, sir?

12    **A.**    Yes, I do.

13    **Q.**    Can you read that, Mr. Catizone?

14    **A.**    "Recognizes that the Internet offers potential

15:57:21  15    benefits in the provision of medical care.  The appropriate

16    application of this technology can enhance medical care by

17    facilitating communication with physicians and other health

18    care providers, refilling prescriptions, obtaining

19    laboratory results, scheduling appointments, monitoring

15:57:38  20    chronic conditions, providing health care information, and

21    clarifying medical advice.  However, it is the expectation

22    of the board that e-mail and other electronic communications

23    and interactions between the physician and patient should

24    supplement and enhance but not replace crucial interpersonal

15:57:58  25    interactions that create the very basis of the

Catizone - Direct (By Mr. Feran)

1    physician-patient relationship."

2    **Q.**    Can you continue, sir?

3    **A.**    "The board has developed these guidelines to educate

4    licensees as to the appropriate use of the Internet medical

5    practice.  The (name of the board) has committed to assuring

6    patient access to the convenience and benefits afforded by

7    the Internet while promoting the responsible practice of

8    medicine by physicians."

9    **Q.**    And it talks in the last paragraph, sir, if you could

10   read that?

11   **A.**    "It is the expectation of the board that physicians

12   who provide medical care electronically or otherwise

13   maintain a high degree of professionalism and should place

14   the welfare of patients first, maintain acceptable standards

15   of practice, adhere to recognized ethical codes governing

16   the medical profession, properly supervise physician

17   extenders, and protect patient confidentiality."

18   **Q.**    There is a cite at the bottom of that, sir.  Do you

19   see that at the bottom of the page?  It's referenced on the

20   bottom of page 2.  Do you recognize that cite?

21   **A.**    Yes.

22   **Q.**    Tell us about that.

23   **A.**    It's referencing the American Medical Association's

24   report of their Council on Medical Services.

25   **Q.**    Let's talk -- if you can flip it over to Section 3,

61

Catizone - Direct (By Mr. Feran)

1    Mr. Catizone.  It says Appropriate Physician-Patient

2    Relationship.  Do you see that, sir?

3    **A.**    Yes, I do.

4    **Q.**    Mr. Catizone, can you please read Section 3?

15:59:08  5    **A.**    "The health and well-being of patients depends upon a

6    collaborative effort between physician and patient.  The

7    relationship between physician and patient is complex and is

8    based on a mutual understanding between physician and

9    patient of the shared responsibility for the patient's

15:59:24  10   health care.  Although the board recognizes that it may be

11   difficult in some circumstances, particularly in an online

12   setting, to define precisely the beginning of the

13   physician-patient relationship, it tends to begin when an

14   individual seeks assistance from a physician with a

15:59:41  15   health-related matter for which the physician may provide

16   assistance.  However, the relationship is clearly

17   established when the physician agrees to undertake diagnosis

18   and treatment of the patient and the patient agrees, whether

19   or not there has been a personal encounter between the

15:59:57  20   physician or other supervised health care practitioner and

21   the patient."

22   **Q.**    The next paragraph, sir, says?

23   **A.**    "The physician-patient relationship is fundamental to

24   the provision of acceptable medical care.  It is the

16:00:09  25   expectation of the board that physicians recognize the

62

Catizone - Direct (By Mr. Feran)

1    obligations, responsibilities, and patient rights associated

2    with establishing and maintaining an appropriate

3    physician-patient relationship whether or not interpersonal

4    contact between physician and patient has occurred."

16:00:23  5    **Q.**    And, sir, this is referenced in footnote number 2.  Is

6    that correct?

7    **A.**    Yes, it is.

8    **Q.**    And what is footnote number 2?

9    **A.**    The American Medical Association Council on Ethical

16:00:33 10    and Judicial Affairs, fundamental elements of a

11    patient-physician relationship.

12    **Q.**    And this was cited, Mr. Catizone?

13    **A.**    Yes.

14    **Q.**    Let's go, sir, if we could, to Section 5.  What is

16:00:49 15    that called?

16    **A.**    Guidelines for the Appropriate Use of the Internet

17    Medical Practice.

18    **Q.**    And can you read the first two paragraphs, the

19    preamble and the first two paragraphs, sir?

16:01:02 20    **A.**    "The board has adopted the following guidelines for

21    physicians utilizing Internet and delivery of patient care.

22    A documented patient evaluation, including history and

23    physical evaluation, adequate to establish diagnosis and

24    identify underlying conditions, and/or contraindications to

16:01:21 25    the treatment recommended provided, must be obtained prior

Catizone - Direct (By Mr. Feran)

1      to providing treatment, including issuing prescriptions

2      electronically or otherwise.

3          "Treatment:  Treatment and consultation

4      recommendations made in an online setting, including issuing

16:01:38  5      a prescription via electronic means, will be held to the

6      same standards of appropriate practice as those in

7      traditional face-to-face settings.  Treatment, including

8      issuing a prescription, based solely on an online

9      questionnaire or consultation does not constitute an

16:01:57 10      acceptable standard of care."

11      **Q.**    Sir, let's talk about pharmacies located in one state

12      and dispensing in another state, if we could.  And if a

13      pharmacy, for example, is located in Florida and wanted to

14      dispense controlled substances in Ohio, can you tell us the

16:02:31 15      steps that would be required of that Florida pharmacy?

16      **A.**    Sure.  The pharmacy would have to meet all the

17      requirements of a license in the state where it's located,

18      as well as apply for licensure or registration in any of the

19      states in which they were going to be dispensing medication,

16:02:48 20      and comply with the laws and regulations of that state, as

21      well.

22      **Q.**    So for example, Mr. Catizone, a Florida pharmacy

23      dispensing in Ohio, where would that Florida pharmacy have

24      to be licensed?

16:03:00 25      **A.**    In both states, Florida and Ohio.

Catizone - Direct (By Mr. Feran)

1    **Q.**    How would an out-of-state pharmacist go about

2    obtaining an Ohio registration?

3    **A.**    They'd have to complete the application process

4    similar to a traditional Board of Pharmacy.

16:03:17  5    **Q.**    Can you explain, sir, in the simplest terms?

6    **A.**    They obtain an application from the Board of Pharmacy,

7    complete that application, and then the Board of Pharmacy

8    would either personally inspect that pharmacy or ask the

9    Board of Pharmacy where it was located to inspect that

16:03:33 10    pharmacy, or utilize a recent inspection form from the Board

11    of Pharmacy where it was located, in order to determine

12    whether it should be licensed or not.

13    **Q.**    In relation to this case, Mr. Catizone, did Vinesh

14    Darji have a license to distribute controlled substances in

16:03:48 15    the state of Ohio?

16    **A.**    He didn't have a license as a pharmacy at all with

17    Ohio.

18    **Q.**    Sir, you stated that you have reviewed various

19    documents in the case file regarding the issue we're here on

16:04:09 20    today.  Do you have an opinion relating to Vinesh Darji

21    filling prescriptions, and did he act outside the usual

22    course of professional practice?

23    **A.**    Based upon all the information I reviewed, which were

24    the existing standards of practice, the requirements that a

16:04:28 25    pharmacist has to follow, the prescription information, the

Catizone - Direct (By Mr. Feran)

1  undercover purchases, it's my opinion that the pharmacy did

2  not comply and the pharmacy operated outside standards of

3  practice, and did not meet the standards of care that

4  pharmacies and pharmacists are required to meet.

16:04:47 5  **Q.**    And Mr. Catizone, let's go through this, and I want

6  you to explain to the jury what you base your opinion on.

7  Can you tell us, sir, some of the criteria that you have

8  used to reach that opinion?

9  **A.**    The first was whether or not a valid prescription was

16:05:07 10  for the pharmacy to dispense that medication.

11       Looking at how those prescriptions were generated, the

12  doctors involved did not conduct the face-to-face physical

13  examination.  There was not a bona fide relationship.

14  Review of the purchase orders indicated that many times it

16:05:26 15  was not even the doctor that talked to the patient, but a

16  customer service representative.  And then there was no

17  follow up by a doctor directly with the patient, and that

18  the doctor was located in Puerto Rico or other states, and

19  then providing prescriptions for patients across the United

16:05:47 20  States where no relationship existed.

21  **Q.**    Stop right there, Mr. Catizone.  You stated a

22  legitimate doctor-patient relationship did not exist?

23  **A.**    Correct.

24  **Q.**    Can you explain that, sir?

16:05:56 25  **A.**    That was what we talked about earlier, that there was

Catizone - Direct (By Mr. Feran)

1    a medication history taken by the doctor, that there was a

2    physical examination, and that there was no relationship

3    between the diagnosis and the medication prescribed.  I

4    didn't find any of that in any of the information that I

16:06:11  5    reviewed.

6    **Q.**    You talked, sir, about -- you mentioned Puerto Rico

7    and other states.  Can you be more specific?  Can you

8    explain what you mean by that, sir?

9    **A.**    There was a doctor that was authorizing prescription

16:06:22 10    orders who was based in Puerto Rico for patients across the

11    country, that the pharmacy then would select those orders

12    and dispense those orders without affirming that there was a

13    valid relationship, and without that pharmacy having any

14    relationship with that patient or with that doctor, as well.

16:06:37 15    **Q.**    Where was the pharmacy located, Mr. Catizone?

16    **A.**    The pharmacies were located in Florida.

17    **Q.**    And were there multiple pharmacies, sir?

18    **A.**    Yes, there were.

19    **Q.**    And where were the pharmacies, plural, located?

16:06:49 20    **A.**    They were located in close proximity to each other

21    in -- I can't recall the exact cities or locations.

22    **Q.**    The pharmacy is in the state of Florida, pharmacies --

23    strike that -- and the doctor is in Puerto Rico.  Did

24    this -- can you comment on this?  Was it significant at any

16:07:09 25    point?

Catizone - Direct (By Mr. Feran)

1    **A.**    Yes.  That's one of the red flags that even the

2    Florida regulations mention about the suspicion about the

3    validity of a prescription, and that's a red flag that for

4    us helps determine whether or not it's a rogue or illegal

16:07:24  5    pharmacy.

6    **Q.**    Did the type of controlled substance play into your

7    analysis, sir?

8    **A.**    Yes.  Looking at the products that were dispensed,

9    they were primarily the hydrocodone products, significant

16:07:38  10    quantities of hydrocodone products far exceeding quantities

11    that are normally dispensed by other Internet pharmacies and

12    traditional brick and mortar pharmacies, and also the

13    distribution of those products, the same quantities, same

14    strengths, to different patients and across the country.

16:07:56  15    **Q.**    Is that a red flag, sir?

16    **A.**    Yes.

17    **Q.**    Why?

18    **A.**    Again, a patient that's being treated for pain or for

19    these medications, it's going to be a very limited time

16:08:06  20    period.  Generally you want to have just a few weeks of

21    treatment, because if a patient takes a hydrocodone product

22    every day for three weeks they begin to develop an addiction

23    generally.  And if they continue after that time period, if

24    they try to stop the medication they'll experience

16:08:24  25    withdrawal effects from that medication.

Catizone - Direct (By Mr. Feran)

1        MR. GORENCE:  Your Honor, I'm going to object

2    on foundation.  I haven't seen anything that he's a

3    toxicologist, and he may have the basis for that, but I'd

4    ask that a foundation be laid to be able to venture that

16:08:38  5    opinion.  That's not in his report, so I object until

6    there's an appropriate foundation.

7        MR. FERAN:  I'll be happy to lay a foundation.

8    **Q.**   Mr. Catizone, are you familiar with the

9    pharmalogic -- pharm -- I'm having a hard time

16:08:52  10   here -- pharmalogic -- pharmacology of hydrocodone?

11       I'm going to get this right, Judge.

12   **A.**   Yes.

13   **Q.**   First of all, how do you pronounce that word?

14   **A.**   Pharmacology.

16:09:02  15   **Q.**   Thank you.  I'm a lawyer, not a pharmacist.  Thank

16   you, Mr. Catizone.  Can you tell us how you are familiar

17   with that?

18   **A.**   Pharmacists are required to know the pharmacology of

19   drugs, the composition of the drug, what it's used for, the

16:09:15  20   side effects it may have, and the potential dangers that

21   they present to a patient.

22   **Q.**   Are you aware of this, sir?

23   **A.**   Yes.

24   **Q.**   How are you aware?

16:09:23  25   **A.**   Again, it's part of the training that every pharmacist

Catizone - Direct (By Mr. Feran)

1    receives and is required to know.

2    **Q.**    Tell us about the pharmacology of hydrocodone.

3    **A.**    I think I did just a few minutes ago about the fact

4    that it's highly addictive after a few weeks.  If the

16:09:43  5    patient is not taken off the medication they could develop

6    significant addiction and even suffer withdrawal effects if

7    the medication is stopped immediately.

8    **Q.**    You talked, Mr. Catizone, about distribution patterns

9    raising a red flag.

16:09:57 10    **A.**    Yes, the quantity.

11    **Q.**    Can you explain that, sir?

12    **A.**    The quantities of hydrocodone dispensed by the

13    pharmacies that I reviewed far exceeded state averages as

14    well as national levels in the reports that were provided by

16:10:11 15    the government, and these were significant levels.  They

16    weren't just a few prescriptions, they were very

17    significant.  And again, the mix of products that they

18    dispensed was significantly different than what a

19    traditional pharmacy would dispense, and that the vast

16:10:27 20    majority of products were controlled substances.

21    **Q.**    In a traditional pharmacy, sir, you stated what

22    percentage of a product is a controlled substance?

23    **A.**    About 8 to 10 percent.

24    **Q.**    8 to 10 percent.  And Mr. Darji 's three pharmacies,

16:10:40 25    do you remember the percentages that were controlled

Catizone - Direct (By Mr. Feran)

1    substances?

2    **A.**     Percentages were sometimes 70, 80 percent of the

3    prescriptions.

4    **Q.**     Was there a mixture of controls with noncontrols being

5    dispensed, sir?

6    **A.**     Yes, sir.

7    **Q.**     Did this cause any red flag?

8    **A.**     What was interesting in one of the statements that I

9    reviewed and one of the reports, one of the telephone

10   conversations that was recorded, is that there was the use

11   of the noncontrolled substance medications, like ibuprofen

12   and other products, as a way of making sure, trying to

13   insure that if a law enforcement official reviewed the

14   pharmacy records they would see that there was a mixture of

15   controlled and noncontrolled, and it would change those

16   ratios or change those percentages.

17        And it was a statement made that said, let's use the

18   controlled substances and then explain that the

19   noncontrolled substances would be used if there was a

20   breakthrough pain in the patient, which is the complete

21   opposite of therapy that are taught to pharmacists, and that

22   you generally use noncontrolled substances for pain and then

23   use the controlled substances for breakthrough pain so that

24   you avoid the patient becoming addicted or abusing the

25   medications, but at the same time you control the pain.

Catizone - Direct (By Mr. Feran)

1      So the noncontrolled substances were ordered and used

2   to try and disguise the ordering quantities of the

3   controlled substances.

4   **Q.**   Based on your training and experience, Mr. Catizone,

5   is this indicative of anything?

6   **A.**   It's indicative of an operation that is trying to

7   traffic or distribute controlled substances without a

8   legitimate prescription, and not in the best interests of

9   the patients, because there's no valid relationship between

10   the doctor and patient or between the patient and

11   pharmacist.

12   **Q.**   You looked at the raw numbers being distributed by the

13   three Darji pharmacies; is that correct, sir?

14   **A.**   Yes, sir.

15   **Q.**   Do you know the names of these pharmacies by chance?

16   **A.**   I believe it was Medicom, Medicine Shoppe, and

17   Vin-Kash.

18   **Q.**   The numbers by themselves, the raw numbers, are they

19   normal, sir?

20   **A.**   As I mentioned, they're very significant and far

21   exceed quantities of any traditional pharmacy.  It even

22   exceeds state and national numbers.

23   **Q.**   And just so we're clear, we're talking about the

24   distribution of hydrocodone.  Is that correct, sir?

25   **A.**   Yes, sir.

Catizone - Direct (By Mr. Feran)

1    **Q.**    Mr. Catizone, in preparation for your testimony here

2    today are you familiar with the term dispensing fee?

3    **A.**    Yes, I am.

4    **Q.**    Can you tell us, sir, what a dispensing fee is?

16:13:13 5    **A.**    It's a fee that's usually added on to the prescription

6    to compensate the pharmacist for their professional

7    services, what they do in terms of drug utilization review

8    and making sure the prescription is appropriate.

9    **Q.**    And Mr. Catizone, based on your professional

16:13:27 10   experience and your expertise, are you familiar, sir, with

11   typical dispensing fees for controlled and noncontrolled

12   substances?

13   **A.**    Yes, sir.

14   **Q.**    Can you tell us about that, Mr. Catizone?

16:13:37 15   **A.**    Sure.  The usual dispensing fee is not differentiated

16   between a controlled substance or noncontrolled

17   substance --

18   **Q.**    Can you stop right there, sir?  So if you distributed

19   a controlled and a noncontrolled, it's the same fee?

16:13:48 20   **A.**    Yes.

21   **Q.**    Can you tell us about that, sir?  Why is that?

22   **A.**    It's based upon the plan that the pharmacy agrees to,

23   and there's just a set professional fee for the dispensing

24   of those prescription products, and it generally will range

16:14:01 25   anywhere between 50 cents to perhaps two and a half dollars.

Catizone - Direct (By Mr. Feran)

1      The professional fees are not significant for pharmacies.

2      **Q.**    When you say 50 cents to two and a half dollars,

3      Mr. Catizone, for what?  What does that mean?

4      **A.**    Some plans may reimburse the pharmacist 50 cents per

16:14:20  5    prescription whether it's controlled or noncontrolled, other

6      plans may reimburse them $2.50 for every prescription

7      whether it's controlled or noncontrolled.  There's no

8      differentiation within a plan for a controlled substance

9      versus a noncontrolled.

16:14:33  10   **Q.**    Is this putting the pills in the bottle, is this what

11     we're talking about here, sir?

12     **A.**    Well, reviewing the prescription beforehand, making

13     sure it's appropriate, counseling the patient, all those

14     activities for $2.50 or maybe $.50.

16:14:47  15   **Q.**    And how did Mr. Darji's dispensing fees relate to this

16     cost average, sir?

17     **A.**    The dispensing fees again did not fit into any of the

18     plans, any of the dispensing fees that I'm aware of or have

19     seen in reviewing pharmacies.  There was a $20 fee for

16:15:04  20   controlled substances and a $4 fee for noncontrolled

21     substances.  And again, I've not seen that dispensing fee in

22     any insurance plan, any pharmacy plan, that I've ever

23     reviewed.

24     **Q.**    When looking at the records, Mr. Catizone, did you

16:15:23  25   look at various prescriptions?

Catizone - Direct (By Mr. Feran)

1    **A.**    Yes, sir.

2    **Q.**    And I want to talk about various addresses that were

3    noted.  Can you tell us about that, sir?

4    **A.**    Yeah.  I observed with the prescriptions that

16:15:39  5    were -- there were several instances where multiple patients

6    were dispensed prescriptions, and both patients resided at

7    the same address but had different names.  That again would

8    be an immediate red flag for the pharmacist.

9        In one case there were I believe 30 patients utilizing

16:15:58  10    the same address, receiving the same controlled substance,

11    the same quantity, the same strength.  Again, for a

12    pharmacist that would be an immediate red flag to question

13    why all these individuals were residing at the same address

14    and why they were all receiving the same controlled

16:16:17  15    substance, the same pain medication, from the same doctor,

16    with the same quantities and strengths and dosage.

17        Another instance, there were 55 patients prescribed

18    prescriptions at the same address, and in those two cases

19    one of the addresses even was listed as Extreme Video, which

16:16:39  20    appeared to be a business address.  And again, as a

21    pharmacist responsibility warning signs, there should have

22    been some investigation, some action taken on those

23    prescriptions.

24    **Q.**    Sir, you stated there were 30 patients at one address.

16:16:54  25    Is that 30 scripts at one address?

Catizone - Direct (By Mr. Feran)

1    **A.**    Yes.

2    **Q.**    Were certain patients having more than one script

3    delivered to an address?

4    **A.**    Yes.  There were some patients that were receiving 10

16:17:07 5    to 12 to 14 prescriptions on a regular basis for the pain

6    medication, which again is outside of the dosing parameters.

7    As we mentioned, they should have been on for a short term,

8    just a few weeks.  Again, that would have been another

9    warning sign for the pharmacist to investigate further to

16:17:24 10    find out what was going on with this patient and why they

11    needed that therapy for so long.

12             MR. FERAN:  Miss Johnson, if you could pull up

13    433-A as in Apple, please.

14    **Q.**    Do you recognize this, Mr. Catizone?

16:17:36 15    **A.**    Yes.

16    **Q.**    Thank you, Miss Johnson.  And what do you recognize

17    this to be?

18    **A.**    This is one of the patients that received multiple

19    prescriptions.

16:17:47 20    **Q.**    And what address was this received at, sir?

21    **A.**    A few years ago I could read it a lot clearer, but I

22    think it is 8290 Roswell Road, as I remember.

23    **Q.**    I'm sorry, sir?

24    **A.**    8290 Roswell Road.  Thank you.

16:18:04 25    **Q.**    Thank you, sir.  And the patient's name is Laura

Catizone - Direct (By Mr. Feran)

1    Keeley?

2    **A.**   Correct.

3    **Q.**   And the date on this is?  Miss Johnson, if you could

4    scroll down.  Thank you.

16:18:14 5    **A.**   May 2006, May 1.

6              MR. FERAN:   433-B, Miss Johnson.

7    **Q.**   The patient name and address?

8    **A.**   Same patient, Laura Keeley, same address.

9    **Q.**   And the date on this, sir?

16:18:30 10    **A.**   May 30th, 2006.

11    **Q.**   And C?  Would you tell us about this, sir?

12    **A.**   The same patient, same address, same 90 tablets.  And

13    the date -- if you could scroll down, please.

14    **Q.**   Scroll down, Miss Johnson?

16:18:52 15    **A.**   July 2006.

16    **Q.**   E, Ms. Johnson?

17    **A.**   Again, the same patient, same address, same quantity.

18    And this prescription was issued in August.

19    **Q.**   G, Miss Johnson?

16:19:15 20    **A.**   Same as before.  You can see they're being written for

21    the same patient, same address, same quantities, and just

22    about on a one monthly basis, sometimes more.

23    **Q.**   K?  Can you tell us what this is, sir?

24    **A.**   The same; another prescription, the same person, same

16:19:47 25    address.

Catizone - Direct (By Mr. Feran)

1    **Q.**    There's a different doctor noted on this one, is there

2    not, sir?

3    **A.**    Yes.

4    **Q.**    Dr. Gordon?

16:19:59 5    **A.**    Yes.

6    **Q.**    Is that indicative of anything?

7    **A.**    The fact that, again, there's a different doctor was

8    one of the warning signs that Florida had mentioned, a

9    patient receiving the same medication from different

16:20:11 10    doctors.  That was in the Florida regulation, something a

11    pharmacist would need to investigate.

12    **Q.**    Continue to Q, Miss Johnson.  What is this?  Tell us

13    what this is, Mr. Catizone.

14    **A.**    Again, a prescription for Laura Keeley, quantity, the

16:20:35 15    date.  Now it's November, and the doctor now has moved back

16    to another doctor.

17    **Q.**    S?  Can you tell us what this is, sir?

18    **A.**    Same comments as the prior prescriptions.

19    **Q.**    W?

16:21:01 20    **A.**    Again, the same comments apply.

21    **Q.**    And AA, Miss Johnson?

22    **A.**    Again, same medication, same patient, same address.

23    **Q.**    And there's a note on this one, Mr. Catizone.  Can you

24    read that note into the record, sir?

16:21:29 25    **A.**    Sure.  It says, "Notes.  Interactions, reviewed the

Catizone - Direct (By Mr. Feran)

1    medical information and spoke with patient.

2    Patient" -- sorry, I can't -- "rates pain as a 9 on a

3    1-to-10 scale.  On medication patient is a 2.  Patient

4    complained of head pain.  Patient stated that has been on

16:21:53  5    medication before as prescribed by M.D. without side effects

6    or problems.  Oriented patient about medication tolerance

7    and habit forming effect.  Advised to use only" -- and then

8    the rest of it is kind of blurred, and it also talks about

9    to monitor the amount of acetaminophen, which is Tylenol.

16:22:12  10    **Q.**    Is there any significance to this, Mr. Catizone?

11    **A.**    One, I have not seen this type of information on

12    prescriptions in traditional or Internet pharmacies.  Two,

13    if you review all the records, this same information with

14    little variance -- sometimes it may say 8 on a scale of 10

16:22:31  15    or 9 -- occurs for just about every patient, which again is

16    unusual that every single patient would have that same

17    reading, and there's a necessity to place this on the

18    prescription in order to justify that prescription.

19    **Q.**    Now, we have ten prescriptions going out to Laura

16:22:52  20    Keeley at this address, correct, sir?

21    **A.**    Yes.

22    **Q.**    Is that a red flag?

23    **A.**    It's a red flag.  And if you look at the warning

24    there, the warning says that they advised the patient about

16:23:01  25    tolerance and habit forming effect, yet they've issued 90

Catizone - Direct (By Mr. Feran)

1    tablets for the patient every single month.  There should

2    have been some further documentation or some annotation

3    about the discussion and why the patient is allowed to

4    continue on this for about 11 months or so.

16:23:20  5    **Q.**    Miss Johnson, can you pull up 433-R.  What is the name

6    on this, sir?

7    **A.**    Nikisha Dawson.

8    **Q.**    And what's the prescription date?

9    **A.**    It looks like 12 December 2006.

16:23:40  10    **Q.**    And what is the address on this one, sir?

11    **A.**    The same address as Laura Keeley.

12    **Q.**    And this is dated what, sir?  I'm sorry.

13    **A.**    December 2006.

14    **Q.**    December what, sir?

16:23:52  15    **A.**    28th.

16    **Q.**    S, Miss Johnson.  The date on this one, sir?

17    **A.**    December 28, 2006.

18    **Q.**    The same as R?

19    **A.**    Yes.

16:24:07  20    **Q.**    And who is the person on this one?

21    **A.**    Laura Keeley.

22    **Q.**    Does this cause you any concern?

23    **A.**    Again, as mentioned in the Florida regulations, we

24    have patients on the same day getting prescriptions from the

16:24:20  25    same doctors in different states for the same medication,

Catizone - Direct (By Mr. Feran)

1      same quantities.  Doesn't seem to have a logical connection

2      to a valid relationship or to a valid diagnosis.

3      **Q.**    And looking at -- I don't want to go through all of

4      these again, the 431 series, we'll just pull up one, Miss

16:24:40  5   Johnson, 431-A, and you can blow that up.  The address on

6      431-A is what, sir?

7      **A.**    It looks -- 585 Tahoma Drive.

8      **Q.**    And in the course of your review were there a number

9      of prescriptions sent to this address?

16:25:02 10   **A.**    Yes.  There were over 50 for this address.

11     **Q.**    Over 50 for this address?

12     **A.**    Yes, sir.

13     **Q.**    Would this cause you concern?

14     **A.**    Significant concern.

16:25:09 15   **Q.**    And why is that, sir?

16     **A.**    As I mentioned earlier, to have 50 prescriptions for

17     different patients to the same address just doesn't seem

18     logical, and it would be something the pharmacist would have

19     to check.  It's not something that the pharmacist would let

16:25:23 20   go by.

21     **Q.**    And how would a pharmacist, Mr. Catizone, go about

22     checking this?

23     **A.**    They'd have to verify each prescription with a doctor

24     and then question the patients as to why they all resided or

16:25:35 25   gave the same address, and if it was any doubt or suspicion

Catizone - Direct (By Mr. Feran)

1    in the pharmacist's mind they shouldn't fill that

2    prescription, or there should be some further evaluation or

3    reporting to law enforcement.

4    **Q.**    Based on your training and experience, Mr. Catizone,

16:25:46 5    what is a reasonable refill on hydrocodone 90, how many

6    times should this occur?

7    **A.**    There shouldn't be a refill unless there's a

8    significant need or some sort of chronic pain condition

9    that's well documented and treated by a pain management

16:26:00 10    specialist.

11    **Q.**    Should it go on for a period of 10 refills, sir?

12    **A.**    Again, based upon what the medication is intended to

13    be used for and what the warnings are, the answer is no.

14    **Q.**    Sir, what do you say to a pharmacist who says, well, I

16:26:16 15    don't have the computer software to do a record check?

16    **A.**    The law doesn't care whether or not in responsibility

17    to a patient whether you have a computer or manage it using

18    paper and pencil.  The responsibility still exists, and the

19    pharmacist is still responsible for that care of that

16:26:29 20    patient.

21    **Q.**    Let's talk about that, sir.  Are you familiar with

22    chief pharmacist?

23    **A.**    Yes.

24    **Q.**    What is a chief pharmacist?

16:26:36 25    **A.**    It's a term that varies from state to state.  It may

Catizone - Direct (By Mr. Feran)

1    be the pharmacist in charge, in some states it may be the

2    chief pharmacist, it may be the responsible pharmacist.

3         Every pharmacy in every state has to have a chief

4    pharmacist, and that's the individual that's legally

16:26:51  5    responsible for executing documents, ordering controlled

6    substances, complying with the Board of Pharmacy

7    regulations, and being responsible for the entire operation

8    of dispensing of that pharmacy, the other pharmacists, and

9    any other technicians that may be used.

16:27:09  10   **Q.**   And who was the chief pharmacist in this case, sir?

11   **A.**   Mr. Darji.

12   **Q.**   Mr. Darji?

13   **A.**   Yes.

14   **Q.**   And you stated he would be responsible for all aspects

16:27:22  15   of the pharmacist operations?

16   **A.**   Yes, sir.

17   **Q.**   Tell us what that means, all aspects.  What does that

18   mean?

19   **A.**   The pharmacist is responsible for making sure that all

16:27:31  20   of the laws and regulations are followed, making sure that

21   the other pharmacists are practicing in accordance with the

22   laws, and if anything happens in the pharmacy the Board of

23   Pharmacy then holds the chief pharmacist responsible for

24   those activities, whether they were directly involved or

16:27:47  25   not.  It's their responsibility that the processes,

Catizone - Direct (By Mr. Feran)

1    procedures, and the personnel all fall under the charge of

2    the chief pharmacist.

3    **Q.**    Are you familiar with the term pharmacy tech,

4    Mr. Catizone?

16:27:58 5    **A.**    Yes.

6    **Q.**    What's a pharmacy tech?

7    **A.**    A tech is somebody that assists the pharmacist in the

8    practice of pharmacy.  In some states they're required to be

9    registered, other states they're not.  The technician can

16:28:09 10   only engage in limited activities.  They're not allowed to

11   counsel patients, they're not allowed to dispense

12   medications when the pharmacist is not there.  They're not

13   allowed to do anything without the direct supervision of the

14   pharmacist in terms of taking the medication off the shelf,

16:28:26 15   filling it, and then providing it to the patient.  The

16   pharmacist has to oversee that entire process and is legally

17   responsible for it.

18   **Q.**    So can you tell us, sir, about the interaction between

19   the chief pharmacist and the pharmacy techs?  Is anybody

16:28:41 20   responsible for the pharmacy tech distribution?

21   **A.**    The chief pharmacist is.

22   **Q.**    What if other pharmacists are employed at a pharmacy,

23   sir, who ultimately is responsible for distribution of that

24   pharmacy?

16:28:51 25   **A.**    The chief pharmacist.

Catizone - Direct (By Mr. Feran)

1   **Q.**    You stated, sir, that Mr. Darji was the chief

2   pharmacist at those three pharmacies?

3   **A.**    Yes, sir.

4   **Q.**    Who was the owner of those pharmacies?

16:29:01 5   **A.**    Mr. Darji also.

6   **Q.**    We were talking, sir, about three pharmacies involved

7   here.  Is that correct?

8   **A.**    Yes, sir.

9   **Q.**    Is this unusual?

16:29:13 10   **A.**    It's not unusual for somebody to own multiple

11   pharmacies.

12   **Q.**    Was the way that the pharmacies were utilized in this

13   case, did that cause you a red flag?

14   **A.**    Yes.

16:29:21 15   **Q.**    Can you explain that, sir?

16   **A.**    Sure.  The prescriptions were distributed across the

17   three pharmacies, not based upon the patient relationships

18   or the physician relationships.  From the information, they

19   were dispersed to conceal the distribution of controlled

16:29:39 20   substances by the pharmacy so that one pharmacy didn't have

21   totals that were so high that it would draw red flags or

22   draw the attention of law enforcement, so the prescriptions

23   then were dispersed across all three.

24   **Q.**    With Mr. Darji being the owner of these pharmacies,

16:29:56 25   Mr. Catizone, can you tell us what the owner's obligations

Catizone - Direct (By Mr. Feran)

1    are?

2    **A.**    The owner has the same responsibilities as the

3    pharmacist in terms of being responsible for distribution

4    and compliance with the laws.  If there's a problem with the

16:30:10  5    clinical aspect of it where the pharmacist wasn't competent,

6    that would fall on the pharmacist, but the owner then would

7    also be responsible for hiring that pharmacist and not

8    making sure that the pharmacist was competent.

9    **Q.**    You talked, Mr. Catizone, about the three pharmacies

16:30:24  10    and moving things around.  Are you familiar with the term

11    spreading, spreading prescriptions?

12    **A.**    In the context of the case, yes.

13    **Q.**    Can you tell us what spreading means, sir?

14    **A.**    That's what I just explained, where they were trying

16:30:37  15    to spread the controlled substance prescriptions among the

16    three so that not one of the pharmacies reflected the total

17    number of controlled substances that were being dispensed.

18    **Q.**    Sir, let's talk about the actual script itself.

19    E-signatures, electronic signatures, can you discuss that

16:30:59  20    with us, please?  Are they permitted on prescriptions?

21    **A.**    On non --

22    **Q.**    On controlled substance prescriptions are electronic

23    signatures during the time frame between October of 2005 and

24    February of 2009?

16:31:15  25    **A.**    The DEA issued a guidance document that said

Catizone - Direct (By Mr. Feran)

1   prescriptions can only be received via fax or oral, which

2   means over the phone or directly from the prescriber, and

3   that prescriptions transmitted via the Internet were not

4   acceptable.

16:31:31  5   **Q.**   So are e-signatures valid, sir?

6   **A.**   No.

7   **Q.**   Let's talk about the term spot checking.  Have you

8   heard that in connection with this case?

9   **A.**   Yes.

16:31:43 10   **Q.**   What do you understand spot checking to be?

11   **A.**   Spot checking in this case was that the pharmacist

12   would spot check prescriptions or look at particular orders

13   to make sure that those -- or to try to determine that they

14   were valid.

16:31:57 15        Spot checking doesn't exist in pharmacy in that

16   regard.  It may exist in the manufacturing process, where

17   you may spot check products to make sure they're all being

18   made the same.  Every single prescription requires the

19   pharmacist to check it, because it would be hard to say to a

16:32:12 20   patient, I'm sorry, I spot checked the prescription before

21   you and that was right, and your prescription was wrong, but

22   I didn't check that prescription, and therefore the

23   consequences you suffer are not my fault.  The pharmacist

24   has a responsibility to check every single prescription to

16:32:27 25   make sure it's correct.

Catizone - Direct (By Mr. Feran)

1    **Q.**    And does this include controlled and noncontrolled

2    substances, sir?

3    **A.**    Any prescription that the pharmacist dispenses,

4    controlled, noncontrolled.

16:32:41  5              MR. FERAN:  Miss Johnson, if you could put up

6    Government's 701.

7    **Q.**    Mr. Catizone, have you seen Government's 701 before?

8    **A.**    Yes, I have.

9    **Q.**    Did you analyze this prior to coming to court, sir?

16:33:00  10   **A.**    Yes.  I spoke about this earlier, about how the

11   quantities dispensed by these pharmacies were significantly

12   higher than --

13              MR. DARKEN:  Your Honor, may I approach?

14              THE COURT:  Sure.

16:33:10  15              (Proceedings had at side-bar:)

16              MR. DARKEN:  Your Honor, I'm going to object

17   to this line of questioning and to any questioning about his

18   volume of scripts by doctor.  This is the two-page report we

19   got, it has nothing, absolutely nothing about any

16:33:50  20   conclusions about volume of prescriptions in 701, or about

21   anything about the number of prescriptions approved by any

22   doctor in any time period.

23              MS. LUTZKO:  Your Honor, if I may, the fact

24   that we gave these materials to the defendant was the

16:34:10  25   subject of Mr. -- I think it was Mr. Milano's request at the

Catizone - Direct (By Mr. Feran)

1    very beginning of the trial before we began, when we sat

2    down and we did provide them with a letter of all the

3    materials that were viewed, and that this ARCOS data was

4    among the other things that the defendants were provided

16:34:28  5    that Mr. Catizone reviewed.

6         MR. DARKEN:  Your Honor, Miss Lutzko is

7    conflating two things.  They have an obligation to give us

8    the list of what was reviewed, which they did belatedly, at

9    Mr. Milano's request, but they have an obligation under Rule

16:34:44 10    16 to give us a written report that lays out the basis of

11    the opinions.

12         What was given to us was what he reviewed, you know,

13    in September late, but the two-page report is the basis for

14    his opinion.  Anything outside the scope of that is beyond

16:35:02 15    Rule 16.  I object.

16         THE COURT:  Okay.  Let me just be clear.  The

17    question was raised in regard to whether what had been

18    turned over by the government was adequate relative to the

19    witness.  The government then I thought engaged in

16:35:30 20    discussion where the government was going to turn over the

21    materials that were underlaying his opinion.  That's what I

22    thought the idea was, to give him what you have, which I

23    think they did that, right?

24         MS. LUTZKO:  Your Honor, if I may, we'll move

16:35:44 25    on.  We'll just keep going.

Catizone - Direct (By Mr. Feran)

1                    THE COURT:  Okay.

2                    (Proceedings had in open court:)

3       BY MR. FERAN:

4       **Q.**    Mr. Catizone, can you describe the volume of

16:36:13 5       hydrocodone distributed by the three Vinesh Darji

6       pharmacies?

7                    MR. DARKEN:  Same objection, Your Honor.

8                    THE COURT:  Come back up here.

9                    (Proceedings at side-bar:)

16:37:57 10                    THE COURT:  Let me start backwards.  What is

11      the government's response to the objection?

12                    MS. LUTZKO:  Your Honor, I think it's

13      absolutely appropriate, but you know, we have had another

14      witness testify about these documents, so I think we can

16:38:11 15      just move on.

16                    THE COURT:  Okay.

17                    (Proceedings had in open court:)

18                    THE COURT:  You may proceed.

19                    MR. FERAN:  Thank you, Your Honor.

16:38:36 20      **Q.**    Mr. Catizone, based on your analysis of the documents

21      provided to you, do you have an opinion regarding what was

22      the goal of Mr. Darji and this organization?

23      **A.**    From the information I received, that it appeared to

24      be a goal of distributing controlled substances for profit,

16:39:07 25      particularly the hydrocodone products.  I could not find any

Catizone - Cross (By Mr. Darken)

1    determination of a valid prescription, any valid

2    patient-doctor relationship, any patient care aspects of it.

3    Simply a means of distributing controlled substances for

4    profit.

16:39:27    5              MR. FERAN:  Your Honor, I have -- one second,

6    Judge.

7    **Q.**    And was this done, sir, in the usual course of

8    professional practice?

9    **A.**    No, it wasn't.

16:39:42   10              MR. FERAN:  Thank you, Judge.  No further

11    questions.

12              THE COURT:  All right.  Mr. Darken?

13         CROSS-EXAMINATION OF CARMEN CATIZONE

14    BY MR. DARKEN:

16:40:46   15    **Q.**    Good afternoon, sir.

16    **A.**    Good afternoon.

17    **Q.**    In connection with your testimony in this case, you

18    wrote a two-page report dated December 17, 2008; correct?

19    **A.**    Yes, sir.

16:41:02   20    **Q.**    Were you ever shown any records, medical records,

21    seized from Vinesh Darji's Medicine Shoppe and/or Medicom

22    Pharmacy?

23    **A.**    No, sir.

24    **Q.**    Were you aware that he had his pharmacist sample

16:41:38   25    medical records off the USMeds website on a sample basis?

Catizone - Cross (By Mr. Darken)

1     Did you know that?

2     **A.**     Yes, sir.

3     **Q.**     How did you know that?

4     **A.**     That was the spot checking that was in the documents,

16:41:46 5    sir.

6     **Q.**     Okay.  And what documents are you referring to?

7     **A.**     The reports provided to me by the government on the

8     interviews.

9     **Q.**     All right.  Now, when I go into Marc's Pharmacy here

16:42:05 10   with a prescription for controlled substances they don't

11    make me bring my medical records, do they?

12    **A.**     No, sir.

13    **Q.**     And they don't check my medical records, right?

14    **A.**     No, sir.

16:42:14 15   **Q.**     Okay.  But you know that Vinesh Darji was sampling

16    medical records because you've been told that, right?

17    **A.**     Yes, sir.

18    **Q.**     Okay.  Now, sampling medical records doesn't

19    mean -- it's not the same thing as spot checking

16:42:32 20   prescriptions, is it?

21    **A.**     I'm not familiar with the sampling of the medical

22    records, so I connoted it to spot checking prescriptions.  I

23    can't testify if it's the same or not, sir.

24    **Q.**     Okay.  Well, a pharmacist has no absolute duty to

16:42:53 25   review medical records, correct?

Catizone - Cross (By Mr. Darken)

1    **A.**    Correct, sir.

2    **Q.**    In fact, most pharmacists for most patients never see

3    the patient's medical record for a prescription, correct?

4    **A.**    Correct.

16:43:09 5    **Q.**    All right.  Let's talk about your background a little

6    bit.  You gave a course for the DEA in May of 2011, correct?

7    **A.**    Yes, sir.

8    **Q.**    You gave a course for the DEA in February of 2011,

9    correct?

16:43:24 10    **A.**    Yes, sir.

11    **Q.**    You gave a course for the DEA in January of 2010,

12    correct?

13    **A.**    Yes, sir.

14    **Q.**    Okay.  The DEA wasn't paying you for your time for

16:43:38 15    those courses, were they?

16    **A.**    No, sir.

17    **Q.**    You were being paid by your employer?

18    **A.**    Yes, sir.

19    **Q.**    You're paid $400,000 a year; is that correct?

16:43:48 20    **A.**    Approximately, sir, yes.

21    **Q.**    Well, what is it?

22    **A.**    I believe it's like 450,000, sir.

23    **Q.**    $450,000.  Okay.  It was 400,000 a few years ago when

24    you testified at trial as a government witness, correct?

16:44:06 25    **A.**    Yes, sir.

Catizone - Cross (By Mr. Darken)

1    **Q.**    When did you get the $50,000 raise?

2    **A.**    Over the past two years.

3    **Q.**    Okay.  Now, you testified for the Department of

4    Justice in a case in San Francisco in February 2012,

16:44:25  5    correct?

6    **A.**    Yes, sir.

7    **Q.**    You testified for the Department of Justice in a case

8    in Boston in January 2012, correct?

9    **A.**    Yes, sir.

16:44:32  10    **Q.**    You testified at a case for the Department of Justice

11    in Beaumont, Texas, in June 2010; is that correct?

12    **A.**    Yes, sir.

13    **Q.**    Did Dr. Nelson -- do you know Dr. Nelson from Utah?

14    **A.**    I don't recall, sir.

16:44:47  15    **Q.**    Okay.  You testified for the Department of Justice at

16    a case in the Western District of Missouri in June of 2010;

17    is that right?

18    **A.**    Yes, sir.

19    **Q.**    You testified for the government in Charlotte, North

16:45:04  20    Carolina, in August 2009; is that correct?

21    **A.**    Yes, sir.

22    **Q.**    You testified for the government in Orlando, Florida,

23    in April of 2009; is that correct?

24    **A.**    Yes, sir.

16:45:14  25    **Q.**    You testified for the government in the Eastern

Catizone - Cross (By Mr. Darken)

1    District of New York in the Brooklyn area in November 2008;

2    is that correct?

3    **A.**    Yes, sir.

4    **Q.**    You testified for the government in another case in

16:45:27 5    the Eastern District of New York in October of 2008; is that

6    correct?

7    **A.**    Yes, sir.

8    **Q.**    You testified for the government in Maryland in July

9    of 2008; is that correct?

16:45:37 10    **A.**    Yes, sir.

11    **Q.**    And you testified for the government in Minnesota in

12    November of 2006; is that correct?

13    **A.**    Yes, sir.

14    **Q.**    How many times have you testified for a defendant?

16:45:50 15    **A.**    In administrative hearings, probably about 20 times,

16    sir.  Nothing in court.

17    **Q.**    How about in criminal cases?

18    **A.**    No criminal cases, sir.

19    **Q.**    You testified in response to Mr. Feran about red

16:46:25 20    flags.  Do you remember that testimony?

21    **A.**    Yes, sir.

22    **Q.**    Now, red flags are a matter of your opinion, correct?

23    **A.**    Yes, sir.

24    **Q.**    Mr. Feran asked you about Mr. Darji's volume of

16:46:48 25    controlled substances, and you indicated that was a red

Catizone - Cross (By Mr. Darken)

1      flag, correct?

2      **A.**    Yes, sir.

3      **Q.**    Is that red flag in and of itself sufficient to

4      indicate any type of abuse in this case?

16:47:01  5   **A.**    No, sir.

6      **Q.**    And you noted that for Mr. Feran that some of the

7      prescriptions were written by a doctor in Puerto Rico,

8      correct?

9      **A.**    Yes, sir.

16:47:13  10   **Q.**    Is the fact that the doctor was in Puerto Rico and the

11     patients were somewhere else sufficient in and of itself to

12     establish some sort of abuse?

13     **A.**    No, sir.

14     **Q.**    Now, there's no need for a pharmacist to call a doctor

16:47:40  15   unless the pharmacist has a legitimate question about the

16     script.  Is that correct?

17     **A.**    Or suspects fraud.

18     **Q.**    Okay.  But other than that, a pharmacist is not

19     required to contact a doctor, correct?

16:47:53  20   **A.**    Yes, sir.

21     **Q.**    All right.  Now, you testified about state laws in

22     response to Mr. Feran.  Do you remember that?

23     **A.**    Yes, sir.

24     **Q.**    Isn't it a fact that in the state of Utah an online

16:48:12  25   pharmacy is permitted to operate without any in-person

Catizone - Cross (By Mr. Darken)

1   medical examination?

2   **A.**    No, sir.

3   **Q.**    Do you recall testifying at United States versus Jude

4   LaCour in Orlando, Florida, on April 14, 2009, and being

5   asked this question and giving the following answer:

6        "Q.  When you stated that one of the online pharmacies

7   is certified by the state of Utah to operate without any

8   in-person medical exam, is that correct?

9        "A.  Yes, sir."

10       Do you remember that?

11  **A.**    Yes, sir.

12  **Q.**    That's what you testified, right?

13  **A.**    Yes, sir.

14  **Q.**    In fact, the name of that company is called Quick Med;

15  is that right?

16  **A.**    Yes, sir.

17  **Q.**    And that's the same state that Dr. Nelson is from,

18  correct?  Utah?

19  **A.**    You asked me that earlier.  I am not familiar with Dr.

20  Nelson, so I apologize, sir.

21  **Q.**    All right.  Now, isn't it a fact, sir, that a pharmacy

22  in Puerto Rico is permitted to use the Internet for a

23  prescription that is not based on a face-to-face

24  examination?

25  **A.**    I'm not familiar with Puerto Rico.  Sorry.

Catizone - Cross (By Mr. Darken)

1    **Q.**    Okay.  You testified at a case titled United States

2    versus Antonio Quinones in the Eastern District of New York

3    on or about October 29, 2008; correct?

4    **A.**    Yes, sir.

16:49:42  5    **Q.**    Do you recall this question and this answer?

6         "Q.  Does the telemedicine law of Puerto Rico allow a

7    Puerto Rican doctor to use the Internet for a prescription

8    that is not based upon a face-to-face examination?

9         "A.  Only in the Commonwealth of Puerto Rico."

16:50:07 10        Do you remember that

11    **A.**    Now that you read it, yes, I do, sir.

12    **Q.**    Now, in order for a pharmacist to have a valid

13    prescription there must be a bona fide relationship between

14    the patient and the prescriber.  Is that correct, sir?

16:50:29 15    **A.**    Yes, sir.

16              MR. DARKEN:  One moment, Your Honor.

17              THE COURT:  Sure.

18    **Q.**    I'm going to show you what has been admitted as

19    Government's Exhibit 976.  We're looking -- if I could have

16:51:37 20    a mic --

21              MS. LUTZKO:  Your Honor.

22    **Q.**    You've seen this before, right?

23              MS. LUTZKO:  May I give him a copy?

24    (Handing.)

16:51:58 25    **A.**    Thank you.  Yes, I have seen it before.

Catizone - Cross (By Mr. Darken)

1    **Q.**    Okay.  And the part that says, for purposes of state

2    law, many state authorities consider the existence of the

3    following four elements as an indication that a legitimate

4    doctor-patient relationship has been established, and then

16:52:18  5    there's four elements, correct?

6    **A.**    Yes, sir.

7    **Q.**    Those are the four elements that you talked about,

8    right?

9    **A.**    Yes, sir.

16:52:23  10   **Q.**    Okay.  But in this 2001 DEA guidance document it

11   doesn't say that the medical history has to be taken by the

12   prescribing practitioner, it just says that a medical

13   history has to be taken, correct?

14   **A.**    Yes, sir.

16:52:40  15   **Q.**    Similarly, in the 2001 guidance document it doesn't

16   say that the physical exam that has to be performed has to

17   be performed by the prescribing practitioner, correct?

18   **A.**    It doesn't say that, but state law would require that.

19   **Q.**    State law would require that.  Okay.  Well, you're

16:53:04  20   testifying here -- well, let me ask it this way.  You

21   testified in response to Mr. Feran about state law, but you

22   never cited any specific state law, did you?

23   **A.**    Florida.

24   **Q.**    Florida.  We'll talk about Florida in a minute.

16:53:25  25   **A.**    Yes, sir.

Catizone - Cross (By Mr. Darken)

1    **Q.**    Other than Florida, you haven't cited a single state

2    law, have you?

3    **A.**    No, sir.

4    **Q.**    All right.  Well, let's take them.  So Alabama, what

16:53:35  5    is the state law in Alabama that required a face-to-face

6    physical examination between October 2005 and February of

7    2009?

8              MR. FERAN:  Objection, Your Honor.

9              THE COURT:  Is Alabama involved in this?

16:53:54  10             MR. FERAN:  It's one of the many prescriptions

11    were found in Alabama, Judge; whether he can cite Alabama

12    law is another question.

13             MR. DARKEN:  May I respond?

14             THE COURT:  You can ask him if he knows.  If

16:54:05  15    he doesn't, there's nothing he can say.

16    **Q.**    Do you know?

17    **A.**    I don't know the specific citation, sir.

18    **Q.**    Do you know there is an Alabama law between October

19    2005 and February 2009 that specifically requires

16:54:19  20    face-to-face examinations, sir?

21    **A.**    Yes, I do.

22    **Q.**    You do, but you don't know it?

23    **A.**    I don't know the specific citation.

24    **Q.**    Okay.  You knew you were going to come to court today

16:54:30  25    with these three people on trial for their lives, right?

Catizone - Cross (By Mr. Darken)

1    **A.**    Yes, sir.

2    **Q.**    But you didn't think -- and you knew you were going to

3    be called as an expert on the laws of the entire United

4    States, right?

16:54:40 5    **A.**    Yes, sir.

6    **Q.**    But you didn't think that you should bring a list of

7    the laws that you were relying on?  Is that correct?

8    **A.**    I have the list and they're accessible, but I didn't

9    think I would need to present all of them, sir.

16:54:53 10    **Q.**    Okay.  Well, how about giving me any of them.

11    **A.**    It's going to be the same response for every state

12    that you question me on, sir.  I've reviewed the law in the

13    state, but I can't give you the specific citation.

14    **Q.**    Well, the jury is just supposed to take your word for

16:55:09 15    it?  Is that it?

16    **A.**    As an expert witness, I think it's up to the jury to

17    decide whether my testimony is credible or not.

18    **Q.**    Exactly.

19              THE COURT:  Okay.  No comments.  It's got to

16:55:21 20    be a question.  The previous one was a question, but that

21    last one was not.

22              MR. DARKEN:  I apologize.

23    **Q.**    Okay.  Now, isn't it true, sir, that the state law of

24    Minnesota and the state law of New Jersey have the same four

16:55:42 25    components that we just looked at in the DEA guidance

Catizone - Cross (By Mr. Darken)

1    document?  Isn't that true?

2                    MR. FERAN:  Objection, Your Honor.

3                    THE COURT:  Overruled.  You can answer if you

4    remember the specifics.

16:55:56  5    **A.**    I don't remember the specifics.

6    **Q.**    Okay.  Do you remember testifying at the trial of

7    United States versus Christopher Smith in the District of

8    Minnesota, Minneapolis, on November 15, 2006?

9    **A.**    Yes, sir.

16:56:09 10    **Q.**    Do you remember being asked this question and giving

11    the following answers?  The following questions.

12    "Q.  As part of your preparation and basis of knowledge for

13    this case, have you looked at certain state laws with regard

14    to physician-patient relationships?

16:56:25 15        "A.  Yes.

16        "Q.  And as an example, have you looked at Minnesota

17    law, New Jersey law?

18        "A.  Yes.

19        "Q.  And what do they say with regard to the

16:56:39 20    physician-patient relationship and valid prescriptions?

21        "A.  Those states specifically require the four

22    components listed in the DEA directive for a valid

23    prescription to be in place.  Legitimate medical need, a

24    physical, and the other two which I can't recall at this

16:56:56 25    time.  And they also specifically say that questionnaires

Catizone - Cross (By Mr. Darken)

1    cannot be utilized solely as a basis for a valid

2    patient-physician relationship."

3         Do you remember that testimony?

4    **A.**    Yes, sir.

16:57:06  5    **Q.**    All right.  So would you agree that Minnesota and New

6    Jersey at least as of 2006 had the same four components as

7    the DEA guidance document?

8    **A.**    Yes, sir.

9    **Q.**    All right.  I've got a list of all 50 states here in

16:57:33 10   alphabetical order.  If I ask you each state -- I don't want

11   to keep these people here, but if I ask you each state are

12   you going to give me the same answer?  You don't remember

13   the specific state law that requires physical face-to-face

14   examination between October 2005 and February 2009?

16:57:50 15   **A.**    I can identify Florida and the other states that I

16   prepared for this case, but the others I would not be able

17   to, sir.

18   **Q.**    Okay.  We're going to get to Florida.  What other

19   states can you identify other than Florida?

16:58:01 20   **A.**    Texas, Indiana, North Carolina, New York.

21   **Q.**    And let's take Texas.  What was the Texas law that

22   required face-to-face between October 2005 and February

23   2009?

24   **A.**    Again, I can't give you the specific citation, but I

16:58:26 25   know that exists, sir.

Catizone - Cross (By Mr. Darken)

1   **Q.**    Okay.  How about North Carolina?

2   **A.**    That's going to be the same answer for all those.  I

3   don't have the specific citations memorized, sir.

4   **Q.**    All right.  Well, the Texas one, was it a statute?

16:58:41  5   Was it a regulation?  Was it a Board of Pharmacy rule?  Was

6   it a Board of Medicine rule?  Or what was it?

7   **A.**    The documents I reviewed were all regulations of the

8   Boards of Pharmacy.

9   **Q.**    Pharmacy boards.

16:58:53  10   **A.**    Yes, sir.

11   **Q.**    And that's Texas, North Carolina, and what?

12   **A.**    New York.

13   **Q.**    New York.  Did you say Indiana?

14   **A.**    Indiana, Alabama.

16:59:03  15   **Q.**    Alabama.  Okay.  All right.  Let's talk about Florida.

16              THE COURT:  Counsel, let me see counsel up

17   here for a minute.

18              (Proceedings at side-bar:)

19              THE COURT:  I think we are running out of

16:59:40  20   time.  You have some questions, about how much?

21              MR. DARKEN:  An hour.

22              THE COURT:  And what do you have.

23              MR. GORENCE:  10 or 15 minutes, Your Honor?

24              THE COURT:  And what do you have?

16:59:55  25              MS. RHA:  Right about an hour.

```
 1              THE COURT:  You have about an hour?  We can't

 2   do anything with that.  We have to have him come back.

 3              MR. DARKEN:  That's fine.

 4              THE COURT:  Okay.  Next Tuesday?

 5              MS. LUTZKO:  Your Honor, we have tomorrow

 6   morning, right?

 7              THE COURT:  I'm sorry.

 8              MR. DARKEN:  We have half a day tomorrow.

 9              THE COURT:  I had a bad moment.

10              MS. LUTZKO:  I will let you know right now

11   though that he does have obligations all week next week and

12   the following week.

13              MR. DARKEN:  We can finish him tomorrow.

14              THE COURT:  I was just asleep at the switch

15   there.  That should be enough.

16              MS. LUTZKO:  I would hope so.

17              THE COURT:  All right.

18              MR. DARKEN:  What time do you want to start

19   tomorrow?

20              THE COURT:  Be ready at 8:30.

21              (Proceedings had in open court:)

22              THE COURT:  Okay.  We're at 5:00, so 8:30

23   tomorrow.  And then you'll be ready to stay until 12:30, and

24   then you can go.  All right?  Have a good evening.

25              A JUROR:  Good night.
```

17:00:10  5
17:00:16 10
17:00:27 15
17:00:34 20
17:01:11 25

1          THE COURT:  And don't talk about the case.

2          (Proceedings had out of the presence of the

3     Jury:)

4          MR. GORENCE:  Your Honor, with this long

17:01:47 5     weekend, Ms. Rovedo is going to return to Florida.  She has

6     been in contact with her Probation officer or Pretrial

7     Services officer, I should say, and they just got an e-mail

8     today saying she couldn't leave until she had the Court's

9     permission.  So she has her tickets, and she'll be back, of

17:02:07 10     course, but I just want to get verbal permission because I

11     think I don't have time to file another motion.

12          THE COURT:  To my knowledge, to my knowledge

13     there have been no issues raised with me by Pretrial and

14     Probation in regard to her, so I would not have any

17:02:26 15     difficulty with her going home and coming back with

16     everybody else.

17          MS. LUTZKO:  We don't object.

18          MR. GORENCE:  That's all.  And I'll

19     communicate that to the Pretrial Services officer, but there

17:02:36 20     seemed to be some snafu.  She was waiting for guidance from

21     you, and I'll communicate that.  Thank you, Your Honor.

22          THE COURT:  All right.

23               -  -  -  -  -

24          (Proceedings adjourned.)

25

Catizone - Cross (By Mr. Darken)

1     MORNING SESSION, THURSDAY, OCTOBER 11, 2012  8:40 A.M.

2             (Proceedings in the presence of the Jury:)

3             THE COURT:  Good morning.  What a beautiful

4    day for an afternoon off.

08:40:24  5             A JUROR:  Yes, it is.

6             THE COURT:  All right come forward, sir:  Good

7    morning.

8             THE WITNESS:  Good morning, sir.

9             THE COURT:  You understand you're still under

08:40:47 10    oath.

11             THE WITNESS:  Yes, sir.

12             THE COURT:  All right.

13     CROSS-EXAMINATION OF CARMEN CATIZONE (RESUMED)

14    BY MR. DARKEN:

08:40:51 15   **Q.**   Good morning, Mr. Catizone.

16   **A.**   Good morning, sir.

17   **Q.**   Sir, I want to start off by asking you some questions

18    about the NABP website.  That's the website for your

19    organization, correct?

08:41:02 20   **A.**   Yes, sir.

21   **Q.**   On the website there's different sections of the

22    website you can look at, correct?

23   **A.**   Yes, sir.

24   **Q.**   And there's a section called resolutions, correct?

08:41:16 25   **A.**   Yes, sir.

Catizone - Cross (By Mr. Darken)

1   **Q.**   What is a resolution?

2   **A.**   A resolution is a direction goal that is set by the

3   individual states for NABP.

4   **Q.**   And on the website there seemed to be an indication

08:41:32 5   that some resolutions had passed and some had not passed.

6   How does a resolution pass?

7   **A.**   Each state has one vote, and a majority of states

8   voting for resolution would indicate pass.

9   **Q.**   And on the website there's an archive of resolutions

08:41:51 10   that goes way back, correct?

11   **A.**   Yes, sir.

12   **Q.**   And those resolutions are kept on the website as part

13   of the ordinary course of the business of your organization,

14   correct?

08:42:02 15   **A.**   Yes, sir.

16   **Q.**   Resolutions are passed as part of the ordinary course

17   of your business, correct?

18   **A.**   Yes, sir.

19   **Q.**   Okay.  I'm going to show you what's been marked for

08:42:12 20   identification as VD Number 5.  VD Number 5 is a resolution

21   from your organization from May 22, 2007, correct?

22   **A.**   Yes, sir.

23   **Q.**   And the title is Valid Ongoing Patient Prescriber

24   Relationship, Resolution Number 103-2-07.  Correct?

08:42:54 25   **A.**   Yes, sir.

Catizone - Cross (By Mr. Darken)

1    **Q.**    And that indicates that the resolution is that NABP

2    work with the Federation of State Medical Boards, U.S. Food

3    and Drug Administration, U.S. Drug Enforcement

4    Administration, and other interested stakeholders to assess

08:43:13  5    and revise, if necessary, the model State Pharmacy Act and

6    the model rules of the National Association of Boards of

7    Pharmacy to explicitly prohibit the dispensing of

8    medications based on prescriptions generated solely from

9    Internet-based, electronic questionnaires, or cyberspace

08:43:34 10    consultations, or invalid patient-prescriber relationships.

11    Correct?

12    **A.**    Yes, sir.

13                MR. DARKEN:  Your Honor, I move for the

14    admission of VD-5.

08:43:58 15                THE COURT:  I'm sorry?

16                MR. DARKEN:  I move for the admission of VD-5.

17                THE COURT:  Any objection?

18                MR. FERAN:  No objection, Judge.

19                THE COURT:  Okay.

08:44:08 20    **Q.**    Now, sir, this is the first resolution from your

21    organization addressing patient-prescriber relationships in

22    the connection with Internet-based websites, correct?

23    **A.**    Possibly, yes.  Possibly.

24    **Q.**    Okay.  Well, put it this way:  You're not aware of any

08:44:40 25    resolution prior to this May 22, 2007 that addressed this

Catizone - Cross (By Mr. Darken)

1    subject, correct?

2    **A.**    I'm aware of recommendations that function the same as

3    resolutions from the task force that we had in 1999 that

4    addressed the situation, sir.

08:44:55  5    **Q.**    Did you hear my question, sir?

6    **A.**    I did.

7    **Q.**    You didn't answer it, did you?

8    **A.**    I did, sir.

9    **Q.**    Okay.  Let me ask it again:  Isn't it a fact, sir,

08:45:05 10    that prior to this May 22, 2007 resolution, you're not aware

11    of any other resolution passed by your organization that

12    addressed patient-prescriber relationships for Internet

13    websites.  Isn't that a fact?

14    **A.**    Yes, sir, I'm not aware.

08:45:28 15    **Q.**    Thank you.  Now, you testified before the Federal

16    Trade Commission Internet Workshop on Telemedicine and

17    Pharmaceutical Panels, and you had a prepared statement.

18    Correct?

19    **A.**    Yes, sir.

08:45:47 20    **Q.**    Isn't it a fact that in that statement you stated,

21    quote, only five states have enacted additional regulations

22    for Internet pharmacies?

23    **A.**    Yes, sir.

24    **Q.**    When was that statement made?

08:45:59 25    **A.**    I don't recall the exact date, sir.

110

Catizone - Cross (By Mr. Darken)

1    **Q.**    What is your best guess?

2    **A.**    2007.

3    **Q.**    Now, on your website, in addition to the resolution

4    section you also have a news section, correct?

08:46:19  5    **A.**    Yes, sir.

6    **Q.**    And in the news section of the website you or your

7    organization re-publishes sometimes sections of state Board

8    of Pharmacy newsletters, correct?

9    **A.**    Yes, sir.

08:46:33 10    **Q.**    And you also sometimes republish sections of your own

11    NABP newsletter, correct?

12    **A.**    Yes, sir.

13    **Q.**    And you do that as part of the ordinary course of your

14    organization's business, correct?

08:46:46 15    **A.**    Yes, sir.

16    **Q.**    And you keep those things on the website as part of

17    the ordinary course of business so your members can see

18    them, correct?

19    **A.**    Correct.

08:46:54 20    **Q.**    Okay.  I'm going to hand you what's been marked for

21    identification as VD-3.

22            MR. DARKEN:  One moment, Your Honor.

23    **Q.**    What I've handed you marked for identification as VD-3

24    is one of those news items from October of 2008, correct?

08:47:44 25    **A.**    Yes, sir.

Catizone - Cross (By Mr. Darken)

1    **Q.**    And it's a reprint from the October 2008 Minnesota

2    Board of Pharmacy Newsletter.  Is that correct?

3    **A.**    Yes, it is, sir.

4    **Q.**    Okay.  And that indicates in the second paragraph that

08:47:57  5    the Minnesota legislature passed a law earlier this year,

6    earlier 2008, that establishes that prescriptions for

7    controlled substances and certain other drugs are not valid

8    unless the prescriptions or orders are based on a documented

9    patient evaluation, including an inpatient examination,

08:48:19  10    adequate to establish a diagnosis and identify underlying

11    conditions and contraindications to treatment.  Correct?

12    **A.**    Yes, sir.

13              MR. DARKEN:  Your Honor, I move for the

14    admission of VD-3.

08:48:33  15              MR. FERAN:  No objection.

16              THE COURT:  It shall be admitted.

17    **Q.**    You're familiar with -- let me put it this way.  Your

18    organization reported on your website about the Ryan Haight

19    Act, correct?

08:49:01  20    **A.**    Yes, sir.

21    **Q.**    And you're familiar with William Winsley, the

22    executive director of the Ohio Board of Pharmacy; correct?

23    **A.**    Yes, sir.

24    **Q.**    Are you aware that William Winsley testified before

08:49:16  25    Congress on June 24, 2008 --

Catizone - Cross (By Mr. Darken)

1          MR. FERAN:  Objection, Your Honor.

2          THE COURT:  He has an objection going.

3          MR. DARKEN:  I can rephrase it, Your Honor.

4          THE COURT:  All right.

08:49:30  5  **Q.**    You've given us your opinion, expert opinion, correct?

6  **A.**    Yes, sir.

7  **Q.**    Would it affect your expert opinion to know that on

8  June 24, 2008, William Winsley, executive director of the

9  Ohio Board of Pharmacy, provided written testimony to a

08:49:46  10  Congressional committee in a hearing on online pharmacies,

11  and stated that state laws and rules relating to Internet

12  pharmacies vary widely.  Would that affect your opinion?

13  **A.**    No, sir.

14  **Q.**    Now, you've said that your organization publishes a

08:50:09  15  newsletter, correct?

16  **A.**    Yes, sir.

17  **Q.**    Did you read the February 2009, February 2009 article,

18  Federal/State Governments Pass Legislation to Address Rogue

19  Internet Drug Outlets?

08:50:30  20  **A.**    Yes, sir.

21  **Q.**    Isn't it a fact, sir, that that article states that

22  New Hampshire --

23          MR. FERAN:  Objection, Your Honor.

24  **Q.**    -- passed --

08:50:42  25          THE COURT:  This is from his -- this is

113

Catizone - Cross (By Mr. Darken)

1    from --

2              MR. DARKEN:  It is from his organization's

3    newsletter.

4              THE COURT:  Do you have a problem with

08:50:52 5   presenting him with something from his own newsletter?

6              MR. FERAN:  The time period, Your Honor.  It

7    is outside the time period.

8              THE COURT:  What was the time frame?

9              MR. DARKEN:  June of 2008, Your Honor.  It's

08:51:02 10  during the conspiracy, alleged conspiracy.

11             MR. FERAN:  You said February '09.

12             MR. DARKEN:  The article is February '09, what

13   it's reporting about is June of '08.

14             THE COURT:  It's talking about June of '08?

08:51:13 15            MR. DARKEN:  Yes.

16             THE COURT:  Okay.  As long as whatever you

17   were talking about was before means it was in the time of

18   the conspiracy.

19             MR. DARKEN:  Yes.

08:51:21 20            THE COURT:  Okay.

21   BY MR. DARKEN:

22   Q.    Isn't it a fact, sir, that in that article it states

23   that New Hampshire passed a statute -- I'll just quote

24   it -- does it say "New Hampshire joined the ranks of those

08:51:39 25  states spelling out elements of a legal patient-practitioner

Catizone - Cross (By Mr. Darken)

1    relationship in June of 2008 when the state's governor

2    signed into law a bill that specified the need for such

3    relationship in the issuance of a prescription"?

4    **A.**    Yes, sir.

08:51:56 5    **Q.**    And didn't that article further state, quote,

6    "Minnesota's legislature, too, passed a law in 2008

7    requiring that prescriptions for controlled substances and

8    certain other drugs be based on a documented patient

9    evaluation, including an in-person examination."  Isn't that

08:52:14 10    true?

11    **A.**    Yes, sir.

12    **Q.**    Isn't it true that the same article says, quote,

13    "Other states that considered similar legislation in 2008

14    included Illinois and Massachusetts."

08:52:25 15    **A.**    Yes, sir.

16    **Q.**    When a state is considering legislation, that means

17    the state hasn't passed it yet, correct?

18    **A.**    Correct, sir.

19    **Q.**    Okay.  Now, you stated in response to Mr. Feran that

08:52:45 20    your organization has this database where you have all the

21    pharmacy laws for every state online somehow, correct?

22    **A.**    Yes, sir.

23    **Q.**    All right.  And you follow those laws as they change,

24    correct?

08:53:01 25    **A.**    Yes, sir.

Catizone - Cross (By Mr. Darken)

1    **Q.**    I will show you what's marked for identification as

2    Darji 7 H's.  That document is an act to amend the Arkansas

3    Internet Prescription Consumer Protection Act, and it was

4    enacted, approved February 21, 2007; correct?

08:53:50  5    **A.**    Yes, sir.

6    **Q.**    Okay.

7                    MR. DARKEN:  Move for the admission of Darji

8    HHHHHHH, Your Honor.

9                    MR. FERAN:  No objection, Judge.

08:54:00  10                    THE COURT:  It shall be admitted.

11    **Q.**    I will show you what's marked for identification as

12    Darji GGGGGGG.  Sir, that exhibit is a Louisiana statute

13    passed sometime in 2007 which imposed the requirement that a

14    prescription issued solely upon the results of answers to an

08:54:45  15    electronic questionnaire in the absence of a documented

16    patient evaluation including a physical examination shall be

17    considered issued outside the context of a valid

18    physician-patient relationship and shall not be a valid

19    prescription.  Correct?

08:54:59  20    **A.**    Yes, sir.

21    **Q.**    And that was passed in 2007, correct?

22    **A.**    Yes, sir.

23                    MR. DARKEN:  Move for the admission of Darji

24    Exhibit GGGGGGG, Your Honor.

08:55:07  25                    MR. FERAN:  No objection.

Catizone - Cross (By Mr. Darken)

1          THE COURT:  It shall be admitted.

2     **Q.**    Showing you what's marked for identification as Darji

3     FFFFFFF.  That exhibit is the statute from the state of

4     Hawaii, correct?

08:55:43  5     **A.**    Yes, sir.

6     **Q.**    And that was effective April 28, 2009; is that

7     correct?

8     **A.**    Yes, sir.

9     **Q.**    And that states in part, "Treatment recommendations

08:55:55 10    made by telemedicine, including issuing a prescription via

11    electronic means, shall be held to the same standards of

12    appropriate practice as those in traditional

13    physician-patient settings that do not include a

14    face-to-face visit," correct?

08:56:09 15    **A.**    Yes, sir.

16    **Q.**    Okay.  And then it further states that "Issuing a

17    prescription based solely on an online questionnaire is not

18    treatment for the purposes of this section and does not

19    constitute an acceptable standard of care."  Correct?

08:56:25 20    **A.**    Yes, sir.

21    **Q.**    And this was passed -- or it's effective April 28,

22    2009.

23    **A.**    Yes, sir.

24    **Q.**    Okay.  Now, you've testified -- we'll switch topics.

08:56:41 25    You've testified that you did a lot of media work, correct?

Catizone - Cross (By Mr. Darken)

1    **A.**    Yes, sir.

2    **Q.**    And you went on the Oprah show?

3    **A.**    Yes, sir.

4    **Q.**    All right.  Do you remember telling a reporter for

08:56:59  5    CNET news, quote, "In the early years of the Internet it was

6    a case of entrepreneurs not understanding the legal

7    requirements for the dispensing of drugs."

8    **A.**    Yes, sir.

9    **Q.**    Now, as part of your job you followed federal

08:57:26 10    legislation, correct?

11    **A.**    Yes, sir.

12    **Q.**    All right.  Do you recall reviewing a Congressional

13    research service report done for Congress titled Legal

14    Issues Related to Prescription Drug Sales on the Internet?

08:57:43 15    Do you remember seeing that in May of 2005?

16    **A.**    Yes, sir.

17    **Q.**    That indicated that, quote, "While some states specify

18    whether or not prescriptions based on online questionnaires

19    are valid, other state laws fail to address the issue."

08:57:59 20    Correct?

21    **A.**    Yes, sir.

22    **Q.**    Are you familiar with a 2004 American Health Lawyers

23    Association article concerning Internet pharmacies?

24    **A.**    Not that I specifically recall, sir.

08:58:21 25    **Q.**    Would you agree with the statement that as of 2004

Catizone - Cross (By Mr. Darken)

1   most states have not passed laws regulating Internet

2   pharmacies?

3   **A.**   Yes.

4   **Q.**   Now, you testified in response to Mr. Feran that one

08:58:48 5   of the ways states can determine a valid physician-patient

6   relationship is through case law.  Do you remember saying

7   that?

8   **A.**   No, sir, I said it was one of the tenets that are used

9   to provide the requirement for physical examination, not to

08:59:10 10   determine.

11   **Q.**   Are you familiar with a case called McKinney versus

12   Schlatter or "Schlatter" in the Ohio Court of Appeals from

13   1997?

14   **A.**   No, sir.

08:59:21 15   **Q.**   Are you aware of cases in any state establishing that

16   a physician-patient relationship can start without a

17   face-to-face interaction?

18   **A.**   No, sir.

19   **Q.**   Would it affect your opinion if you knew that courts

08:59:43 20   in Ohio, the Kansas Supreme Court, and New York State

21   Supreme Court, and the Missouri Supreme Court, and the Texas

22   Supreme Court have held that in certain circumstances a

23   physician-patient relationship can begin without

24   face-to-face interaction?  Would that affect your opinion,

09:00:07 25   or no?

Catizone - Cross (By Mr. Darken)

1    **A.**    If I had a chance to review the entire case it might,

2    but I can't say, sir.

3    **Q.**    Okay.  Well, I don't have the whole case, but let me

4    show you this footnote.

09:00:30  5                    MR. FERAN:  Judge, I object to this.

6                    THE COURT:  Okay.  You say it's just a

7    footnote?

8                    MR. FERAN:  I want him to read the whole case.

9                    MR. DARKEN:  All I have is the footnote.

09:00:39  10                   MR. FERAN:  I object, Judge.

11                   THE COURT:  Sustained.

12   **Q.**    You know Benjamin Gluck, right?

13   **A.**    I'm not -- I don't think so.

14   **Q.**    Okay.  There is a May 2008 conference sponsored by

09:01:11  15   your organization, and he's a lawyer from a firm called

16   Bird, Marella, and he spoke at that.  Did you attend that

17   conference?

18   **A.**    I probably did, sir.

19   **Q.**    All right.  Do you recall Mr. Gluck stating at that

09:01:39  20   conference in May 2008 before your organization, "29 states,

21   58 percent, have medical board policies addressing online

22   prescribing.  Some only say things like use of Internet does

23   not change standards of care, citing New York.  Most merely

24   deem it unprofessional.  None of these say it is outside the

09:02:07  25   course or an invalid prescription."  Do you remember that?

Catizone - Cross (By Mr. Darken)

1    **A.**    I don't remember it, but I'm sure it occurred.

2    **Q.**    All right.  Do you remember Mr. Gluck at that

3    conference further stating that 15 states, 30 percent, have

4    statutes addressing online prescribing.  Some merely address

09:02:27 5    cross-border licensing issues.  Most merely deem it

6    unprofessional, only Nevada and Virginia prohibit it."  Do

7    you recall that?

8    **A.**    I don't recall, but I'm sure that he made those

9    statements at our conference.

09:02:41 10    **Q.**    Okay.  Do you recall Mr. Gluck putting together this

11    map entitled Internet Prescribing as a Medical Practice, and

12    the only two states that are blacked out are Nevada and

13    Virginia?

14    **A.**    Same response.  I don't remember it, but I'm sure he

09:02:55 15    presented it.

16    **Q.**    Do you remember Mr. Gluck talking about the climate

17    summary and stating, quote, "The medical community does not

18    reflect the consensus that DEA purports to rely on.  The

19    legal community similarly does not reflect the purported

09:03:14 20    consensus."  Do you remember that?

21    **A.**    Same response, sir.

22    **Q.**    Mr. Gluck was a speaker at your organization, was

23    brought in to talk at that conference, wasn't he?

24    **A.**    Yes, sir.

09:03:41 25    **Q.**    We're going to shift topics.  You were shown by

Catizone - Cross (By Mr. Darken)

1   Mr. Feran the Model Guidelines for the Appropriate Use of

2   the Internet in Medical Practice put out by the Federation

3   of State Medical Boards in 2002, and you read part of that,

4   correct?

09:03:56  5   **A.**   Yes, sir.

6           MR. DARKEN:  Your Honor, at this time we move

7   for the admission of that document.  My copy is marked Darji

8   Defendant Exhibit C.

9           THE COURT:  Any objection?

09:04:04  10          MR. FERAN:  No, Judge.  We'd like a Joint

11  Exhibit, or however he wants to admit it, we want it

12  admitted, too.

13          MR. DARKEN:  That's fine.  We can mark it with

14  the government number, Your Honor, that's fine.

09:04:15  15          MR. FERAN:  Thank you.

16  **Q.**   Do you remember Mr. Feran asked you about the purpose,

17  what did you think the purpose of this was, and you gave

18  your answer?  Do you remember that?

19  **A.**   Yes, sir.

09:04:34  20  **Q.**   All right.  Now, the other side of the website are

21  customers, correct?

22  **A.**   The federation's website, sir?

23  **Q.**   No.  I'm sorry, poor question.  When we're looking at

24  the USMeds website we've got the website, the doctors, the

09:05:02  25  pharmacies, but the other side are the customers or

Catizone - Cross (By Mr. Darken)

1    patients, correct?

2    **A.**    Yes, sir.

3    **Q.**    All right.  And they have to want to buy or pay for

4    these orders in order for this website to function, correct?

09:05:21  5    **A.**    I believe so, sir, yes.

6    **Q.**    All right.  You were interviewed in December 2003 by

7    the *Fort Worth Star Telegram*.  Do you recall saying, quote,

8    "The health care system is inaccessible, Catizone said.  You

9    wait three weeks to see a doctor for 10 seconds, then you

09:05:43  10    wait 45 minutes for prescriptions."  Do you remember saying

11    that?

12    **A.**    Yes, sir.

13    **Q.**    Now we'll move on.  You were asked about electronic

14    signatures, and you testified that your opinion was that

09:06:09  15    only faxes were valid, but not Internet prescriptions.

16    Correct?

17    **A.**    No, sir, I testified that oral and fax prescriptions

18    at that time period were only allowed, and Internet

19    transmission of prescriptions was not allowed.

09:06:25  20    **Q.**    I'm sorry.  Thank you.  Okay.  I want to show you

21    what's marked for identification as VD-4.  Now, that's one

22    of those news items that was posted on your organization's

23    website in the news section, correct?

24    **A.**    Yes, sir.

09:07:08  25    **Q.**    That's a reprint from the July 2006 North Carolina

Catizone - Cross (By Mr. Darken)

1    Board of Pharmacy newsletter, correct?

2    **A.**    Yes, sir.

3    **Q.**    All right.  Now, let me ask you this:  Isn't it true

4    that at some point the Medicare Part D program was directed

09:07:28  5    to develop uniform standards for e-prescribing?

6    **A.**    Yes, sir.

7    **Q.**    And the purpose of that was for potential cost savings

8    and patient safety improvement.  Is that correct?

9    **A.**    Yes, sir.

09:07:42  10    **Q.**    It's just that that had not come into effect at the

11    time you were talking about, correct?

12    **A.**    It just came into effect this year, sir.

13    **Q.**    I'm going to show you what's marked for identification

14    as VD-8.  That's a letter dated August 24, 2011 to you from

09:08:29  15    Joseph Renzi, Deputy Administrator, Office of Diversion

16    Control, Drug Enforcement Administration, correct?

17    **A.**    Yes, sir.

18    **Q.**    And that's a response to a letter that you wrote dated

19    July 26, 2011, correct?

09:08:42  20    **A.**    Yes, sir.

21    **Q.**    And you wrote that in your capacity as executive

22    director of your organization, correct?

23    **A.**    Yes, sir.

24    **Q.**    And you were seeking clarification on DEA's policy

09:08:56  25    when a pharmacist has information missing from a Schedule II

Catizone - Cross (By Mr. Darken)

1    script, correct?

2    **A.**    Yes, sir.

3    **Q.**    All right.  And specifically, the question was, if a

4    practitioner's DEA number is missing or if the patient's

09:09:15 5    name or address is wrong, what is the pharmacist to do,

6    correct?

7    **A.**    Yes, sir.

8    **Q.**    And you wanted advice from DEA, correct?

9    **A.**    Yes, sir.

09:09:24 10   **Q.**    All right.  And you were told, were you not, that

11   whether it is appropriate for a pharmacist to make changes

12   to the prescription, such as adding a practitioner's DEA

13   number or correcting a patient's name or address, varies

14   case by case.  Correct?

09:09:41 15   **A.**    Yes, sir.

16   **Q.**    All right.  And you were told that when information is

17   missing or needs to be changed on a Schedule II controlled

18   substance prescription pharmacists use their professional

19   judgment, correct?

09:09:56 20   **A.**    Yes, sir.

21   **Q.**    Okay.  Now, Schedule II, as everybody knows, is more

22   controlled than Schedule III, like hydrocodone, correct?

23   **A.**    Yes, sir.

24   **Q.**    All right.  So here the situation was the pharmacist

09:10:15 25   gets a script for a Schedule II that doesn't even have a DEA

Catizone - Cross (By Mr. Darken)

1    number on it, correct?

2    **A.**    Yes, sir.

3    **Q.**    All right.  And the pharmacist, according to this

4    letter, is allowed to deal with that using his or her best

09:10:30  5    professional judgment, correct?

6    **A.**    No, sir.

7    **Q.**    Okay.  Well, doesn't that document say whether it is

8    appropriate for a pharmacist to make changes to the

9    prescription, such as adding the practitioner's DEA number

09:10:51  10    to the prescription, or correcting the patient's name or

11    address, varies case by case based on the facts present,

12    that should be presented?  Right?  The facts present.  I'm

13    sorry.  That's what it says, right?

14    **A.**    Yes, sir.  The second part said knowledge of state and

09:11:11  15    federal laws.  That's a very important part of that

16    sentence, sir.  It says professional judgment and knowledge

17    of state and federal laws.

18    **Q.**    Okay.  The next sentence states, "Consequently, DEA

19    expects that when information is missing or needs to be

09:11:24  20    changed on a Schedule II controlled substance prescription

21    pharmacists use their professional judgment and knowledge of

22    state and federal laws and policies to decide whether it is

23    appropriate to make changes to the prescription."  Is that

24    correct?

09:11:36  25    **A.**    Yes, sir.

126

Catizone - Cross (By Mr. Darken)

1   **Q.**    Well, if it was so obvious under state or federal law,

2   why did you have to write that letter to DEA and ask them?

3   **A.**    The DEA had issued a prior letter saying that

4   pharmacists could not add the DEA number or add the

09:11:52 5   patient's name, or any other information.

6   **Q.**    Okay.  So DEA sent the prior letter, and then you

7   wrote a letter asking them to reconsider, or challenging

8   them, or what?

9   **A.**    Asking them to reconsider, sir.

09:12:14 10   **Q.**    You didn't think it was entirely clear or you wouldn't

11   have written the letter, right?

12   **A.**    Correct.

13            MR. DARKEN:  One moment, Your Honor.

14   **Q.**    Now we're going to go quickly through some statements

09:12:46 15   you made on direct.

16       Do you remember testifying in response to Mr. Feran

17   about the number of controlled substances versus

18   noncontrolled substances regarding Mr. Darji?

19   **A.**    Yes, sir.

09:13:13 20   **Q.**    And you testified that your opinion was this was done

21   to disguise the ordering pattern, correct?

22   **A.**    Yes, sir.

23   **Q.**    Now, we've heard testimony from a DEA official about

24   the ARCOS data.  You're familiar with ARCOS data, correct?

09:13:33 25   **A.**    Yes, sir.

Catizone - Cross (By Mr. Darken)

1    **Q.**    Now, if I'm a pharmacist and I order a hundred

2    controls and a hundred noncontrols, DEA sees that I ordered

3    a hundred controls, correct?

4    **A.**    Yes, sir.

09:13:46 5    **Q.**    There's no way for me to hide the fact that I ordered

6    a hundred controls; whether I order zero controls or a

7    hundred controls, DEA still knows I ordered a hundred

8    controls, right?

9    **A.**    Yes, sir.

09:14:05 10   **Q.**    Now, you testified in response to Mr. Feran about

11   dispensing fees.  Do you remember that?

12   **A.**    Yes, sir.

13   **Q.**    And you said that for a pharmacist operating -- for

14   patients with insurance plans they get paid somewhere

09:14:16 15   between 50 cents and $2.50 per script.  Is that correct?

16   **A.**    Yes, sir.

17   **Q.**    All right.  But isn't it true that a lot of people in

18   this country are not insured?

19   **A.**    No, sir.

09:14:30 20   **Q.**    It's not true?

21   **A.**    No.  Presently 97 percent of the prescriptions that

22   are dispensed by pharmacies are filled under insurance

23   plans.

24   **Q.**    Well, let me put it this way:  There's no law in this

09:14:46 25   country that sets a price that a pharmacist -- the fill fee

128

Catizone - Cross (By Mr. Darken)

1    a pharmacist can charge for a cash transaction.  Isn't that

2    true?

3    **A.**    Correct, sir.

4    **Q.**    All right.  Now, you're familiar in medical insurance

09:15:08 5    that certain procedures are not covered by insurance,

6    correct?  They're cash only procedures?

7    **A.**    As a layperson, but not as an expert, sir.

8    **Q.**    Right.  I understand that.  But for example, certain

9    types of cosmetic procedures are not covered by insurance.

09:15:23 10   You have to pay cash to have them done, right?

11   **A.**    Again, from what I know as a patient, not as a

12   pharmacist or expert, sir.

13   **Q.**    And when the doctor does those procedures, the doctor

14   says, well, I'll do this cosmetic procedure if you pay me X.

09:15:37 15   Correct?

16   **A.**    I believe so.

17   **Q.**    All right.  And that's legal, right?

18   **A.**    Again, as a person and a patient, I would say yes.

19   **Q.**    All right.  Now, you were asked a number of questions,

09:15:54 20   do you remember Mr. Feran went through Laura Keeley and all

21   of her prescriptions?  Do you remember that?

22   **A.**    Yes, sir.

23   **Q.**    I'm not going to bring them all up here, but the dates

24   were May 1 '06, May 30 '06, July 5 '06, August 4 '06,

09:16:17 25   November 8 '06.  They're all about 30 days apart, right?

Catizone - Cross (By Mr. Darken)

1    **A.**    Yes, sir.

2    **Q.**    All right.  So she wasn't filling early, correct?

3    **A.**    Yes, sir.

4    **Q.**    Now, you testified about Laura Keeley, and Nikisha

09:16:34  5    Dawson, or -- I think that's right, and they had the same

6    address on their scripts.  Correct?

7    **A.**    Yes, sir.

8    **Q.**    All right.  Now, you worked at Osco Drugs; is that

9    right?

09:16:45  10    **A.**    I used to, sir.

11    **Q.**    When did you work at Osco Drugs?

12    **A.**    From 1978 to 1985.

13    **Q.**    Okay.  And when you worked at Osco Drugs, that's a

14    chain, right?

09:16:57  15    **A.**    Yes, sir.

16    **Q.**    All right.  Did you have pharmacy techs who worked

17    under you?

18    **A.**    Yes, sir.

19    **Q.**    Now, I know you testified that the pharmacist in

09:17:09  20    charge is ultimately in charge, correct?

21    **A.**    Yes, sir.

22    **Q.**    All right.  You don't really expect Mr. Darji to

23    physically compare every prescription against every other

24    prescription to match up addresses, do you?

09:17:25  25    **A.**    Yes.

Catizone - Cross (By Mr. Darken)

1    **Q.**    Okay.  You expect him personally to do that or his

2    techs to do that?

3    **A.**    Mr. Darji would establish a system that he would be

4    responsible for to make sure that occurred.

09:17:42  5    **Q.**    Right.  And in your view he's responsible for setting

6    up the system, but he's not responsible for personally

7    crosschecking every prescription against every other

8    prescription to match up addresses.  Is that right?

9    **A.**    Under law he is personally responsible if that system

09:17:57 10    fails.

11    **Q.**    Now, when you testified "under law," okay, do you

12    understand the difference between pharmacy board law in a

13    state and criminal law?  You understand that difference?

14    **A.**    Yes, sir.

09:18:12 15    **Q.**    Okay.  And that's a big difference; isn't that true?

16    **A.**    Yes, sir.

17    **Q.**    Okay.  Now, you talked in response to Mr. Feran about

18    Mr. Darji spreading prescriptions among three pharmacies.

19    Do you remember that?

09:18:30 20    **A.**    Yes, sir.

21    **Q.**    What evidence do you have that Mr. Darji -- well, back

22    up.  One of Mr. Darji's prescriptions was -- one of

23    Mr. Darji's pharmacies was primarily for ALF homes.  Are you

24    aware of that?

09:18:47 25    **A.**    Yes, sir.

Catizone - Cross (By Mr. Darken)

1    **Q.**    What evidence do you have that he spread hydrocodone

2    prescriptions into that pharmacy?

3    **A.**    The taped conversations, the wiretaps that I read in

4    the report, talked about spreading the prescriptions around

09:19:05  5    and utilizing certain doctors because the DEA and others

6    were becoming aware of that, and how to hide those

7    prescription totals, and what they could do to conceal that

8    activity.  That's where I came up with my opinion, sir.

9    **Q.**    Okay.  Now, this jury has heard one phone call between

09:19:22  10    Mr. Hazelwood and Mr. Darji.  Is that what you're relying

11    on?

12    **A.**    There were several calls that they taped of

13    Mr. Hazelwood between Mr. Hazelwood, Miss Rovedo, and some

14    of the others involved where they talked about the

09:19:35  15    operation, sir.

16    **Q.**    Okay.  I'm focused on Mr. Darji, just Mr. Darji.  Do

17    you understand?

18    **A.**    Yes, sir.

19    **Q.**    Okay.  Now, you didn't hear -- well, did you actually

09:19:46  20    listen to the April 29 call between Mr. Darji and

21    Mr. Hazelwood, or not?

22    **A.**    No, sir.

23    **Q.**    No.  Okay.  So you don't really know, right?

24    **A.**    Just what I read in the reports, sir.

09:19:58  25    **Q.**    Okay.  Well, you're not aware of any other call

Catizone - Cross (By Mr. Darken)

1    between Mr. Hazelwood and Mr. Darji other than the April 29

2    call, are you?

3    **A.**    No, sir.

4    **Q.**    Okay.

09:20:21  5                    MR. DARKEN:  One moment, Your Honor.

6    **Q.**    Now, we said yesterday, we talked about Florida law.

7    Do you remember that?

8    **A.**    Yes, sir.

9    **Q.**    Let me show you what's marked -- I'll bring them up at

09:20:44  10   the same time -- marked for identification as VD-7 and Darji

11   EEEEEEE.  (Handing.)

12   **A.**    Thank you.

13   **Q.**    Now, Mr. Feran asked you some questions about VD-7,

14   which is Florida Administrative Code 64 B 16-27.831.

09:21:40  15   Correct?

16   **A.**    Yes, sir.

17   **Q.**    And you read a section that stated that one of the

18   criteria which would cause a physician to question whether a

19   prescription was issued for a legitimate medical purpose was

09:21:58  20   only controlled substance prescriptions are prescribed for a

21   patient.  Is that correct?

22   **A.**    It's for the pharmacist, sir, not for the physician.

23   This is within the borders --

24   **Q.**    You're right, I'm sorry.  And that's the section that

09:22:09  25   you read, correct?

Catizone - Cross (By Mr. Darken)

1    **A.**    Yes, sir.

2    **Q.**    And that's one of five criteria, correct?

3    **A.**    Yes, sir.

4    **Q.**    All right.  And this was the Florida Administrative

09:22:28 5    Code section which was in effect at least as of 2003,

6    correct?

7    **A.**    Yes, sir.

8    **Q.**    All right.  Now, isn't it true that other factors

9    which pharmacists should consider in terms of whether or not

09:22:49 10    a prescription was issued for a legitimate medical purpose

11    was, A, frequent loss of controlled substance medications,

12    correct?

13    **A.**    Yes, sir.

14    **Q.**    You don't have any evidence that in this case

09:23:02 15    Mr. Darji was informed that any of these patients had

16    frequent loss of controlled substance medications, correct?

17    **A.**    Correct.

18    **Q.**    And then B you talked about with Mr. Feran.  C, one

19    person presents controlled substance prescriptions with

09:23:21 20    different patient names.  Correct?

21    **A.**    Yes, sir.

22    **Q.**    That's a version of double dipping, right?

23    **A.**    Yes, sir.

24    **Q.**    Are you aware that Mr. Darji's techs worked to weed

09:23:36 25    out double dippers?

Catizone - Cross (By Mr. Darken)

1    **A.**    No.

2    **Q.**    You are not aware of that?

3    **A.**    No, sir.

4    **Q.**    The government didn't tell you that?

09:23:42  5    **A.**    No, sir.

6    **Q.**    Have you seen any documents from the government

7    showing that Mr. Darji did that?

8    **A.**    No, sir.

9    **Q.**    Okay.  Then the next factor, same or similar

09:23:57  10   controlled substance medication is prescribed by two or more

11   prescribers at the same time.  Correct?

12   **A.**    Yes, sir.

13   **Q.**    That's another version of double dipping, that's

14   doctor shopping, where I'm a patient and I go to doctor A

09:24:08  15   and get a script, and then I go to doctor B and get a

16   script.  Correct?

17   **A.**    One of the double dipping ways, yes, sir.

18   **Q.**    And the same thing:  You're not aware that Mr. Darji's

19   techs tried to weed out those double dippers, are you?

09:24:24  20   **A.**    No, sir.

21   **Q.**    And you haven't seen any documents from the government

22   showing you that, right?

23   **A.**    No, sir.

24   **Q.**    All right.  E, patient always pays cash and always

09:24:32  25   insists on brand name product.  Correct?

Catizone - Cross (By Mr. Darken)

1    **A.**    Yes, sir.

2    **Q.**    Okay.  All right.  Now, Mr. Feran asked you, and you

3    read part of what the pharmacist is supposed to do if he has

4    a concern.  Correct?

09:24:51  5    **A.**    Yes, sir.

6    **Q.**    And that is if any of the criteria in 2 is met, the

7    pharmacist shall, A, require that the person to who the

8    medication is dispensed provide picture identification, and

9    the pharmacist should photocopy such picture identification

09:25:09 10    for the pharmacist's record; correct?

11    **A.**    Yes, sir.

12    **Q.**    Now, in this case, sir, are you aware that these

13    USMeds patients before they ever got to Mr. Darji they had

14    provided photo identification?

09:25:20 15    **A.**    Yes, sir.

16    **Q.**    You knew that?

17    **A.**    Yes, sir.

18    **Q.**    Are you aware that the website made people in certain

19    cases resend their photo identification if the original

09:25:34 20    photo identification was blurry or didn't look right?  Are

21    you aware of that?

22    **A.**    No, sir.

23    **Q.**    You weren't told that?

24    **A.**    No, sir.

09:25:40 25    **Q.**    Okay.  All right.

Catizone - Cross (By Mr. Darken)

1          MR. DARKEN:  Your Honor, I move for the add

2     vision of VD-7.

3          MR. FERAN:  No objection, Judge.

4          THE COURT:  It shall be admitted.

09:25:56 5   **Q.**    Now, looking at the other document, Darji EEEE -- I

6     don't know how E's -- EEEEEEE, I'm sorry, that is Florida

7     Administrative Code 64 B 8-9.014, Standards For Telemedicine

8     Prescribing Practice.  Correct?

9     **A.**    Yes, sir.

09:26:15 10  **Q.**    All right.  And this is a document which states in

11    Section 1, "Prescribing medications based solely on

12    electronic medical questionnaire constitutes the failure to

13    practice medicine with that level of care, skill, and

14    treatment which is recognized by reasonably prudent

09:26:40 15   physicians being acceptable under similar conditions and

16    circumstances, as well as prescribing legend drugs other

17    than in the course of a physician's professional practice,"

18    right?

19    **A.**    Yes, sir.

09:26:53 20  **Q.**    All right.  Now, it doesn't say -- it says based

21    solely on electronic medical questionnaire.  Correct?

22    **A.**    Yes, sir.

23    **Q.**    Now, you understand that this case does not involve

24    simply solely based on a medical questionnaire because

09:27:08 25   there's the questionnaire and then there's consultations,

Catizone - Cross (By Mr. Darken)

1    telephone consultations, correct?

2    **A.**   The telephone consultations weren't valid in my

3    opinion, sir.

4    **Q.**   Okay.  My question -- all right.  Let me ask it this

09:27:25 5    way:  This case doesn't involve solely electronic medical

6    questionnaires; isn't that right?

7    **A.**   Well, you would say yes, I would say no.

8    **Q.**   Okay.  Fair enough.

9               MR. DARKEN:  Your Honor, at this time move for

09:27:42 10   the admission of Darji EEEEEEE.

11              THE COURT:  Any objection?

12              MR. FERAN:  No objection, Judge.

13              THE COURT:  It shall be admitted.

14   **Q.**   Okay, sir, we're getting to the end.  You testified in

09:28:01 15   response to Mr. Feran that federal law defers to state law

16   to actually define what is a valid script.

17   **A.**   Yes, sir.

18   **Q.**   I'll show you what's marked for identification as

19   VD-6.

09:28:36 20   **A.**   Thank you.

21   **Q.**   VD-6 is the section of the Code of Federal

22   Regulations, 21 C.F.R. 1306.21, which is titled Requirement

23   of Prescription, correct?

24   **A.**   Yes, sir.

09:29:22 25   **Q.**   This is the federal law that you were referring to

Catizone - Cross (By Mr. Darken)

1    when you said federal law defers to state law to define what

2    is a valid script.  Correct?

3    **A.**    No, sir.

4    **Q.**    No, it's not?

09:29:34 5    **A.**    No, sir.

6    **Q.**    What were you talking about?

7    **A.**    I'm talking the Food, Drug, and Cosmetic Act which

8    differentiates between prescription drugs, and prescription

9    drugs in the Food, Drug, and Cosmetic Act, the prescription

09:29:46 10   drug can only be dispensed upon a valid prescription.  I was

11   referring to that, sir.

12   **Q.**    Okay.  Well, this section states, Section A, "A

13   pharmacist may dispense directly a controlled substance

14   listed in Schedule III, IV, or V, which is a prescription

09:30:03 15   drug as determined under the federal Food, Drug, and

16   Cosmetic Act only pursuant to either a written prescription

17   signed by a practitioner or a facsimile of a written signed

18   prescription transmitted by the practitioner or the

19   practitioner's agent to a pharmacy or pursuant to an oral

09:30:23 20   prescription made by an individual practitioner and promptly

21   reduced to writing by the pharmacist containing all the

22   information required in Section 1306.05 except for the

23   signature of the practitioner."  Correct?

24   **A.**    Yes, sir.  That's the reference that they're referring

09:30:37 25   to, the same one I used yesterday.

Catizone - Cross (By Mr. Darken)

1   **Q.**   All right.  So here is my point.  Nothing in 1306.21

2   defines what a valid prescription is, correct?

3   **A.**   It refers you to the Food, Drug, and Cosmetic Act, and

4   that definition is there.  It incorporates that reference

09:31:02  5   and that federal law and that definition.

6   **Q.**   Well, actually, sir, let's blow this up.

7          MR. DARKEN:  Your Honor, I move for the

8   admission of Exhibit VD-6.

9          THE COURT:  Any objection?

09:31:15 10          MR. FERAN:  No objection, Judge.

11          THE COURT:  It will be admitted.

12          THE WITNESS:  My screen is not working.

13          MR. DARKEN:  I'll fix the screen.  That's my

14   fault.  Can you read it now, sir?

09:31:37 15          THE CLERK:  It's not on.

16          THE WITNESS:  I keep getting ESPN.  That's

17   okay.  I can read off the page here if that would be easier.

18          MR. DARKEN:  One moment, Your Honor.

19          THE COURT:  Sure.

09:32:29 20          THE CLERK:  It's not working, Judge.

21          THE COURT:  It's not working?

22          THE CLERK:  No.

23          THE WITNESS:  I can read off the sheet, that's

24   fine.

09:32:35 25   **Q.**   Okay, if you can read it.  I've got a section

Catizone - Cross (By Mr. Darken)

1    highlighted.

2    **A.**    If you can read the highlighted section, that would be

3    fine.

4    **Q.**    Okay.  The highlighted section is, it begins on the

09:32:46 5    third line of 1306.21, and the highlighted section is

6    Prescription Drug as Determined under the Federal Food,

7    Drug, and Cosmetic Act.  That's what I've highlighted.

8    **A.**    Yes, sir.

9    **Q.**    So here is my question.  Isn't it true that 1306.21

09:33:09 10    refers to a prescription drug as determined under the

11    Federal Food, Drug, and Cosmetic Act?  Correct?

12    **A.**    Yes, sir.

13    **Q.**    But isn't it also true that what's being defined in

14    relation to the Federal Food, Drug, and Cosmetic Act is what

09:33:28 15    is a prescription drug, not what is a prescription?  Isn't

16    that true?

17    **A.**    I can't answer the question because I'm not sure what

18    the question is.  Under the Food, Drug, and Cosmetic Act a

19    prescription drug is defined, and that definition includes

09:33:47 20    the term valid prescription that defines how it can't be

21    dispensed, so it is part of the definition, sir.

22    **Q.**    Well, let me put it this way.  1306.21 does not say

23    that a valid prescription -- to be a valid prescription it

24    has to be a prescription that was issued by a doctor who had

09:34:12 25    conducted a face-to-face physical examination or

Catizone - Cross (By Mr. Darken)

1    face-to-face physical consultation.  Correct?

2    **A.**    Correct.

3    **Q.**    Okay.

4              MR. DARKEN:  One moment, Your Honor.  Your

09:34:41  5    Honor, I've been handed -- one moment.  I've been handed a

6    McKinney vs. Schlatter case that the witness and the

7    government wanted to see the full case.  I don't know if

8    he's going to need a little time to read it.  I've got one

9    other thing to cover.  I don't know how you want to deal

09:35:10  10    with this.

11             THE COURT:  Well, I mean, how long is the

12    case?

13             MR. DARKEN:  Nine pages.

14             THE COURT:  Why don't you finish your other

09:35:24  15    area, I'll give you leave to come back with that one case so

16    we can keep it moving, and maybe at a break he can look at

17    it and counsel for the United States can look at it, and

18    we'll see where we are.

19             MR. DARKEN:  That makes sense, Your Honor.

09:35:49  20    **Q.**    Okay.  You testified in the case of United States

21    versus Christopher Smith in Minnesota on November 15, 2006,

22    correct?

23    **A.**    Yes, sir.

24    **Q.**    And you were asked questions about the regulation we

09:36:24  25    just looked at, 21 C.F.R. 1306.21.  Correct?

Catizone - Cross (By Mr. Darken)

1    **A.**    Yes, sir.

2    **Q.**    Excuse me?

3    **A.**    Yes, sir.

4    **Q.**    All right.  Do you recall making this question and

09:36:37 5    this answer.

6         "Q.  Well, if I wanted to run an Internet pharmacy and

7    I read this regulation, would you agree with me that there's

8    no place here that refers me within this regulation to state

9    law?

09:36:50 10        "A.  Yes, sir."

11        Do you remember that?

12   **A.**    Yes, sir.

13   **Q.**    Okay.  Do you remember we were talking earlier this

14   morning about the part of your website, your organization's

09:37:08 15   website, that has the news on it?  Do you remember that?

16   **A.**    Yes, sir.

17   **Q.**    Okay.  And I'm going to show you what's marked for

18   identification as VD-9.  That's a news item from your

19   website that was reprinted from the January 2007 Minnesota

09:37:45 20   Board of Pharmacy Newsletter.  Is that correct?

21   **A.**    Yes, sir.

22   **Q.**    And that document refers to the same four elements

23   that were in Government's Exhibit 976, correct?

24   **A.**    Yes, sir.

09:38:06 25   **Q.**    And that document states, "A patient completing a

Catizone - Cross (By Mr. Darken)

1    questionnaire that is reviewed by a physician working on

2    behalf of an Internet pharmacy does not constitute a bona

3    fide doctor-patient relationship, and any prescriptions

4    generated as a result of the questionnaire are not valid."

09:38:30    5    Correct?

6    **A.**    Yes, sir.

7    **Q.**    All right.  And that is dated January 1, 2007,

8    correct?

9    **A.**    Yes, sir.

09:38:36    10            MR. DARKEN:  Your Honor, I move for the

11    admission of VD-9.

12            MR. FERAN:  No objection.

13            THE COURT:  It shall be admitted.

14            MR. DARKEN:  One moment, Your Honor.

09:38:44    15            THE COURT:  Sure.

16            MR. DARKEN:  Your Honor, Ms. Wilson informs me

17    that I didn't move for the admission of the Hawaii statute,

18    FFFFFFF.  I move for the admission of the FFFFFFF document.

19            MR. FERAN:  Judge, we have no objection to any

09:39:15    20    state statutes that Mr. Darken wants to introduce.

21            MR. DARKEN:  Thank you.

22            THE COURT:  It shall be admitted.

23    **Q.**    Are you aware, sir, that the New York State Board for

24    Professional Medical Conduct has issued a statement on

09:39:52    25    telemedicine dated December 24, 2003?

Catizone - Cross (By Mr. Darken)

1       **A.**     No, sir.

2       **Q.**     Okay.  Would it change your opinion if you knew that

3       that statement stated that the fact that an electronic

4       medium is utilized for contact between parties or as a

09:40:09 5      substitute for face-to-face consultation does not change the

6       standards of care?  Does that change your opinion?

7       **A.**     No, sir.

8       **Q.**     Would you agree that by using the term" substitute for

9       face-to-face consultation" the New York State Board For

09:40:28 10     Professional Medical Conduct seems to envision some type of

11      non-face-to-face interaction between a doctor and a patient?

12      **A.**     Yes, sir.

13                  MR. DARKEN:  One moment, Your Honor.

14                  THE COURT:  Sure.

09:41:12 15     **Q.**     Are you aware that the Maryland Code 10.32.05.05

16      states that if a physician-patient relationship -- I'm

17      sorry -- as of 2005 states that if a physician-patient

18      relationship does not include prior in-person face-to-face

19      interaction with a patient the physician shall incorporate

09:41:37 20     real time auditory communications or real time visual and

21      auditory communications to allow a free exchange of

22      information between the patient and the physician performing

23      the patient evaluation.  Are you aware of that?

24      **A.**     No, sir.

09:41:52 25     **Q.**     Would that affect your opinion?

Catizone - Cross (By Mr. Gorence)

1  **A.**    No, sir.

2           MR. DARKEN:  One moment, Your Honor.

3        That's all I have, Your Honor.

4              THE COURT:  All right.  Who is next?

09:42:09  5        MR. GORENCE:  I'm next, Your Honor.  Are we

6  going to take a break?

7              THE COURT:  No.  He's going to come back.

8        CROSS-EXAMINATION OF CARMEN CATIZONE

9  BY MR. GORENCE:

09:42:28  10  **Q.**    Mr. Catizone, let me first introduce myself.  My name

11  is Bob Gorence, and I represent Barb Rovedo in this case.

12  We've never met, have we?

13  **A.**    No, sir.

14  **Q.**    Now, I want to start with some background questions in

09:42:57  15  terms of your qualifications.  You've told us yesterday that

16  you graduated pharmacy school in '83?

17  **A.**    Yes, sir.

18  **Q.**    And then you started with the National Association of

19  the Boards of Pharmacy in '85?

09:43:10  20  **A.**    Yes, sir.

21  **Q.**    Was that full time in '85?

22  **A.**    Yes, sir.

23  **Q.**    And you've been with them ever since.  You got

24  promoted two years later to be the executive director.

09:43:20  25  **A.**    Three years later.  Yes, sir.

Catizone - Cross (By Mr. Gorence)

1    **Q.**    Three years.  So a title that you've then had for the

2    last 24 years.

3    **A.**    Correct.

4    **Q.**    Now, in that capacity as the executive director, I

09:43:30  5    take it you don't practice pharmacy.  You're not a

6    practicing pharmacist in a pharmacy now, are you?

7    **A.**    Correct, sir.

8    **Q.**    And you haven't been doing that for how long?

9    **A.**    Probably the last 15 years, sir.

09:43:44 10    **Q.**    So there was a period of time when you were the

11    executive director from '88 on when you did practice as a

12    pharmacist?

13    **A.**    Yes, sir.

14    **Q.**    Okay.  One of the things of being of executive

09:43:57 15    director, as Mr. Darken has pointed out for the last hour

16    this morning and yesterday, is that you have a paper trail

17    comparable to a politician in terms of statements that

18    you've made, whether it's testimony in courtrooms or to

19    Congressional boards, or media outlets.  And I want to go

09:44:18 20    through the same thing, but I want to highlight some of the

21    issues as they presented in Internet medicine and Internet

22    pharmacies, I should say.

23        Since you've been the executive director this issue

24    of Internet pharmacies really started in the late '90s,

09:44:36 25    didn't it?

Catizone - Cross (By Mr. Gorence)

1    **A.**    Yes, sir.

2    **Q.**    And in fact, you made quite a few presentations in the

3    late '90s regarding the onset of this new business

4    opportunity as it applied to pharmacies, did you not?

09:44:51 5    **A.**    Yes, sir.

6    **Q.**    I'm on page 17 of what is your -- and I've highlighted

7    some -- this is your CV.

8    **A.**    Excuse me, sir.  I don't have access to the computer

9    screen, it's not operating here, so I can't see that.

09:45:40 10    **Q.**    I only have one copy.

11    **A.**    If you could read the highlighted portions, that would

12    help.

13    **Q.**    My question, Mr. Catizone, and I want to start, and

14    you outlined your presentations that you have made to

09:46:21 15    various entities --

16    **A.**    Excuse me, sir.  What page are you on?

17    **Q.**    17.

18    **A.**    Thank you.

19    **Q.**    Do you have it?  As you've indicated here and in

09:46:36 20    length, really starting in 1999 you started making

21    presentations about this new business opportunity as it

22    presented itself to pharmacists and pharmacies, correct?

23    **A.**    I'm sorry, sir, on page 17 I've got chapters and books

24    and publications.  I don't have -- that's my page 17 that

09:46:54 25    you gave me.  Is it a different page, Your Honor, sir?

148

Catizone - Cross (By Mr. Gorence)

**Q.**    I have a report that you dated on December 17, 2008

with the CV from that period of time.  Is that the newer one

he has?

**A.**    This one has no numbers on it like the one that you

09:47:29   have there, sir.

**Q.**    I'm using your old one.  You found it, sir?

**A.**    Is the first one the Workshop Presentation on Cyber

Drug Stores?  Is that the first presentation?

**Q.**    They're not numbered, but they're bullet points, and

09:48:14  you've got one, and I've highlighted the first one.

**A.**    But the one at the top of the page --

**Q.**    It says Pharmacy Practice, ABC News, with Peter

Jennings, you did on May 15 of '02.

**A.**    I can't locate it, but go ahead, I'm familiar.  It's

09:48:38  not the same page, sir, but go ahead.

**Q.**    I'm going to go through this in detail.  Do you have a

copy of that?  I just have a report that was provided to me

by the government and was dated December 17 of '07.  You

addressed it to Ms. Lutzko.

09:48:52            MS. LUTZKO:  Your Honor, we provided the

defense with an updated copy of Catizone's resume this past

summer, so I think he maybe handed him two different

documents.

            MR. GORENCE:  Well, I marked the old one.  I

09:49:04  can walk through it, sir.  I can see the citations.

Catizone - Cross (By Mr. Gorence)

1    **Q.**    Mr. Catizone, I appreciate the new CV, but it was

2    after the dates of this indictment, and I didn't think it

3    was completely relevant, so I'm going to focus on this one.

4    **A.**    Yes, sir.

09:49:31  5    **Q.**    And all I'm trying to get at with this first set of

6    questions is, as you've indicated, starting in the late '90s

7    this issue of online pharmacies with regulations not yet in

8    place came to the forefront of all pharmacists around the

9    country.  That's true, isn't it?

09:49:48  10    **A.**    It was an issue, but regulations were in place, sir.

11    **Q.**    Come again?

12    **A.**    It was true that it was a topic of discussion, but

13    regulations were in place, sir.

14    **Q.**    You're saying in 1999 it was completely regulated for

09:50:03  15    pharmacists in terms of how to practice e-pharmacy?

16    **A.**    No.  The regulation of Internet practice was the same

17    as standard practice back in 1990, sir.

18    **Q.**    Well, you made a fair number of presentations about

19    this new field of opportunity that technology was allowing

09:50:20  20    for pharmacists, did you not?

21    **A.**    Yes, sir.

22    **Q.**    Okay.  And as Mr. Darken has gone through, the real

23    issue early on in terms of a problem that you were working

24    with had to do with the importation of drugs from outside

09:50:37  25    the United States.  That's true, that was one of the first

Catizone - Cross (By Mr. Gorence)

1    real issues to be addressed with e-pharmacy, Internet

2    pharmacy, correct?

3    **A.**    No, sir, that was a different issue.  There

4    were -- those are two separate issues.

09:50:53 5    **Q.**    Okay.  What are you saying?  I'm saying the

6    importation was one of the first problems that DEA

7    encountered in the practice of Internet pharmacy.  Correct?

8    **A.**    I can't speak for the DEA, but from our organization,

9    importation was a separate issue to Internet pharmacy issues

09:51:13 10    that we faced.

11    **Q.**    Go ahead and explain, what do you mean by separate

12    issues?

13    **A.**    What we saw with the importation was that products

14    were entering the U.S. by citizens traveling to Canada or

09:51:22 15    Mexico and buying those products and transporting them over

16    the border.  That became the first problem with importation.

17        It then spread to the use of Internet sites that

18    people ordered from outside of the U.S., but that became

19    then a part of the Internet issue.  Importation began before

09:51:43 20    the Internet issue.

21    **Q.**    Okay.  In your position as the executive director of

22    the National Association of Boards of Pharmacy you work very

23    closely with the DEA, do you not?

24    **A.**    Yes, sir.

09:51:54 25    **Q.**    And you've actually work closely with federal

Catizone - Cross (By Mr. Gorence)

1   prosecutors around the country?

2   **A.**   Yes, sir.

3   **Q.**   And it's in addition to just being an expert witness

4   for them, you make presentations to federal prosecutors?

09:52:07 5   **A.**   Yes, sir.

6   **Q.**   Okay.  And in fact, I have a list of at least in 2008,

7   and I've got them on -- it's called the National Advocacy

8   Center, it's in Columbia, South Carolina.  You made a

9   presentation to a group of nothing but Assistant U.S.

09:52:24 10   Attorneys, correct?

11   **A.**   Yes, sir.

12   **Q.**   And you've actually done that since 2008, haven't you?

13   **A.**   Yes, sir.

14   **Q.**   Tell the jury how many times.

09:52:32 15   **A.**   I can't recall, but I was adjunct faculty at Quantico,

16   the training center for the FBI and DEA agents, and so I

17   gave presentations there four times a year, and other

18   meetings when requested.

19   **Q.**   So you're actually on the faculty?

09:52:47 20   **A.**   As an adjunct, not as a full faculty member.

21   **Q.**   As an adjunct.  You're not permanently stationed in

22   Quantico?

23   **A.**   Correct.

24   **Q.**   But you periodically go to teach DEA agents, correct?

09:52:58 25   **A.**   Yes, sir.

Catizone - Cross (By Mr. Gorence)

1    **Q.**    You indicated yesterday to Mr. Darken you're not paid

2    for that, that's just part of your job is to be in close

3    association with the DEA.

4    **A.**    To be in cooperation and to share educational

09:53:12 5    information, sir.

6    **Q.**    Okay.  And then in addition to that, that role as a

7    teacher, so to speak, about issues about pharmacy, you also

8    testify on their behalf, as Mr. Darken has pointed out --

9    which I don't want to go through all the testimony again --

09:53:28 10   around the entire United States on behalf of the DEA, as

11   well.

12   **A.**    Yes, sir.

13   **Q.**    Okay.  Now, the issue of importation you addressed at

14   some of your presentations, did you not?

09:53:44 15   **A.**    Yes, sir.

16   **Q.**    I have the second highlighted one.  For instance, this

17   one in Arlington Heights, Illinois, in September of 2004,

18   you make a presentation to Illinois pharmacists at their

19   annual conference about the issues in medical importation.

09:54:11 20   **A.**    Yes, sir.

21   **Q.**    The one at the bottom in '03, the same topic.  You're

22   addressing illegal importation of prescription drugs.

23   Again, and that was, as I said, August of '03, you made

24   another presentation about the illegal importation of

09:54:35 25   prescription drugs, that was in Pine Mountain, Georgia, in

Catizone - Cross (By Mr. Gorence)

1    '03.  Do you recall that?

2    **A.**    Yes, sir.

3    **Q.**    Getting back the Internet at the top, you made a

4    presentation in Orlando in '03 having to do with Internet

09:54:57 5    pharmacies, imported pharmaceuticals and regulations,

6    correct?

7    **A.**    Yes, sir.

8    **Q.**    Now, the issue here as I was talking about was

9    pharmacies not physically located in the United States

09:55:12 10    involved in Internet filling and shipping them in from

11    abroad.  That was the issue, correct?

12    **A.**    That was the Internet issue, sir.

13    **Q.**    I'm focusing on the Internet.  I'm not talking about

14    people who go to Mexico and then walk across the border with

09:55:27 15    whatever scripts they want.

16    **A.**    Right.

17    **Q.**    I'm talking about only in the Internet context, that

18    was a practice in the late '90s, early 2000s, that was of

19    great concern to the DEA.  Correct?

09:55:40 20    **A.**    Great concern -- I can testify on our behalf, great

21    concern to NABP.

22    **Q.**    And as a result of that, and I'm now back on

23    Government's 976, you're familiar with this, I think Mr.

24    Darken showed this to you from the Office of Diversion

09:55:59 25    Control from the DEA.  We've all seen it in this trial

Catizone - Cross (By Mr. Gorence)

1    several times, the guidance that was provided in 2001 to

2    doctors and pharmacists, correct?

3    **A.**    Yes, sir.

4    **Q.**    And in this document it not only detailed at least

09:56:16  5    doctor-patient relationships, which we'll talk about, and

6    I'm on the bottom, where it talked about some pharmacy sites

7    are operating in a foreign country and often do not require

8    any prescription before sending controlled substances to

9    you.  And it goes on, these sites often advise that there

09:56:47 10    have been changes to U.S. law that authorize that.  And it

11    goes on to say that these sites may be engaging in the

12    illegal sale of controlled substances.  Correct?

13    **A.**    I don't have the screen, but I trust that you're

14    reading it, so yes.

09:57:05 15    **Q.**    The second page of this provided as guidance --

16                MR. FERAN:  (Handing.)

17                THE WITNESS:  Thank you.

18    **Q.**    The second page provides the legal basis then in place

19    in 2001 which prohibited the importation of a controlled

09:57:46 20    substance in the United States, citing 21, United States

21    Code, 952, 953, 954, and the accompanying Code of Federal

22    Regulations; correct?

23    **A.**    Yes, sir.

24    **Q.**    The second issue that arose early on, and I'm going to

09:58:02 25    go through your publications, where there were foreign sites

Catizone - Cross (By Mr. Gorence)

1    that did not require prescriptions at all from any doctor.

2    You just called up, sent your information, and they would

3    send a prescription without any doctor consultation or

4    questionnaire whatsoever.

09:58:18  5    **A.**    Yes, sir.

6    **Q.**    Right?

7    **A.**    Yes.

8    **Q.**    That was the second problem.  Maybe we don't have to

9    number them in terms of chronology.  We first had the issue

09:58:26 10    of no doctor contact whatsoever with foreign sites or, I

11    should say, foreign pharmacies; then we had the issue of

12    just foreign pharmacies in general.  Those were issues that

13    were addressed by DEA in 2001 with regard to being illegal,

14    correct?

09:58:44 15    **A.**    No, sir.  From our perspective, it was just two issues

16    in that regard.  One was the importation of products outside

17    of the U.S., and the most recent example of that was the

18    cancer drugs that were imported from Canada and England that

19    killed a number of people.  That was an importation issue we

09:59:06 20    dealt with.

21         The other issue, whether they were U.S. or foreign,

22    was whether there was a valid prescription, and that meant

23    whether there was a doctor consultation or not.  Any of the

24    factors you've mentioned we considered under a no

09:59:18 25    prescription, no valid prescription context.

Catizone - Cross (By Mr. Gorence)

1    **Q.**    Okay.  You recall, and again, I don't have all the

2    presentations, but at least in the top one, on June 17 of

3    2004 I guess you were invited onto NBC's Today Show, and

4    your topic was purchasing medications online without a

09:59:44 5    prescription.

6    **A.**    Yes, sir.

7    **Q.**    That's the issue that I'm talking about.

8    **A.**    Yes, sir.

9    **Q.**    Correct?

09:59:48 10    **A.**    Yes, sir.

11    **Q.**    It wasn't limited to cancer drugs, it also involved

12    scheduled drugs under the Controlled Substances Act,

13    correct?

14    **A.**    Correct.

09:59:59 15    **Q.**    You addressed a group of governors, a governors Summit

16    on prescription drug importation, this being one of the

17    Senate office buildings.  You told them what this issue was

18    in February of '04.  Again, same topic, correct?

19    **A.**    Yes, sir.

10:00:19 20    **Q.**    Again, this being the issue in all of 2004, you went

21    onto a Chicago station -- I only watch the Cubs on that

22    station, I didn't see you -- but it was the importation of

23    prescription drugs; again, the same topic that was raging at

24    that period of time.

10:00:34 25    **A.**    Yes, sir.

Catizone - Cross (By Mr. Gorence)

1    **Q.**    Again, whether it was the importation, the ability to

2    get a script with no prescription requirement, this is now

3    in 2003 you're talking about that on CNN.  Correct?

4    **A.**    Yes, sir.

10:00:49  5    **Q.**    More presentations about prescription drugs,

6    reimportation, and you're addressing that.  You've got

7    importation of drugs from Canada in '03, more topics in the

8    '03 time period, in January Canadian medications.  And they

9    weren't limited to just cancer drugs either, were they?

10:01:10  10    **A.**    No, sir.

11    **Q.**    We're talking hydrocodone?

12    **A.**    Every prescription drug, sir.

13    **Q.**    Okay.  And what happened is you said, as I pointed out

14    here, laws in place, DEA made it emphatically clear that

10:01:26  15    that's illegal.  And I want to use the word emphatic.  It

16    was made emphatically clear that you could not obtain a

17    prescription without a valid -- let me backtrack.  You

18    couldn't obtain a controlled substance without a valid

19    prescription from a doctor, it was made abundantly clear to

10:01:42  20    every doctor and every pharmacist in the United States as of

21    2004, that was abundantly clear and well known.

22    **A.**    No, the guidance document was issued in 2001, sir.

23    **Q.**    You're talking about the same topics in '03 and '04,

24    so again, the guidance document -- let's go back.  At least

10:02:00  25    as of '01 it was clear to every doctor and every pharmacist

Catizone - Cross (By Mr. Gorence)

1    that you couldn't fill -- you could not fill a controlled

2    substance without a valid script, and it couldn't come from

3    a foreign pharmacy.  That was made clear, correct?

4    **A.**    And the other components about the medical history,

10:02:23  5    the physical examination, and the connection, was made in

6    the 2001 guidance document, too, sir.

7    **Q.**    I'm getting there.  I'm only taking the topics you

8    talked about in sequence in terms of what the issues were

9    over the last, I want to say, 15 years, when the Internet

10:02:39 10    came into play, and how it evolved.

11   **A.**    Uh-huh.

12   **Q.**    Then we'll get to this case.

13   **A.**    Okay.

14   **Q.**    The next issue after imports and no scripts at all

10:02:50 15   really had to do with what Mr. Darken asked you, it was

16   called a questionnaire-based model.  No medical records, no

17   doctor consults, just a questionnaire being filled out.

18   That was the next topic that DEA addressed, correct?

19   **A.**    It was addressed in 2001.  Yes, sir.

10:03:07 20   **Q.**    Okay.  And if it was addressed, that was a problem at

21   least as of that time, that a model based only on a

22   questionnaire was not going to be sufficient to satisfy the

23   requirements at least as promulgated by most state medical

24   boards as to what constituted a doctor-patient relationship.

10:03:31 25   **A.**    Yes.

Catizone - Cross (By Mr. Gorence)

1    **Q.**    And DEA addressed it specifically again in 2001, not

2    as law, but as guidance.  At least what pharmacists and

3    doctors were told, gave some guidance about what sites may

4    not be legitimate, writing "Some Internet pharmacy sites do

10:04:02  5    not require that you have a prescription from your doctor."

6    We've already talked about that.

7         "These Internet pharmacies require the customer to

8    complete a medical questionnaire," and it goes on, "and

9    sometimes if you don't even answer the question you get a

10:04:17 10    default that allows you to proceed."  DEA at the end says

11    "Questionnaire-based models" -- again, just giving

12    guidance -- "may be engaging in the illegal sales of

13    controlled substances."

14         So again, we go from no script, foreign pharmacies,

10:04:36 15    to a model based only on a questionnaire.  DEA at least as

16    of 2001 has provided notice to the world that they think

17    there may be a problem with that.  Not law, but may be a

18    problem, and I want to underscore the word "may."  Correct?

19    **A.**    Yes, sir.

10:04:58 20    **Q.**    Now, this document in 2001 talked about the

21    doctor-patient relationship, and Mr. Darken showed you on my

22    copy, which was marked up, didn't require face-to-face,

23    there was no requirement of a face-to-face

24    requirement -- excuse me -- face-to-face meeting between

10:05:19 25    doctors and patient to establish this relationship, did it?

Catizone - Cross (By Mr. Gorence)

1    **A.**    No, sir.  It says a physical examination has been

2    performed.  That has to be face-to-face.

3    **Q.**    By some doctor, it doesn't say the doctor prescribing

4    it.  So if medical records -- you agree that medical records

5    that would have been supplied show that there has been at

6    least one face-to-face between a doctor and a patient.  It

7    doesn't say anything in here about the doctor prescribing it

8    has to have a face-to-face, does it?

9    **A.**    I believe it does later in the document.

10   **Q.**    You take your time and read it.

11   **A.**    Okay.  The few paragraphs just above page 3 of 6, it

12   says, "Federal law requires that a prescription for a

13   controlled substance to be effective must be issued for a

14   legitimate medical purpose by an individual practitioner

15   acting in the usual course of his professional practice.

16   Every state separately imposes the same requirement under

17   the laws.

18        "Under federal and state law, for a doctor to be

19   acting in the usual course of professional practice there

20   must be a bona fide doctor-patient relationship."  And then

21   it continues, "For the purposes of state law, many state

22   authorities" -- and then they define what is a bona fide

23   patient relationship.  So it says for a prescription to be

24   valid and effective a bona fide relationship, here are the

25   components of the bona fide relationship, and it explicitly

Catizone - Cross (By Mr. Gorence)

1    says that every state separately imposes the same

2    requirement under its laws.

3    **Q.**    Okay.  And the point being, and Mr. Darken has gone

4    through in great detail the requirement of a face-to-face in

10:07:02  5    every state was evolving from 2001 until ultimately the

6    passage of the Ryan Haight Act that went into effect after

7    this indictment.  That's the reality, as was painstakingly

8    pointed out by Mr. Darken with you in the last hour and a

9    half.  Every state changed in terms of when and if it

10:07:25 10    required a face-to-face requirement before establishing a

11    doctor-patient relationship.  That's true?

12    **A.**    No, sir.

13    **Q.**    Okay.  Why do you say that?  As we just went -- I

14    don't want to go through the whole thing.  You stated as of

10:07:40 15    2001 there was a national -- a face-to-face requirement in

16    every state?

17    **A.**    Yes, sir.

18    **Q.**    What is your basis for that?

19    **A.**    The examples that Mr. Darken provided -- and last

10:07:51 20    night I conducted research, and I erred yesterday in court,

21    I indicated that only 20 states between 2001 and 2005 had

22    regulations.  Upon further research of that database I've

23    identified 22 states.  I have the citations I can provide to

24    counsel of the practice act and regulations.

10:08:09 25        Prior to 2001 within the practice acts and within the

162

Catizone - Cross (By Mr. Gorence)

1    statutes of both the pharmacy board and medical board that

2    standard existed.  The examples that Mr. -- the other

3    attorney gave, some of those took the board regulation,

4    codified them into the statute, and also added products like

10:08:29  5    Soma and other products so it covered more than just the

6    traditional controlled substances.

7         In many of the cases that he cited the laws existed

8    because they were the same for Internet practice and

9    traditional brick and mortar practice, but there wasn't

10:08:43 10    specific laws identifying Internet pharmacies, and so they

11    took painstaking efforts to say the laws exist and cover all

12    pharmacies, but we're going to make sure everybody knows for

13    certain that Internet pharmacies are part of that so there's

14    no question.  So it was a further codification, it was

10:08:58 15    another tool that the states employed.  But I do have the

16    citations for those 22 states that the other attorney asked

17    for yesterday, sir.

18    Q.    Okay.  And if it was so abundantly clear, what you

19    just testified, I take it you haven't made that statement --

10:09:17 20    I want to go back -- in any of your other testimony in any

21    other case in any federal courtroom in the United States,

22    have you?

23    A.    Not that I -- I may have, sir.  I can't recall.

24    Q.    And if it was so abundantly clear as to what was

10:09:29 25    required, that face-to-face requirement, you know that the

Catizone - Cross (By Mr. Gorence)

1    DEA never amended this April 27, 2001 guideline giving

2    guidance about what the law says to pharmacists and doctors.

3    This wasn't amended in the time period that we're dealing

4    with, which would go through February of '09.

10:09:52  5    **A.**    It happens all the time, sir.  Yes.  It happens with

6    other issues.

7    **Q.**    We're just talking about fair notice.  I'm talking

8    about DEA then, it was so clear to you, you'd agree that in

9    eight years they never even give, not law, guidance

10:10:06  10   published in the Federal Register as to what you just said.

11   That never happened, did it?

12   **A.**    I didn't -- the guidance that they provided was

13   published and was information provided to all registrants.

14   **Q.**    Let me ask the question.

10:10:20  15   **A.**    I'm sorry, I didn't understand.

16   **Q.**    I'm talking about that an agency of the federal

17   government, the DEA, responsible for enforcing the Food,

18   Drug --

19   **A.**    -- and the Controlled Substances Act.

10:10:30  20   **Q.**    -- and Controlled Substances Act, they never amended

21   this notice to pharmacists and doctors to reflect what your

22   opinion is here.

23   **A.**    Because it already exists in state law, sir.

24   **Q.**    In this case you mentioned my client's name, Barb

10:10:58  25   Rovedo.  You know that Ms. Rovedo never operated a pharmacy,

Catizone - Cross (By Mr. Gorence)

1    nor dispensed drugs?

2    **A.**    Yes.

3    **Q.**    I take it you know something about Ms. Mendel and Mr.

4    Mann?  They owned the business before that, MS Networks?

10:11:14 5    **A.**    I'm not familiar with them, sir.

6    **Q.**    You never heard about them at all in this case?

7    **A.**    Not -- I can't recall the doctors.  I remember the

8    Delta Health, the center, and the involvement there.  That's

9    as far as I remember, sir.

10:11:27 10    **Q.**    This document has been marked both by the government

11    as 999 and by Mr. Darken, this being the Federation of State

12    Medical Boards of the United States.  I take it your

13    organization works with this federation, as well?

14    **A.**    Yes, sir.

10:11:46 15    **Q.**    And you're familiar with this, are you not?

16    **A.**    Yes, sir.

17    **Q.**    Now, this came out in 2002, and this was read in part,

18    but I want to go over a little bit what Mr. Darken asked

19    you.  The question about guidance again, and it just says,

10:12:29 20    "The relationship between a doctor and patient is clearly

21    established when the physician agrees to undertake a

22    diagnosis and treatment of the patient" -- the patient has

23    to agree, of course; and this question -- "whether or not

24    there has been a personal encounter between the physician or

10:12:50 25    other supervised health care practitioner and the patient.

Catizone - Cross (By Mr. Gorence)

1        I want to focus, this other supervised health care

2   practitioner, that would mean a physician's assistant or a

3   nurse of some sort?

4   **A.**   Yes, sir.

10:13:01  5              MS. LUTZKO:  Your Honor, may I approach the

6   witness so he can see the exhibit he's referring to.

7              MR. GORENCE:  I keep forgetting you don't have

8   it.

9              THE COURT:  You may.

10:13:11 10              THE WITNESS:  Thank you.

11  **Q.**   Mr. Catizone, that is on page 4.

12  **A.**   Yes, Section 3.

13              THE COURT:  Do you want to ask a few

14  questions, or we can take a break now.  We're pretty close.

10:13:21 15              MR. GORENCE:  This would be a good time, Your

16  Honor.  Briefly.  Thank you.

17              THE COURT:  Why don't we take 15 minutes.

18              (Recess had.)

19              (Proceedings in the presence of the Jury:)

10:37:15 20              THE COURT:  Sir, you're still under oath.  Do

21  you understand?

22              THE WITNESS:  Yes, sir.

23              THE COURT:  All right.  Mr. Gorence.

24              MR. GORENCE:  Thank you, Your Honor.

10:37:21 25  **Q.**   Mr. Catizone, have you had a chance to review this

Catizone - Cross (By Mr. Gorence)

1    over the break?

2    **A.**    Yes, sir.

3    **Q.**    Again, as of 2002, at least from the physician's side

4    of the equation, in terms of whether or not you needed a

10:37:53  5    face-to-face doctor-patient relationship and there had to be

6    a face-to-face encounter before a doctor-patient

7    relationship, you can see that wasn't required.  Do you

8    agree with that?

9    **A.**    To some extent, yes, sir.

10:38:08  10    **Q.**    Okay.  I'm not here to restrict your answers.

11    **A.**    Sure.

12    **Q.**    I'm going to go to the next page, where you are

13    talking about what, treatment?

14    **A.**    In that particular instance that was carved out so

10:38:21  15    that legitimate telemedicine practice could occur.  That's

16    why that was in there.  But for all other prescribing and

17    diagnosis, the face-to-face physical examination would be

18    required.

19    **Q.**    Okay.  Well, I want to really focus on the language

10:38:35  20    here.  And of course, you're a pharmacist, you're not a

21    doctor.

22    **A.**    Correct, sir.

23    **Q.**    And this is the portion that was read in yesterday

24    about treatment, and it does have the line right here, it

10:38:46  25    says, "Treatment, including issuing a prescription, based

Catizone - Cross (By Mr. Gorence)

1    solely on an online questionnaire or consultation does not

2    constitute an acceptable standard of care."

3        I want to take that apart for a second, because this

4    is what I was asking earlier.  The problem related to a

10:39:06  5    questionnaire-based Internet pharmacy model, this addresses

6    that, correct?

7    **A.**    Yes, sir.

8    **Q.**    And even the idea that a doctor consult looking at a

9    questionnaire would be insufficient, correct?

10:39:20 10    **A.**    Yes, sir.

11    **Q.**    But this doesn't address a model that developed having

12    to do with medical records, assuming they're true and

13    authentic, not with government sting, but people like Miss

14    Schiffbauer and Miss Bruce, Wendy Bruce, when they actually

10:39:37 15    submitted real medical records from real doctors having

16    followed from real face-to-face consultations, this doesn't

17    address that in any way, does it?

18    **A.**    No, sir.  Legitimate telemedicine is not addressed.

19    **Q.**    Well, that's what I'm talking about.  People that had

10:39:54 20    actually seen doctors and then had gone to another doctor in

21    a telemedicine context, this does not prohibit that

22    explicitly, does it?

23    **A.**    Correct, sir.

24    **Q.**    Now, lastly, if you had a doctor, and I'll give you a

10:40:11 25    hypothetical, because you're an expert here and I can do

Catizone - Cross (By Mr. Gorence)

1    that, if there was a doctor, and I think there will be

2    testimony here from Dr. Dora, that instead of actually

3    reviewing the medical records herself as a trained

4    physician, if that was delegated not even to a nurse or a

10:40:29  5    physician's assistant but let's say a neighbor or her

6    sister, individuals who had no health care experience

7    whatsoever, that clearly would violate the things set forth

8    here because a doctor was never involved.  Correct?

9    **A.**    Yes, sir.

10:40:47  10    **Q.**    Point being, if a doctor did that and violated the

11    law, a pharmacist would have no way of knowing that, would

12    they, with a valid script submitted by a doctor with a DEA

13    license, the point being doctors could pull the wool over

14    the eyes of a pharmacist at any time.  Right?

10:41:06  15    **A.**    Yes, sir.

16    **Q.**    And the same would be true for a company that all it

17    did was submit medical records to the doctor.  In this case

18    you know that's what Miss Rovedo's company did, Delta

19    Health?

10:41:17  20    **A.**    Sure.  It's possible, sir, yes.

21    **Q.**    The point -- no, it's not just possible.  Delta Health

22    once they submitted the records online, you know from what

23    you've seen in this case they were not part of the online

24    consultation nor medical review process, was it?

10:41:34  25    **A.**    From what I saw, I believe that they were involved in

Catizone - Cross (By Mr. Gorence)

1    establishing the doctor relationships and setting up the

2    explanations for the consultations and designing it, but I'm

3    not sure where they were in terms of the review of the

4    medical records, sir.

10:41:51  5    **Q.**    Let's make sure we're on the same page.  Delta Health

6    collected a driver's license or form of identification,

7    always a driver's license, from the patients.  You know

8    that?

9    **A.**    Yes, sir.

10:42:03 10    **Q.**    And as Mr. Darken indicated, if the driver's license

11   was not valid or wasn't legible enough it was sent back as

12   the first step.  That was what was required, is a valid

13   driver's license showing the identity of someone who

14   actually existed.

10:42:20 15    **A.**    Yes, sir.

16   **Q.**    And you know, as we can see here, even on the very

17   last attempt by Diversion Investigator Zakrzewski on

18   December 10 of '07 they tried to send in a phony one, one

19   that was clearly patently not valid, and it was rejected by

10:42:38 20   Delta Health.  You can see it right there on the chart, on

21   behalf of Matthew Douglas.

22   **A.**    Sure.  Based on the chart, yes, sir.

23   **Q.**    Okay.  Then I'm saying Delta Health after that

24   collected medical records that were either e-mailed or

10:42:50 25   faxed, and then all they did is submit them on to the

Catizone - Cross (By Mr. Gorence)

1    physician.  I take it that's your understanding of this

2    case, isn't it, from the materials you reviewed?

3    **A.**    No, sir.

4    **Q.**    Explain yourself.

10:43:00  5    **A.**    It was my understanding that Delta Health selected the

6    physicians and even directed the physicians in terms of how

7    they should consult the time, and then it was Delta Health

8    in recorded conversations that suggested changing the model

9    from working with pharmacies to actually issuing a

10:43:18  10    prescription so the patients could then take those to

11    various pharmacies.  So it seemed like Delta Health was

12    involved in the organization and operation to a much larger

13    extent than just simply passing the records on, sir.

14    **Q.**    There were 3,000 recorded captured phone calls.  Did

10:43:32  15    you listen to -- you said you didn't listen to a single one

16    of them?

17    **A.**    No, sir.  I just read the information in the report

18    about some of those conversations.

19    **Q.**    And you indicated you never even read the actual

10:43:41  20    transcripts of these recorded conversations, correct?

21    **A.**    Correct sir.

22    **Q.**    And all you're doing is relying on the hearsay of what

23    an agent wrote about some of them, now we use the word

24    snippets?  That's what you're basing this on, not even

10:43:53  25    firsthand information.  You are just relying on the hearsay

Catizone - Cross (By Mr. Gorence)

1    of an agent as to what occur without listening to any of it?

2    **A.**    The information in the report, yes, sir.

3    **Q.**    So again, this is twice removed.  You've never even

4    taken the time before you want to come in and say this to a

10:44:06 5    jury to listen to them yourself or read them?

6    **A.**    I haven't done that, sir.  Yes.

7    **Q.**    Let me get back to my first question.  You've already

8    admitted that if the doctors didn't engage in something that

9    was legitimate, i.e. a legitimate doctor-patient

10:44:21 10    relationship, you can fool the pharmacists of the world,

11    right?

12    **A.**    Sometimes, yes, sir.

13    **Q.**    And in this case Delta Health, assuming that they just

14    submitted the records off -- well, let me ask -- you know

10:44:34 15    Delta Health didn't participate in a three-way conversation

16    between the doctor, the patient, and a representative from

17    Delta Health during the doctors' consultation.  You know

18    that, don't you?

19    **A.**    Yes, sir.

10:44:48 20    **Q.**    Okay.  So after they passed the medical records off,

21    the ultimate decision of either approving or disapproving

22    that prescription was solely with the doctor.

23    **A.**    Yes, sir.

24    **Q.**    And if the doctor approved it, Delta Health had

10:45:05 25    nothing to do with that.

Catizone - Cross (By Ms. Rha)

1    **A.**    Yes, sir.

2              MR. GORENCE:  I have nothing further, Your

3    Honor.

4              THE COURT:  Ms. Rha?

10:45:16  5              MS. RAH:  Thank you, Judge.

6         CROSS-EXAMINATION OF CARMEN CATIZONE

7    BY MS. RHA:

8    **Q.**    Good morning.

9    **A.**    Good morning.

10:45:50  10   **Q.**    Good morning.  Can you hear me?

11   **A.**    Yes.

12   **Q.**    Good morning, Mr. Catizone.  My name is Megan Rha, and

13   I'm one of the attorneys representing Dr. Terence Sasaki in

14   this case.  Okay?  And a lot has been asked of you and

10:46:07  15   you've given a lot of answers, so I am going to try to not

16   repeat some of the things that's already been covered.  So I

17   am just going to go through some of the things you said

18   during your direct examination that perhaps wasn't followed

19   up, and just ask you some follow-up questions on that.

10:46:24  20   Okay?

21   **A.**    Sure.

22   **Q.**    You started by responding to Mr. Feran's questions

23   with respect to your background, and you started by saying

24   how you've been the executive director of this particular

10:46:38  25   organization that you represent here today that's the

Catizone - Cross (By Ms. Rha)

1    National Association of Boards of Pharmacy, correct?

2    **A.**    Yes.

3    **Q.**    And you've been with that organization since 1985, and

4    executive director since 1988, correct?

10:46:53  5    **A.**    Correct.

6    **Q.**    And now with respect to this organization, which I

7    will call NABP, NABP, you stated that the members of this

8    organization are state Boards of Pharmacy and the equivalent

9    of state boards in Canada, Australia, New Zealand, correct?

10:47:14  10    **A.**    And South Africa.

11    **Q.**    And South Africa.  So including Canada, Australia, New

12    Zealand, South Africa, that's four countries and 50 state

13    boards from this country that make up the members of your

14    organization?

10:47:29  15    **A.**    Yes.  Puerto Rico, the District of Columbia, Guam,

16    Virgin Islands, all the territories, as well, so there's

17    probably about 57 members.

18    **Q.**    Okay.  Thank you.  And you stated as part of your

19    response to one of the questions initially that only state

10:47:45  20    agencies that regulate pharmacy are members of your

21    organization, but not individuals who are not pharmaceutical

22    companies.  Do you remember giving that answer, sir?

23    **A.**    I didn't hear the last part.  The pharmaceutical --

24    **Q.**    Not pharmaceutical companies and not individual

10:48:07  25    pharmacists?

Catizone - Cross (By Ms. Rha)

1    **A.**    Correct.

2    **Q.**    Correct?  So they are not part of the national

3    association of Boards of Pharmacy because obviously, as the

4    name states, your organization, NABP, is made up of other

10:48:19  5    boards that actually regulate pharmacists and pharmacies.

6    Am I right?  Am I understanding?

7    **A.**    Yes.

8    **Q.**    And now, is that because your organization NABP is

9    actually involved in regulating, supervising, overseeing

10:48:42  10    pharmacists and pharmacies that exist in this country?

11    **A.**    No, it's because we assist the states in that process.

12    We're not directly involved and have no authority or

13    government standing.

14    **Q.**    You make recommendations to state boards that regulate

10:48:58  15    them though?

16    **A.**    Yes.

17    **Q.**    And would it also be fair and correct for me to

18    understand your organization NABP to be fair and impartial

19    and independent?

10:49:08  20    **A.**    Yes.

21    **Q.**    And you also stated that your organization NABP does

22    not lobby.  Do you remember saying that?

23    **A.**    Yes.

24    **Q.**    Now, when you gave that answer, what did you mean by

10:49:22  25    the fact that your organization does not lobby?

Catizone - Cross (By Ms. Rha)

1    **A.**     There are very specific requirements at the federal

2    level and state level that if you're going to participate in

3    lobbying activities that you have to register and designate

4    individuals as lobbyists.  We do not have or fall under any

10:49:37  5    of those requirements, nor do we hold any registered

6    lobbyists in any state or with the federal government.

7    **Q.**     So I understand that NABP is not registered as a

8    lobbying organization, but when you use the word, and you

9    volunteered this answer to Mr. Feran, because it triggered

10:49:54  10    something in my mind, you said your organization does not

11    lobby, that it only is involved in charitable and

12    educational activities.

13    **A.**     Correct.

14    **Q.**     Right?  So when you use that word lobby, I understand

10:50:08  15    now that NABP is not registered as a lobbying organization,

16    but what do you mean they don't lobby?

17    **A.**     We don't specifically advocate passage of a particular

18    bill unless asked our opinion.  We don't meet with

19    individual congressmen or senators or state legislators

10:50:30  20    unless invited to do so or requested to do so and requested

21    to give our opinion on a legislation, or unless the states

22    indicate to us through a resolution or recommendation that

23    we should advance a position saying that the states are in

24    favor of this or the state Boards of Pharmacy are in support

10:50:45  25    of a particular bill, legislation, or activity.

Catizone - Cross (By Ms. Rha)

1   **Q.**   I see, Mr. Catizone.  So the difference here, and

2   correct me if I'm wrong, is that if you are asked or if you,

3   Mr. Catizone, or if your organization NABP is asked by a

4   Congressional member or asked by a senator or asked by

10:51:09 5   somebody involved in the legislative process, if they ask

6   you for your opinion, your recommendation, your comments,

7   you could provide them, but you cannot go before them and

8   solicit your involvement and your participation.  Is that

9   your understanding of what NABP does and does not do?

10:51:28 10   **A.**   Right.  We can't solicit or we can't actively lobby

11   for a particular law or requirement or change.

12   **Q.**   But in reality, NABP does get asked, does get

13   solicited, and has many requests for NABP to make comments

14   or to review something and give some sort of feedback, or

10:51:53 15   appear before a Congressional hearing or a subcommittee or

16   committee meetings, and provide NABP's opinions, correct?

17   **A.**   Yes.

18   **Q.**   And many times when such opinions are given on behalf

19   of NABP, you as the executive director, with all your

10:52:11 20   experience in speaking and writing and testifying, two

21   decades plus of experience, you are the one in fact that

22   appears on behalf of NABP many times to provide such

23   information and opinion, et cetera.  Right?

24   **A.**   Yes.

10:52:28 25   **Q.**   Now, I looked at your CV, I looked at your latest one.

Catizone - Cross (By Ms. Rha)

1      The one that I had ended in 2008, because in 2008 was when

2      Miss Lutzko wrote a letter to you asking for your opinion,

3      right, on this particular matter.  Right?

4      **A.**    Yes.

10:52:48  5   **Q.**    She wrote you a letter dated August 11, 2008, "Thank

6      you for agreeing to provide expert opinion," and then she

7      provided series of documents that she specified in that

8      cover letter that she sent to you.  Right, sir?

9      **A.**    Yes.

10:53:04  10  **Q.**    And along with that I guess either you gave her the CV

11     or she obtained one, one was provided to me, and when I took

12     a good look at your CV, I noticed that as of 2008 you had

13     given over 134 presentations.  Does that sound correct?

14     **A.**    Yes.

10:53:23  15  **Q.**    And then when I looked at your CV as of yesterday, you

16     know, as of 2012, you had given additional presentations in

17     addition to the 134 presentations that I had counted as of

18     2008.  Correct?

19     **A.**    Yes.

10:53:38  20  **Q.**    And when you testified yesterday during

21     cross-examination by Mr. Darken, it also came to my

22     attention that in addition to all the different criminal

23     cases in which you had testified as of 2008, since 2008,

24     from then until now, you've also been involved in additional

10:53:57  25  numerous federal criminal trials, and you have testified on

Catizone - Cross (By Ms. Rha)

1      behalf of the U.S. Attorney's Office; right, sir?

2      **A.**    Yes.

3      **Q.**    And it also came as a surprise to me that all those

4      times that you testified on behalf of the United States, the

10:54:15  5   government, as their expert witness, that you were never

6      compensated for your time.  You're not being compensated

7      today for your time, right?

8      **A.**    No.

9      **Q.**    And in addition to you being here yesterday and today,

10:54:32  10  and the travel time, I mean, you weren't compensated for any

11     of those hours you spent?

12     **A.**    No.

13     **Q.**    And what about all these items that you had to review

14     that have been sent to you by this letter dated August 11,

10:54:47  15  2008.  You were given an affidavit in support of application

16     for wire interception of James Hazelwood's telephone dated

17     April 19, '07.  You reviewed that affidavit?

18     **A.**    Yes.

19     **Q.**    You were given affidavit in support of application for

10:55:00  20  continued wire interception of James Hazelwood's telephone

21     dated May 18, '07.  You obviously reviewed that application

22     and the affidavit?

23     **A.**    Yes.

24     **Q.**    And you reviewed affidavit in support of application

10:55:12  25  for continued wire interception of James Hazelwood's

Catizone - Cross (By Ms. Rha)

1    telephone dated June 15, '07, you reviewed that, I'm sure?

2    **A.**    Everything on the list I reviewed.

3    **Q.**    And application and affidavit for search warrant of

4    Julie Toennies' e-mail account, you reviewed that, sir?

10:55:28  5    **A.**    Yes.

6    **Q.**    And then you also reviewed DEA-6 reports summarizing

7    details of undercover control purchases.  And then they go

8    on to list one, two, all the way up to 20 different

9    purchases or attempt to purchase incidents.  So you reviewed

10:55:45 10    all the diversion investigator's reports summarizing those

11    buys, correct?

12    **A.**    Correct.

13    **Q.**    And then you reviewed summary of prescription volume,

14    summary of prescription, another summary of prescription

10:55:58 15    volume, selection of e-mails; all these were reviewed by

16    you?

17    **A.**    Yes.

18    **Q.**    By the way, the affidavits that were given to you that

19    the government had in the past submitted so they could

10:56:13 20    wiretap Hazelwood's phone call conversations and the

21    affidavit that the government has submitted in the past so

22    they could search Julie Toennies' e-mail, when you read

23    those affidavits you saw that the government laid out the

24    probable cause that they were submitting to the Court so

10:56:33 25    they could get the Court's permission to wiretap somebody's

Catizone - Cross (By Ms. Rha)

1    phone conversation; right?

2    **A.**    Yes.

3    **Q.**    And the probable cause that they are saying that they

4    had as of that date to say, Judge, please allow me to go

10:56:46  5    search somebody's e-mail account in this case, Julie

6    Toennies, who is the sister and co-defendant with James

7    Hazelwood, correct?

8    **A.**    Yes.

9    **Q.**    And when you read those affidavits you would agree

10:56:59 10    with me that those affidavits laid out details, right?

11    **A.**    I believe so, yes.

12    **Q.**    And obviously the Judge saw there was probable cause,

13    because you know that phone conversations were intercepted

14    on wiretaps for April, May, June, and July of 2007, right?

10:57:16 15    **A.**    Yes.

16    **Q.**    And you also know that the Judge allowed the

17    government to intercept -- not intercept, but go and search

18    Julie Toennies' e-mail account and read her e-mail.  You

19    know that, too, right?

10:57:28 20    **A.**    Yes.

21    **Q.**    But when you were reviewing all these things you did

22    not see Dr. Terence Sasaki mentioned as an actor, correct?

23    You didn't see his name in those affidavits.

24    **A.**    Not in the affidavits.

10:57:42 25    **Q.**    Right.  And you would also agree with me that although

Catizone - Cross (By Ms. Rha)

1    they laid out all the facts that they thought they had as of

2    in 2007, and they laid out the facts, they laid out the

3    facts that would make probable cause, and they would name

4    the targets, they would name the people that they were

10:57:58  5    suspicious of, et cetera, et cetera, that despite all of the

6    details that they believe they sufficiently provided to the

7    Court at that time, my client, Dr. Terence Sasaki, was not

8    named in those documents.  Right, sir?

9    **A.**    Correct.

10:58:15  10   **Q.**    And, sir, did you know, did the government tell you

11   that Dr. Sasaki wrote an e-mail, detailed e-mail to the DEA

12   in May -- excuse me -- in May of 2007?

13              MR. FERAN:  I object to this.

14              MS. RHA:  Yes.  Go ahead, Mr. Feran.

10:58:38  15              MR. FERAN:  I objected, Judge.

16              THE COURT:  Go ahead.  Here is what I would

17   say.  Ask him whether or not he has any knowledge about, you

18   know, any certain -- if he doesn't have any knowledge base

19   then you don't get a chance to go through like all the

10:58:56  20   different things that is a part of the evidence.

21        So let's see whether he has any knowledge about

22   anything in regard to what you're talking about.  That's how

23   we would start it.  And then if he has some knowledge you

24   can go on and testify.  If he has no knowledge, then I think

10:59:11  25   that would probably end the inquiry with regard to that.

Catizone - Cross (By Ms. Rha)

1          MS. RHA:  Judge, I forgot if I had a question

2     pending, but I'll start again.

3     **Q.**    So Mr. Catizone, so the undercover buys, right, that

4     you reviewed in this case, you know, 20 that's mentioned in

10:59:30  5     August 11, 2008, and then I also see there is a cover letter

6     that was sent to you dated September 19 of 2012, like a

7     month ago.  Do you remember getting that letter?

8     **A.**    Yes.

9     **Q.**    And along with that letter, Mr. Catizone, you were

10:59:45  10    given additional DEA-6 reports that has to do with a list, 1

11    through 26, some sort of attempted buy, some sort of

12    purchases, and these documents are date numbered from 1

13    through 9 and to 28.  Do you need to look at this to refresh

14    your memory?

11:00:04  15    **A.**    No.

16    **Q.**    You did spend your time reviewing these documents, as

17    well, right?

18    **A.**    Yes, I did.

19    **Q.**    And the transcripts of phone conversations,

11:00:10  20    transcripts of recordings.  I don't remember if you said you

21    heard the recordings, but anyway, transcripts of the

22    undercover buys, et cetera, right?

23    **A.**    Yes.

24    **Q.**    And how many hours would you say that you spent

11:00:23  25    approximately reviewing the items that were given to you via

Catizone - Cross (By Ms. Rha)

1    the letter dated August 11 of '08 and via the letter dated

2    September 19 of 2012?

3    **A.**    For the first letter 20 hours, for the second letter

4    30 hours.

11:00:37 5    **Q.**    So anyway, reviewing all these undercover buy

6    paperwork, undercover buy transcripts of phone calls, and

7    the diversion investigator's report which we call DEA-6

8    reports, related to all these undercover buys, and you would

9    agree with me that the items that you reviewed show that

11:01:14 10    these undercover buys were attempted not within a week span,

11    not within two weeks span, but over a period of time; right?

12    **A.**    Yes.

13    **Q.**    And during that time that all these attempts were

14    being made and undercover purchases were actually attempted

11:01:31 15    and successfully executed, nowhere in any of that material

16    did you see my client, Dr. Sasaki, Dr. Terence Sasaki's name

17    mentioned; correct?

18    **A.**    In the undercover?

19    **Q.**    Yes, in the undercover, sir.

11:01:49 20    **A.**    No.

21    **Q.**    Right?

22    **A.**    Correct.

23    **Q.**    Right?  Okay.

24            MS. RHA:  Can I actually, Judge, can I have

11:01:57 25    your permission to move that poster so I can see the board

184

Catizone - Cross (By Ms. Rha)

1    with all the photos of the people?

2                THE COURT:  You want to move it?

3                MS. RHA:  Yes.  I'll do it, Judge.  Can I

4    approach?

11:02:09   5                THE COURT:  Sure.

6                MS. RHA:  Your Honor, may I have the

7    permission to stand here?  I just want to point to some of

8    these photos.

9                THE COURT:  Do you have a microphone on?

11:02:39  10                MS. RHA:  I do, Judge.

11                THE COURT:  You may proceed.

12   BY MS. RHA:

13   Q.    Now, Mr. Catizone, when you were reviewing all those

14   items that took you 20 hours plus 30 hours, you know?

11:02:47  15   That's a lot of time, I know, because I had to review that

16   too.

17         Now, when you were reviewing those items there were

18   names that appeared in the affidavits for the search

19   warrants for the e-mail account, there were names that

11:02:59  20   popped up in the affidavits that had to do with intercepting

21   Mr. Hazelwood's phone calls; right?  And then the undercover

22   buys, samples of actual e-mails that you were given,

23   according to the September 2012 letter.

24         Amongst all these things, the names that popped up,

11:03:19  25   if you would take a look at this poster that was shown to

Catizone - Cross (By Ms. Rha)

1    the jury at the beginning of this case, do you recognize

2    this name, James Hazelwood?

3    **A.**    Yes.

4    **Q.**    And he's here, and you're also aware that he's named

11:03:35 5    in the indictment, right?

6    **A.**    Yes.

7    **Q.**    And do you recognize this name, Delta Health?

8    **A.**    Yes.

9    **Q.**    Do you recognize Edward Cheslow?

11:03:46 10    **A.**    Yes.

11    **Q.**    Do you recognize Dora Fernandez?

12    **A.**    Yes.

13    **Q.**    Do you recognize the Medicine Shoppe, Medicom,

14    Liddy's?

11:03:53 15    **A.**    Yes.

16    **Q.**    These are all -- Liddy, was that included in any of

17    those documents that you saw?

18    **A.**    Yes.

19    **Q.**    What about Helen Kann?

11:04:01 20    **A.**    Yes.

21    **Q.**    Julie Toennies?

22    **A.**    Yes.

23    **Q.**    Jennifer Ryan?

24    **A.**    Yes.

11:04:06 25    **Q.**    Fiorillo, Derks, USMeds; right?

Catizone - Cross (By Ms. Rha)

1   **A.**    Correct.

2   **Q.**    All of these, Anthony Trawick, do you remember him?

3   He was in the affidavit for the search warrant, right?

4   **A.**    Yes.

11:04:14  5   **Q.**    You remember that name, but he's not in the

6   indictment, right?  And then one of the undercover buys --

7                MR. FERAN:  Judge, I'm going to object to

8   that.

9                THE COURT:  Okay.  Let me read this.

11:04:39 10               MS. RHA:  Can I ask one last question?  And

11  I'll be done with this poster board for the duration of

12  Mr. Catizone's cross-examination.

13               THE COURT:  Why don't you -- and Mr. Feran can

14  stay on his feet in case he objects.  She wants to ask one

11:04:52 15  last question.

16               MS. RHA:  One last question.

17               THE COURT:  But it doesn't mean I'll let him

18  answer it.

19               MR. FERAN:  That's fine, Your Honor.

11:04:59 20               MS. RHA:  Thanks.

21  **Q.**    Mr. Catizone, so everybody on this board appeared in

22  those documents that you -- you know, the search warrant

23  applications, right, and the affidavits for the phone calls,

24  the e-mail applications, the undercover buys, all the DEA-6

11:05:17 25  reports related to the undercover buys, the transcripts

Catizone - Cross (By Ms. Rha)

1    related to the undercover buys.  These people's names

2    appear.  The only name that does not appear in those things

3    that I just listed is Dr. Terence Sasaki, correct?

4    **A.**    In the documents that you listed?

11:05:34 5    **Q.**    That I just listed.

6    **A.**    Correct, in just those documents.

7    **Q.**    Thank you.  So you know, it occurs to me, you spent 50

8    hours reviewing these items, you spent two days testifying

9    here, you spent a day traveling, a day traveling back

11:05:48 10   tomorrow perhaps, but you do not get compensated for these

11   hours.  What about the other testimonies that you gave on

12   behalf of the U.S. Attorney's Office in all those other

13   cases that you mentioned, were you compensated for those?

14   **A.**    No.

11:06:05 15   **Q.**    And prior to you going as an expert witness for those

16   cases I would think that you being an expert on those cases,

17   you would have had to review documents and listen to tapes,

18   or look at prescriptions, or whatever it may be, related to

19   your expert testimony.  Correct?

11:06:24 20   **A.**    Correct.

21   **Q.**    And you weren't compensated for those hours either?

22   **A.**    No.

23   **Q.**    What about the fees related to you traveling here?

24   Your airfare, your hotel, your meal and lodging, do you get

11:06:38 25   compensated for that?

Catizone - Cross (By Ms. Rha)

1    **A.**    My expenses are reimbursed, yes.

2    **Q.**    So on an average, in 2012 how many times have you

3    testified in addition to this trial on behalf of the United

4    States, you know, the U.S. Attorney's Office, as an expert

11:06:54  5    witness?

6    **A.**    In 2012, I think two additional times, two or three.

7    **Q.**    And were they outside of the state where you reside

8    and work?

9    **A.**    Yes, yes.

11:07:04  10    **Q.**    And what about in 2011, how many times did you testify

11    as an expert witness for the U.S. Attorney's Office?

12    **A.**    Between four and five times.

13    **Q.**    What about in 2010?

14    **A.**    Again, the balance of the 12 times, probably three or

11:07:19  15    four times.

16    **Q.**    And I would think that you would have testified in

17    2009, 2008, '7, et cetera?

18    **A.**    One or two in 2008, one in 2009.

19    **Q.**    And now this is all in addition to the presentations,

11:07:32  20    the talks you give, the seminars you hold, the classes you

21    teach, et cetera, et cetera?

22    **A.**    Yes.

23    **Q.**    Now, you do hold a very important title in my mind,

24    which is the executive director of the National Association

11:07:48  25    of Boards of Pharmacy.  So my question is, what does that

Catizone - Cross (By Ms. Rha)

1    entail, that title?  What are your duties and your

2    responsibilities?

3    **A.**    I'm responsible for the oversight of the staff and the

4    operation of the association.

11:08:03  5    **Q.**    You're responsible for the staff -- I'm sorry -- staff

6    and the operation.  So as part of your duties as the

7    executive director, sir, you have regular contact with the

8    state boards that exist in each state of this country?

9    **A.**    Yes.

11:08:28 10    **Q.**    And you also are in pretty consistent communication

11    with the Drug Enforcement Administration --

12    **A.**    Yes.

13    **Q.**    -- DEA with respect to controlled substances, and

14    things of that nature?

11:08:40 15    **A.**    Yes.

16    **Q.**    And I would also think that you as the executive

17    director would also be pretty in good communication,

18    consistent communication with the Federation of State

19    Medical Boards; correct?

11:08:55 20    **A.**    Correct.

21    **Q.**    And in fact, Federation of State Medical Boards is

22    sort of like the counterpart of NABP but for the doctors,

23    correct?

24    **A.**    Correct.

11:09:05 25    **Q.**    Medical doctors, I mean.

Catizone - Cross (By Ms. Rha)

1    **A.**    And osteopathic doctors.

2    **Q.**    I'm sorry?

3    **A.**    And osteopathic doctors, as well.

4    **Q.**    Correct.  DOs.  Yes.  So but then there's also the

11:09:18  5    American Medical Association.  Are you in contact with them

6    as well within your duties as an executive director for

7    NABP?

8    **A.**    Yes, but not as frequently.

9    **Q.**    Not as frequently, because FSMB, right, the Federation

11:09:37  10    of State Medical Boards are composed of individual state

11    medical boards, correct?

12    **A.**    Correct.

13    **Q.**    And the individual medical state boards are the

14    agencies that would actually regulate the practices of the

11:09:50  15    doctors within their respective states, correct?

16    **A.**    Correct.

17    **Q.**    But then the American Medical Association, AMA, is not

18    a -- is a voluntary membership organization for the doctors

19    in this country, right?

11:10:04  20    **A.**    Correct.

21    **Q.**    Now, you as an executive director of your organization

22    then, it seems to me that -- and you would agree with me, I

23    think -- that you spend a fair amount of time traveling,

24    preparing for, and actually testifying or presenting, or

11:10:29  25    giving testimonies or issuing opinions, all around this

Catizone - Cross (By Ms. Rha)

1    country, right?

2    **A.**    Yes.

3    **Q.**    And you said in addition to what seems to me like a

4    huge, you know, number of hours you spend doing this, you

11:10:44  5    also spend your time, you said, overseeing the operation of

6    your particular organization, which is the NABP, right?

7    **A.**    Correct.

8    **Q.**    And as part of overseeing the overall operation of the

9    organization you will be familiar with how your organization

11:11:01  10    gets its money, how much money it uses to operate, where it

11    spends its money, et cetera; right?

12    **A.**    Correct.

13    **Q.**    Now, I remember when you were talking during direct

14    examination about your organization not lobbying, one of the

11:11:15  15    things you volunteered again was that the IRS

16    something-something, and did you mean that NABP is a

17    501(c)(3) organization?

18    **A.**    Correct.

19    **Q.**    Now, would you tell the jury what 501(c)(3)is, sir?

11:11:30  20    **A.**    It's a classification by the IRS that says that we can

21    engage in charitable and educational activities, and it

22    exempts us from taxes to the IRS because of our activities.

23    Similar to a hospital, similar to a religious organization,

24    similar to those organizations that don't pay taxes because

11:11:48  25    they're involved in charitable and educational works that

Catizone - Cross (By Ms. Rha)

1    support the community and support the government.

2    **Q.**    So as a charitable and educational organization that's

3    exempt from taxes, how do you fund yourself?  I mean, you

4    testified yesterday that you receive $450,000 a year, right?

11:12:11  5    And today you testified that you spend enormous number of

6    hours just on this case, you spent 50 hours reviewing

7    documents, and spending days testifying.  The only

8    reimbursement you get is for your travel and lodging and

9    meals.  How does a charitable organization sustain the work

11:12:30  10    style that you seem to be engaged in for the last 20 years

11    without you being compensated for all these hours that you

12    spend outside of the organization itself?

13    **A.**    Two different questions, but I'll answer both of them.

14    **Q.**    Thank you.

11:12:44  15    **A.**    Our funding comes from really just three sources.  The

16    pharmacists who take the national licensure exam pay us the

17    fee, and that exam is about $450, and every pharmacy student

18    that wants to become a pharmacist has to take that exam

19    because the states require it.  They're also required to

11:13:02  20    take a state law exam which we also develop and administer

21    for the states, and that fee is somewhere in the range of

22    about $200.  That's our primary source of income.

23    The other source of income is when a pharmacist wants

24    to transfer from state to state they provide a fee to us for

11:13:19  25    us to do a background check, check all their disciplinary

Catizone - Cross (By Ms. Rha)

1    information, and then provide that information to the

2    states.  And that fee is somewhere between 3 and $400,

3    depending upon how many states the pharmacist wants to

4    transfer their license.

11:13:32  5    So about 60 percent of our revenue comes from our exam

6    fees, which I have used to develop this national exam I

7    administer for the states, which would cost each state a

8    million to 2 million on its own to develop, so it's a

9    savings for the state.  35 percent of our revenue comes from

11:13:51  10   these fees that we charge the pharmacist to do the

11   background check, and then the remainder of our fees come

12   from our accreditation program of the wholesalers and

13   pharmacies that are distributing durable medical equipment.

14   We lose money on our Internet program, we lose money

11:14:06  15   on our annual meeting, we lose money on all our

16   publications, because those are benefits we provide to the

17   states.  Every state board of pharmacy since 1985 has paid

18   us a membership fee of $250, and that's all the states pay

19   for the services we provide.

11:14:23  20   Q.   Thank you, Mr. Catizone.  Now that I know how your

21   organization survives, operates, maintains its operation, I

22   have follow-up question to that.  That is that you just

23   stated again, and you said it yesterday, and it just stuck

24   in my head, you were talking about your organization

11:14:49  25   certifying Internet pharmacies.  And again, you know, sir, I

Catizone - Cross (By Ms. Rha)

1    don't represent the pharmacy in this case, I represent Dr.

2    Sasaki, but the jury should know.  You were talking about

3    the NABP being involved in certifying Internet pharmacies,

4    right?

11:15:08   5    **A.**    Yes.

6    **Q.**    Do you remember that?  And that program, a lot of

7    acronyms in this case, but that program is called VIPPS;

8    correct?

9    **A.**    Correct.

11:15:20  10    **Q.**    And it stands for Verified Internet Pharmacy Practice

11    Site, correct?

12    **A.**    Correct.

13    **Q.**    And this is something you or your organization

14    developed in 2000?

11:15:31  15    **A.**    1999 we first launched it.

16    **Q.**    1999?

17    **A.**    It began in 1997, we launched it in 1999.

18    **Q.**    1999.  So at the onset of the Internet in the

19    e-commerce industry, your organization already foresaw that

11:15:49  20    this would be something that would be necessary and came up

21    with an accreditation program called VIPPS, VIPPS for short;

22    right?

23    **A.**    Correct.

24    **Q.**    And this program still exists, right?

11:16:03  25    **A.**    Yes.

Catizone - Cross (By Ms. Rha)

1  **Q.**   And when you were describing it, and you didn't spend

2  much time on it yesterday during your direct examination,

3  you described it briefly and then you said it's a money

4  loser, that your organization is losing money on it; right?

11:16:18  5  **A.**   Yes.

6  **Q.**   Do you remember saying that?

7  **A.**   Yes.

8  **Q.**   And then do you remember you just said that just now

9  like a minute ago?

11:16:24  10  **A.**   Yes.

11  **Q.**   You keep pointing that out, that VIPPS is a program

12  that you started in 1999 -- now I know -- but your

13  organization NABP, which is a charitable organization, keeps

14  on losing money on it.  So I looked it up, you know?  Like

11:16:40  15  you looked up things last night, I looked up things last

16  night.  And when I looked it up what I found was really

17  interesting.  And tell me you would agree with me this:  As

18  of today, how many pharmacies have earned this certification

19  from your organization?

11:16:56  20  **A.**   32.

21  **Q.**   32 around the country.  Now, with VIPPS certification

22  they could represent themselves to be a VIPPS-certified

23  pharmacy, correct?

24  **A.**   Correct.

11:17:10  25  **Q.**   And but you don't have to be a VIPPS-certified

Catizone - Cross (By Ms. Rha)

1    pharmacy to advertise yourself as an Internet pharmacy,

2    correct?

3    **A.**    No, you have to be certified to advertise on Google

4    and Microsoft.

11:17:25  5    **Q.**    That's right.  That's what I was going to point out.

6    You beat me to it.  And the thing is, but if somebody were

7    to go on Google, if somebody were to go on -- what's the

8    other search engine?  Microsoft?

9    **A.**    Microsoft Bing.

11:17:38  10    **Q.**    Right.  But everybody uses Google, so if somebody were

11    to go on Google and type in like Internet pharmacy, the

12    Internet pharmacy that would be allowed to advertise

13    themselves on the Internet via Google search engine would

14    have to be certified by NABP --

11:17:56  15    **A.**    Correct.

16    **Q.**    -- through its VIPPS program, right?

17    **A.**    Or e-Advertiser, correct.

18    **Q.**    Right.  I thought that was an interesting point.  Now,

19    so you get your money -- when I say you, I know,

11:18:10  20    Mr. Catizone, you don't get compensated, but I'm talking

21    aside from the salary of $450,000, but I'm talking about

22    your organization.  NABP gets its money by, what's the word,

23    administering tests to people who want to become licensed

24    pharmacists; correct?

11:18:28  25    **A.**    Developing and administering.

Catizone - Cross (By Ms. Rha)

1    **Q.**    Right.  You have to develop the test, and the test has

2    to be in accordance with things, right, that are pertinent

3    to the industry of pharmacy, I would think; right?

4    **A.**    And it has to be a valid --

11:18:40  5    **Q.**    It takes time and money to do that?

6    **A.**    Yes.

7    **Q.**    And then you also get money when a pharmacist in New

8    York wants to, I guess, move to Florida, move to Minnesota.

9    They would have to go through your organization to transfer

11:18:52 10    their license.  Am I right?

11    **A.**    Correct.

12    **Q.**    And then you have the VIPPS program, and I guess you

13    could have some other program, but does NABP accept

14    contributions from pharmaceutical companies?

11:19:08 15    **A.**    Only educational grants for educational programs, and

16    those are limited to $5,000, and then nonrestricted grants

17    where the funding goes directly to the states and not to

18    NABP.

19    **Q.**    So anything up to $5,000, let's say a pharmaceutical

11:19:25 20    company that makes a particular drug, and I don't know any,

21    so whatever it may be, if they want to give your

22    organization money they could give you up to $5,000, but

23    they would have to specify what type of educational program?

24    No?

11:19:42 25    **A.**    No.  When we hold the meeting we have various

Catizone - Cross (By Ms. Rha)

1    educational sessions, and then there are expenses for the

2    speakers and for the food, refreshment breaks.  If somebody

3    wants to sponsor that they can submit a request and a grant

4    up to $5,000.  We decide what session they fund as well as

11:20:00  5    the content.  They have no input.

6         We have accepted a million dollar grant from Purdue

7    Pharma to establish the prescription monitoring programs,

8    and every dollar of that million dollars is going to fund

9    the states for their cost to connect to an interstate

11:20:16  10    system.  And all that is documented on our website, so you

11    can see how much is in the fund and how much each state has

12    been paid.  That's the only grant of that nature, and it's

13    very transparent, and none of those funds are going to NABP

14    directly.

11:20:30  15    **Q.**    And you used the word transparent because -- tell me

16    if you would agree with me -- that it's very important that

17    any money given by a pharmaceutical company composed of

18    agencies that regulate pharmacists and pharmacies, you

19    cannot have this conflict of interest, right?

11:20:52  20    **A.**    Correct.  And in fact --

21    **Q.**    That's why --

22    **A.**    -- our investment policy calls we cannot invest in

23    pharmaceutical companies or in pharmacies so we maintain

24    that objectivity.

11:21:01  25    **Q.**    Because avoiding conflict of interest is very

Catizone - Cross (By Ms. Rha)

1    important to an organization that is made up of regulating

2    state agencies; correct, sir?

3    **A.**    Correct.

4    **Q.**    Now, in addition to pharmaceutical study grants, do

11:21:15  5    you get money from anywhere else then?  Does the government

6    give you any grants?

7    **A.**    The FDA has provided some grants for us to do studies

8    in regard to patient counseling, but those have not been

9    significant, maybe two or three that we received from the

11:21:31  10   FDA.

11   **Q.**    Okay, so not anything from the government, some from

12   pharmaceutical companies.  Do retail drug stores -- you've

13   heard of the term chain drug stores, correct?

14   **A.**    Correct.

11:21:47  15   **Q.**    Can you tell the jury what chain drug stores are?

16   **A.**    It's generally a corporation that has -- some people

17   say more than four pharmacies, others might say 12 or 18, it

18   depends what definition.  There's a central ownership,

19   central control, and they operate sometimes as a local

11:22:05  20   chain.  Many of their sites are in one state or they can be

21   multi-state, like a Rite Aid or a Wal-Mart.  Those are chain

22   pharmacies.

23        And chain pharmacies are also allowed to submit a

24   grant of up to $5,000 to support educational programs at our

11:22:23  25   educational sessions, but not beyond that.

Catizone - Cross (By Ms. Rha)

1    **Q.**    So when we say chain drug stores, that particular term

2    has a very definite meaning within your industry, correct?

3    Like the one you just described.

4    **A.**    Yes.

11:22:36   5    **Q.**    And if we were to give the jury examples of

6    pharmacists -- pharmacist -- no -- pharmacies that would fit

7    into that description, it would be stores like CVS?

8    **A.**    Correct.

9    **Q.**    Stores like Target?

11:22:51  10    **A.**    Correct.

11    **Q.**    Stores like Walgreens?

12    **A.**    Correct.

13    **Q.**    Rite Aid?

14    **A.**    Yes.

11:22:55  15    **Q.**    Eckerd's?

16    **A.**    I'm not familiar with that.

17    **Q.**    Oh, okay.  All right.  But anyway, stores like that,

18    right?

19              THE COURT:  Ms. Rha, let's take about a

11:23:06  20    five-minute break.  Let's take a short break.

21              THE CLERK:  All rise.

22              (Recess had.)

23              THE COURT:  Sir, you're still under oath.

24              THE WITNESS:  Yes, sir.

11:35:19  25              THE COURT:  Miss Rha.

Catizone - Cross (By Ms. Rha)

1       MS. RHA:  Yes, sir.

2    **Q.**   Mr. Catizone, before the break we talked about the

3    chain drug stores, right?  And you said that you are allowed

4    to receive some grants or funding from them, but up to

11:35:47 5    $5,000?

6    **A.**   For the educational programs, yes.

7    **Q.**   For the educational programs.  So now we have with

8    respect to how NABP supports itself you have the sometimes

9    government grants, but not significant amount, and then you

11:36:04 10   have some money from some pharmaceutical companies, but for

11   limited purposes, for limited amount, and same thing goes

12   for the chain drug stores.  Where else do you get your

13   funding?

14   **A.**   From investments.  Less than 1 percent come from

11:36:20 15   contributions from the pharmaceutical industry or the chain

16   drug stores.  The balance is what I have explained prior,

17   the examination fees, the licensure fees, and the

18   accreditation fees.

19   **Q.**   You did mention investments just now, right?

11:36:33 20   **A.**   Yes.

21   **Q.**   So NABP has investments?

22   **A.**   Correct.

23   **Q.**   Where do you hold your investments?

24   **A.**   They're held in mutual funds, as well as in stocks and

11:36:42 25   bond accounts, different brokers.

Catizone - Cross (By Ms. Rha)

1    **Q.**    And do you as the executive director of the

2    organization for the last 20 years, do you oversee where

3    these investments are placed so they're not being invested

4    in companies that could be in conflict with what your

11:36:58  5    organization stands for?

6    **A.**    Yes.

7    **Q.**    So making sure that they're not being invested in

8    drugs that are being developed or Internet pharmacies, or

9    other affiliations related to chain drug stores, et cetera?

11:37:10  10    **A.**    Correct.

11    **Q.**    Because again, once again, you would agree with me

12    that to achieve the goals that your organization has there

13    should not be any conflict of interest.  For example, if you

14    are composed of state agencies that regulate pharmacies and

11:37:28  15    pharmacists then you should not be investing money or your

16    assets or receiving significant amount of money from the

17    very entities or people that you are regulating; correct?

18    **A.**    Correct.

19    **Q.**    Now, and we'll address that point again, but I just

11:37:44  20    want to finish this topic, and that is where NABP gets its

21    money from.  How do you sustain yourself?

22            MR. FERAN:  Objection.

23    **Q.**    You as the executive director?

24            THE COURT:  Ms. Rha, I'll allow you some

11:37:55  25    latitude, you have a right to explore those kinds of things,

Catizone - Cross (By Ms. Rha)

1    but I think you've probably covered most of that now.

2              MS. RHA:  I have just maybe two more points to

3    make on this area, Judge, only because he said so yesterday

4    that they don't have to take his word for it.  He's the

11:38:10  5    expert witness for the government --

6              THE COURT:  Yes, but if you're asking some

7    open-ended questions, if you've got some that you want to

8    ask him, if you've got some information that there are

9    conflicts or may be conflicts, whatever, let's get on with

11:38:23  10    it.

11              MS. RHA:  Sure, Judge, I will ask.

12    **Q.**    The 2008 annual meeting that Mr. Darken asked you

13    about, that was held in May of 2008 in Baltimore, Maryland,

14    at the Marriott Hotel.  Do you remember that meeting?

11:38:38  15    **A.**    Yes.

16    **Q.**    Obviously you as the executive director was involved

17    in the planning and the overseeing that particular meeting,

18    correct?

19    **A.**    Correct.

11:38:47  20    **Q.**    That was your organization's meeting, once-a-year

21    meeting, right?

22    **A.**    Correct.

23    **Q.**    And during that organization you also held continuing

24    pharmacy education, correct?

11:38:58  25    **A.**    Correct.

Catizone - Cross (By Ms. Rha)

1    **Q.**    And Mr. Darken asked you yesterday about the things

2    that were presented at the meeting, including there was a

3    session that was held titled case strategy, how to

4    investigate an Internet pharmacy.  Do you remember that?

11:39:20  5    **A.**    Yes.

6    **Q.**    And do you remember you being asked about the things

7    that were taught during that particular session?

8    **A.**    Correct.

9    **Q.**    Right?  And I'll get to that, but just going back to

11:39:29  10    the conflict issue that the Judge wanted me to address --

11                    THE COURT:  Yes.  I want you to move along.

12    **Q.**    Yes.  Now, with respect to the conflict, now, when

13    that meeting began, and every time your organization holds

14    one of these annual meetings it's traditional to hold a

11:39:45  15    reception for the attendees, correct?

16    **A.**    Correct.

17    **Q.**    And I use that word traditional because it was used in

18    an article that quoted you, that there was a reception that

19    was held at the beginning of this meeting, and that

11:39:59  20    reception, I think you probably know where I'm going, that

21    reception was funded by the National Association of Chain

22    Drug Stores.  Am I not right?  I'm right?

23    **A.**    Part of the cost was.  The other part was our

24    foundation covered the other cost.

11:40:16  25    **Q.**    Whether it be part or a total, let's tell the jury

Catizone - Cross (By Ms. Rha)

1    that that annual meeting that was held in 2008, the

2    reception was funded by the Chain Drugstore Association;

3    correct?

4    **A.**    Yes.

11:40:29  5    **Q.**    And then that reception cost $21,000, correct?

6    **A.**    Probably.

7    **Q.**    And you were also interviewed by the *USA Today* when

8    they were looking into any potential conflict of interest

9    issues involving the National Association of Boards of

11:40:44  10   Pharmacy, the state agencies that make up the regulatory

11   bodies within each state; correct?

12   **A.**    Correct.

13   **Q.**    And you stated, you told the reporter, and you were

14   quoted in their article saying, "Yeah, in sum and substance,

11:40:57  15   yes, we should avoid conflict of interest, but it's

16   tradition."

17   **A.**    Correct.

18   **Q.**    Correct?

19   **A.**    Correct.

11:41:02  20   **Q.**    Now, you stated that NABP does not get involved in

21   lobbying, but NABP also has a subset called National

22   Association of Boards of Pharmacy Foundation.  Am I not

23   right?

24   **A.**    Correct.

11:41:19  25   **Q.**    And if you looked up the website for NABP Foundation,

Catizone - Cross (By Ms. Rha)

1    it does say that it's involved in not only educational

2    activities, but regulatory initiatives, right?

3    **A.**    Correct.

4    **Q.**    And I put that in quotes, regulatory initiatives;

11:41:33  5    right?

6    **A.**    Right.

7    **Q.**    And regulatory initiatives really means, Mr. Catizone,

8    that you initiate regulations?

9    **A.**    No.

11:41:41  10   **Q.**    What's regulatory initiatives?

11   **A.**    For example, right now I'm getting calls from

12   congressmen and senators in states with regard to the

13   meningitis issue and the people that have been killed by the

14   compounded product.  They've asked us, is there more federal

11:41:54  15   regulation that's required?  We want to initiate some

16   regulatory changes to the federal law.

17        The states are calling us saying, do we need to change

18   our state law, some new regulatory initiatives?  So we

19   comment on those initiatives as they come up, but we don't

11:42:08  20   initiate them.  We help the states and the federal

21   government deal with issues, like the meningitis issue, to

22   try and find out how to help patients and how to avoid this

23   in the future.

24   **Q.**    So basically you're in touch, in communication with

11:42:24  25   agencies or government authorities or legislators who are

Catizone - Cross (By Ms. Rha)

1    interested in coming up with some sort of law, and they want

2    your comment, your feedback.  When I said you, you or your

3    organization they you represent; right?

4    **A.**    Correct.

11:42:38    5    **Q.**    And you talked about VIPPS, you talked about not

6    getting compensated, you talked about how much money that

7    they pay you on an annual basis.  Now, when I looked up the

8    expenses and revenues for your organization, which you say

9    is a 501(c)(3) charitable organization, I see that as of

11:43:05    10    December of 2010 your total revenue was $25,572,604;

11    correct?

12    **A.**    Correct.

13    **Q.**    And then your expenses was $18,366,192 as of December

14    of 2010; correct?

11:43:28    15    **A.**    Correct.

16    **Q.**    This is published; correct?

17    **A.**    I said correct.

18    **Q.**    And there was a net gain that year, as of December of

19    2010, of $7,206,412; correct?

11:43:40    20    **A.**    Correct.

21    **Q.**    And as of end of December of 2010 your organization

22    held a total asset of $60,112,796; right?

23    **A.**    Correct.

24    **Q.**    Now, I print this up, because every time you talked

11:43:58    25    about VIPPS -- and I don't represent a pharmacy in this

Catizone - Cross (By Ms. Rha)

1    trial, but I do want the jury to know -- you volunteered the

2    information that money loss, money loss, but to an

3    organization that has a total assets of $60 million-plus two

4    years ago --

11:44:15  5              MR. FERAN:  I object to this, Your Honor.

6                THE COURT:  Okay.

7                MS. RHA:  Withdrawn.  Withdrawn.  Let's just

8    move on.  I'm speaking to myself.  I'm going to move on.

9    **Q.**    Now, 2008 annual meeting, right?  This is my last

11:44:27 10   point with you.  Mr. Darken asked you, there was a seminar

11   that was given entitled Case Strategy, How to Investigate an

12   Internet Pharmacy, and it was given by a Benjamin Gluck.

13   Correct?

14   **A.**    Correct.

11:44:46 15  **Q.**    And this is a seminar --

16               THE COURT:  I'm just going clear about the

17   time today.  I will have no opportunity -- how it works,

18   there will be no opportunity for me to stay beyond 12:30.

19   I'm just putting that on the record, and then we'll have to

11:45:03 20  deal with the time.  If there's not enough, we'll have to

21   deal with it.  All right?

22               MS. RHA:  Thank you, Judge.

23   **Q.**    Now, this seminar was put together by your

24   organization, correct?

11:45:17 25  **A.**    Correct.

Catizone - Cross (By Ms. Rha)

1    **Q.**    For its annual meeting, correct?

2    **A.**    Correct.

3    **Q.**    And in addition to that seminar, you held seminars on

4    other pertinent topics.  For example, there was a seminar on

11:45:30  5    pedigree update, correct?

6    **A.**    Correct.

7    **Q.**    There was a seminar on Medicaid fraud, correct?

8    **A.**    Correct.

9    **Q.**    There was a seminar on compounding update, correct?

11:45:38  10    **A.**    Correct.

11    **Q.**    And you as the executive director was directly or

12    indirectly, and no pun intended, involved in selecting the

13    topics that would be appropriate to present to the members

14    who are coming to this very important annual meeting;

11:45:55  15    correct?

16    **A.**    Correct.

17    **Q.**    And you stated yesterday that you were there, right?

18    **A.**    I was at the meeting, yes.

19    **Q.**    And you were there during the seminar?

11:46:06  20    **A.**    No.  Because we had concurrent sessions running, so

21    some of the staff that are involved with compliance handle

22    that seminar, I went to the other sessions that dealt with

23    the board members --

24    **Q.**    So you were the announcer of different seminars?

11:46:17  25    **A.**    Yes.

Catizone - Cross (By Ms. Rha)

1    **Q.**    Because you're the director, and you wanted to make

2    sure everything was running smoothly?

3    **A.**    Correct.

4    **Q.**    And you, with all your experience and presentation,

11:46:29  5    and testimonies and commentaries, and opinions and

6    feedbacks, would have to keep up with the trend in the

7    industry, so to speak; correct?

8    **A.**    Correct.

9    **Q.**    And you would also, I would think, would have to be

11:46:49 10    aware of the things that were being presented on behalf of

11    the National Association of Boards of Pharmacies; correct?

12    **A.**    Correct.

13    **Q.**    And you would also as the executive director, because

14    you've been doing this job for 20 years, so you would agree

11:47:03 15    with me, obviously your board members at your organization

16    seem to think you're doing a pretty good job; right?  They

17    just gave you a raise of $50,000 two years ago, right?

18                    MR. FERAN:  Judge, objection to this.

19                    MS. RHA:  Withdrawn.

11:47:16 20    **Q.**    And so --

21                    THE COURT:  Now, Ms. Rha, you should have the

22    opportunity to ask questions, but you've got to -- let's not

23    go over old ground.  If you've got some things that you

24    really want to ask him about that haven't been covered, go

11:47:38 25    ahead and do that directly; but we need to move on.

Catizone - Cross (By Ms. Rha)

1              MS. RHA:  Yes, sir.

2      **Q.**    So during this seminar or during this conference for

3      annual meeting, when you were going in and out of different

4      seminars and just overseeing things -- (pause.)

11:48:17  5              THE COURT:  Can counsel approach the bench,

6      please, for a minute, everybody?

7                    (Proceedings at side-bar:)

8              MS. LUTZKO:  Your Honor, as I mentioned

9      yesterday, this witness has obligations, I did want to say

11:48:36 10      that this witness has obligations for the National Board of

11      Pharmacy that is going to put him out of pocket for two

12      weeks after today.

13              THE COURT:  All right.  Let me ask you this:

14      How much more do you have on redirect?

11:48:50 15              MR. FERAN:  I'm going to bang through it in 15

16      minutes, Judge.

17                    MS. LUTZKO:  Half an hour.

18              MR. FERAN:  Half an hour.  I've got a lot to

19      cover.  I'll go fast.

11:48:57 20              THE COURT:  Do you have anything further?

21              MR. GORENCE:  I don't know what Ed is going to

22      do, Your Honor.  I have one question so far.  I don't know.

23              THE COURT:  How much more do you have?

24              MS. RHA:  Five more minutes.

11:49:08 25              THE COURT:  Five?

Catizone - Cross (By Ms. Rha)

1           MS. RHA:  Depending on what he says.  Five

2     minutes.

3           THE COURT:  Let's move on.

4           (Proceedings had in open court:)

11:49:27  5     BY MS. RHA:

6     Q.   Mr. Catizone, if you would take a look at what's on

7     the screen, do you remember seeing this PowerPoint

8     presentation, stated "States do not reflect the DEA's

9     purported consensus.  29 states, 58 percent, have medical

11:49:48 10     board policies addressing online prescribing.  Some only say

11     things like Use of Internet does not change standards of

12     care, New York; most merely deem it unprofessional.  None of

13     these say it is outside the course or an invalid

14     prescription."  Do you remember hearing this?

11:50:03 15     A.   I believe I testified to this earlier, and the answer

16     is yes.

17     Q.   Now, at the same annual meeting, now, do you remember

18     seeing this PowerPoint presentation as part of that same

19     seminar?

11:50:17 20     A.   Yes.

21     Q.   The climate summary.  And if you would take a look at

22     the highlighted portion especially, it says, "While some

23     sources" --

24     A.   I've seen this document.

11:50:25 25     Q.   I want to put it on the record.  "While some sources,

Catizone - Cross (By Ms. Rha)

1    though certainly not all, deem online prescribing

2    unprofessional, the overwhelming majority do not treat it as

3    outside the usual course to the extent that it results in an

4    invalid prescription." Right?  This was taught at the

11:50:44  5    2008 -- let me rephrase.

6    **A.**   No, it wasn't taught.  This was presented to be

7    objective --

8    **Q.**   Mr. --

9    **A.**   Wait.  You asked the question.  I'm answering the

11:50:52 10    question.

11              THE COURT:  Wait.  Wait --

12    **Q.**   I did not ask that question --

13              THE COURT:  You're both going to have to stop

14    talking.  When I talk, that's the one rule you have to obey.

11:50:57 15    You have to stop.

16         Now, you're talking across the witness, and he got

17    back into it with you, but you're talking fast.  And give

18    him a chance to answer the question, and you have to also

19    make sure that you say who showed it at the seminar, how it

11:51:14 20    was displayed at the seminar, some context for that.

21              MS. RHA:  Okay, sir, I will.

22              THE COURT:  So let's move on, but don't talk

23    across each other, and certainly when I'm talking, you

24    should stop right away.

11:51:24 25              MS. RHA:  Yes, sir.

Catizone - Redirect (By Mr. Feran)

1          Mr. Catizone, I apologize.  I will calm down.

2      **Q.**    So this particular seminar given at the 2008 annual

3    meeting was given by a Benjamin Gluck; correct?

4      **A.**    Correct.

11:51:36   5      **Q.**    And he is not a board member or a member of the

6    National Association of Board of Pharmacy, right?

7      **A.**    Correct.

8      **Q.**    However, he was invited by your organization to come

9    and give this presentation; correct?

11:51:47  10      **A.**    To present an objective view on both sides of the

11    issue, yes.

12      **Q.**    Okay.

13                MS. RHA:  Thank you, and no more questions.

14                THE COURT:  Thank you, counsel.  Mr. Feran?

11:52:13  15          REDIRECT EXAMINATION OF CARMEN CATIZONE

16    BY MR. FERAN:

17      **Q.**    We're going to go in reverse order, Mr. Catizone.

18    Let's talk about the statements you just saw up on the

19    screen there.  Can you explain what those statements are,

11:52:21  20    sir?

21      **A.**    Sure.  We have speakers at our meeting that present

22    all sides of the issue.  That speaker was presenting

23    contrary views as to what the interpretations may be at a

24    recent annual meeting.  We had a presentation on

11:52:34  25    pseudoephedrine, which is used to manufacture meth, and we

Catizone - Redirect (By Mr. Feran)

1    brought up proponents that said pseudoephedrine should not

2    be regulated, and those that said it should be regulated,

3    and they both provided facts on both sides saying why it

4    shouldn't and why it should.

11:52:47  5        We provide those types of programming so the boards

6    can have all the information, and then go back and make

7    objective decisions.  That was the same in this case.

8    Individuals had different opinions and interpretations of

9    state and federal law.  We give everybody a chance to be

11:53:00  10   heard and to have information presented.

11   **Q.**    These comments did not reflect the view of your

12   organization.  Is that correct, sir?

13   **A.**    Correct, sir.

14   **Q.**    Let's talk about when Miss Rha showed you the chart

11:53:10  15   and talked about materials that you've reviewed regarding

16   Dr. Sasaki.  Do you remember those questions?

17   **A.**    Yes.

18   **Q.**    Focusing on he's not on the T III, he's not on the

19   controlled buys; correct?

11:53:20  20   **A.**    Correct.

21   **Q.**    Let's talk about all the materials you reviewed, sir.

22   Did you review -- in all the materials did you review

23   materials relating to Dr. Sasaki?

24   **A.**    Yes.  Dr. Sasaki was in other materials related to the

11:53:33  25   prescriptions, the processing of those prescriptions, and

Catizone - Redirect (By Mr. Feran)

1    Dr. Sasaki's efforts to involve other physicians to write

2    prescriptions on his behalf as part of this operation.

3            MR. MILANO:  Objection, Your Honor.  Can we

4    approach the bench?

11:53:51  5            THE COURT:  You may.

6            (Proceedings at side-bar:)

7            MR. MILANO:  Judge, my fear is I don't know

8    that this is accurate.  My fear is the government is now

9    attempting to move down the Dr. Nelson line, because

11:54:15  10   questions were asked about specific things that he reviewed,

11   he is now saying he reviewed things about Dr. Sasaki

12   recruiting other physicians.  And that gets us into the

13   statements which again Ms. Rha in no way opened the door to

14   these brand new opinions now on direct.

11:54:34  15       If that's not the case, if that's not what they're

16   doing, then I'm sorry.

17           MS. LUTZKO:  Your Honor, a couple of points.

18   First of all, Ms. Rha elicited only some of the things he's

19   reviewed.  She didn't explicitly make clear and tried to

11:54:46  20   create a false picture he hadn't reviewed other documents

21   that relate to Dr. Sasaki.  We did not give him his

22   statement, we did not give him additional information he

23   had.  What he had --

24           MR. MILANO:  Then excuse me.

11:55:01  25           THE COURT:  All right.  There's no objection

Catizone - Redirect (By Mr. Feran)

1      now, right?

2                    MR. MILANO:  Well, no, if we're not in that

3      area where they're offering new opinions.  I am not sure of

4      the basis he recruited other physicians --

11:55:09  5            MS. LUTZKO:  He reviewed the indictment, he

6      reviewed all sorts of things.  They're on the list.

7                    THE COURT:  Let me just say this.  I'll give

8      limited latitude.  She made a lot of the fact that he

9      reviewed everything that he ever saw, Dr. Sasaki anyway, and

11:55:25 10   I think it's fair, as long as you're talking about what he

11     reviewed.

12                   MS. RHA:  I said I listed the items that I was

13     questioning him about.

14                   THE COURT:  I know.  The objection is

11:55:45 15   overruled.  Let's move.

16                   (Proceedings had in open court:)

17     **Q.**   Okay.  Mr. Catizone, we talked about Ms. Rha asked you

18     about T IIIs and controlled buys, correct?

19     **A.**   Correct.

11:56:09 20  **Q.**   Now, you reviewed materials that you listed other than

21     those materials, correct?

22     **A.**   Correct.

23     **Q.**   And these included the indictment and DEA-6s, correct?

24     **A.**   Correct.

11:56:17 25  **Q.**   As a result of your review of those materials, sir,

Catizone - Redirect (By Mr. Feran)

1    was Dr. Sasaki mentioned?

2    **A.**    Yes.

3    **Q.**    And what was his role in this organization, sir?

4    **A.**    He worked with Dr. Cheslow in order to have approvals

11:56:29 5    of the orders that came over the Internet.

6    **Q.**    Did you read pharmacy records related to Dr. Sasaki?

7    **A.**    Yes.  He was also involved in approving a number of

8    orders for those for the hydrocodone and other buys.

9    **Q.**    Based on your training and experience, Mr. Catizone,

11:56:45 10   would you tell us about your thoughts on those approval

11   process?

12   **A.**    In my opinion, I didn't believe there was a valid

13   patient-doctor relationship there, and those orders were

14   simply approved as part of this organization and part of

11:56:58 15   this operation.

16   **Q.**    Why didn't you view this as a valid doctor-patient

17   relationship, sir?

18   **A.**    Based on the information I reviewed, I didn't see any

19   consultation occur between the patients and the doctors.  I

11:57:17 20   didn't see any follow up.  And the number of orders that

21   were filled and the process for filling them also indicated

22   that the relationship didn't exist or wasn't created.

23   **Q.**    We went into great detail about your compensation for

24   testimony and not being paid.  Why do you agree to testify

11:57:32 25   here today, sir?

219

Catizone - Redirect (By Mr. Feran)

1    **A.**    Because it's part of our mission to help the states.

2    When I first started at NABP we had an annual budget of less

3    than a million dollars, and we had seven staff.  And because

4    we've been able to develop these programs and work with the

11:57:44 5    states, that's why the budget is where it's at today, and

6    because of the things we do for the states to try and help

7    the states.

8    **Q.**    Let's move on, and we're going to talk about Mr.

9    Darken's questions to you.  To start off, I'll talk about

11:57:57 10    medical records in a pharmacy.  Correct?  Do you remember

11    the first line of questions he asked you yesterday?

12    **A.**    Yes, sir.

13    **Q.**    Is it unusual that a pharmacist would have medical

14    records in his pharmacy during this time frame in the

11:58:10 15    conspiracy, sir?

16    **A.**    Yes.

17    **Q.**    Can you explain that, Mr. Catizone?

18    **A.**    It came up in the questioning today, most pharmacies

19    don't have access to medical records, don't maintain medical

11:58:21 20    records.  They're truly focused on the prescription

21    processing and the information they get from the

22    prescription.

23    **Q.**    You talked about testifying, and it was gone through

24    in great length on certain dates you testified for the

11:58:37 25    government in various trials.  Do you remember that line of

Catizone - Redirect (By Mr. Feran)

1    questioning?

2    **A.**    Yes, sir.

3    **Q.**    You also stated you testified in administrative

4    hearings.  Is that correct, sir?

11:58:44 5    **A.**    Yes, sir.

6    **Q.**    And how many times was that?

7    **A.**    Probably about half a dozen or so, sir.

8    **Q.**    And what context was that, Mr. Catizone?

9    **A.**    In terms of the administrative hearings on behalf of

11:58:57 10   the government, they were for DEA registration revokes,

11   revocations.

12        On the other side, in regards to pharmacists, I've

13   testified in about 20 administrative hearings where we have

14   felt that the board acted inappropriately against the

11:59:10 15   pharmacist, and so we've testified on the pharmacist's

16   behalf and asked the Board of Pharmacy to reconsider their

17   action or reinstate their license, or to make an exception

18   for the pharmacist because of the board acting out of its

19   course of duty, or perhaps in some other way that we didn't

11:59:26 20   think was fair to the pharmacist, or in conformance with

21   what the laws and regulations were in that state.

22   **Q.**    So you've testified for accused pharmacists, sir?

23   **A.**    Yes.

24   **Q.**    Against a charging agency?

11:59:36 25   **A.**    Yes.

Catizone - Redirect (By Mr. Feran)

1    **Q.**    Let's talk about, Mr. Darken talked about red flags.

2    Do you remember that line of questioning?

3    **A.**    Yes, sir.

4    **Q.**    And he mentioned in and of itself is this sufficient

11:59:47  5    where a doctor is in one state and the pharmacist and the

6    patient is in another state.  Do you remember that?

7    **A.**    Yes, sir.

8    **Q.**    Are red flags, Mr. Catizone, are they viewed in

9    isolation?

11:59:59  10    **A.**    Each of the red flags taken by themselves would be

11    something the pharmacist would investigate, but wouldn't

12    necessarily say this was an invalid relationship.  When you

13    look at the situation, all of those red flags were present,

14    so it wasn't one or two.  All the red flags were present.

12:00:16  15    So if you look at the situation in total, those red flags

16    all add up to the situation, and the opinion that talked

17    about not having a valid prescription and not dispensing

18    these prescriptions appropriately.

19    **Q.**    Mr. Catizone, you previously ascribed the legal

12:00:32  20    obligations or requirements a pharmacist must do to insure a

21    prescription is valid.  Do you remember talking about that,

22    sir?

23    **A.**    Yes, sir.

24    **Q.**    Are these requirements uniform throughout the United

12:00:42  25    States?

Catizone - Redirect (By Mr. Feran)

1    **A.**    Yes, they are.  And they apply for Internet pharmacies

2    as well as the additional brick and mortars, and that's why

3    you didn't have a lot of states acting early on for special

4    Internet regulation.  The requirements, the standards

12:00:55  5    already existed.  The states were trying ways to implement

6    them and deal with a whole new entity, because the Internet

7    isn't really much more than a telephone in communicating,

8    but the states needed some new tools to deal with these

9    pharmacies that were operating in multiple states.

12:01:10  10    **Q.**    Would you go to 976 in front of you, sir?  I know you

11    have a lot of documents.  This is the DEA memo.  Is that in

12    front of you?

13    **A.**    Yes.

14    **Q.**    Go to page 1 on that, sir.  Now, the date on this is

12:01:21  15    2001, correct?

16    **A.**    Correct.

17    **Q.**    Is this a guidance document?

18    **A.**    Yes.

19    **Q.**    What's a guidance document?  Can you explain this?

12:01:28  20    **A.**    The DEA has responsibility for the Controlled

21    Substances Act.  They issue regulations.  They also issue

22    guidance documents.  The guidance document has the same

23    weight and bearing as regulation, because the DEA will use

24    this in issues and matters to prosecute pharmacies or

12:01:44  25    pharmacists or doctors, based upon the guidance document,

Catizone - Redirect (By Mr. Feran)

1    which is their interpretation of the law and the statutes.

2    **Q.**    Mr. Catizone, is the regular prescribing day after day

3    of hydrocodone for people residing in multiple states

4    something that should cause a pharmacist to question these

12:02:01   5    prescriptions?

6    **A.**    Yes.

7    **Q.**    Can you explain that, sir?

8    **A.**    Prescriptions for patients in multiple states from

9    doctors that may be in different states than the patients,

12:02:08  10    and the doctors and patients that are in different states of

11    the pharmacist, would raise red flags.  Generally the

12    pharmacist is familiar with the doctors that they're going

13    to dispense prescriptions for, the patients they're

14    dispensing for; without that familiarity the pharmacist has

12:02:24  15    to do his due diligence or her due diligence, and verify

16    everything occurring is valid.

17    **Q.**    Sir, is it usual for a Florida pharmacist to regularly

18    fill prescriptions for a Puerto Rican doctor day after day?

19    **A.**    For patients that are not located, again, within that

12:02:39  20    pharmacy's area that the pharmacist is familiar with, and

21    not knowing the doctor, a validating doctor, the answer

22    would be it's unusual.

23    **Q.**    We went into a series, and I believe you have them, of

24    NABP, Mr. Darken went into it, Minnesota news, North

12:03:01  25    Carolina, Minnesota?  Do you see those, sir? I'm referring

Catizone - Redirect (By Mr. Feran)

1    to VD-3, VD-9, VD-5.  Do you see those, sir?

2    **A.**    Yes, I do.

3    **Q.**    Do you have those in front of you, sir?

4    **A.**    Yes, I do.

12:03:12 5    **Q.**    Are the statutes the only thing that establish a

6    doctor-pharmacist requirements for practice?

7    **A.**    No.  It's based upon the federal law that we talked

8    about earlier, where the basis says it must be a valid

9    prescription.  Then it occurs in state statutes and

12:03:31 10   regulations, where it may be specifically cited, or it's

11   based upon the standards of practice that exist for that

12   particular patient, that particular profession.  As.

13        An example, I think one of the examples given was

14   Louisiana, that it didn't pass in 2007.  However, the

12:03:45 15   research that I did last night, Louisiana Board Reg 2515 in

16   1989 talked specifically about questionnaires, the number of

17   prescriptions, and a matter of authorization electronically

18   for prescriptions.

19        So the states had things in place at this time period

12:04:04 20   and beyond.  What was presented today were simply updates or

21   moving things from regulation to statute so that they would

22   be stiffer penalties for those infractions, or that that

23   message would be even clearer for those individuals involved

24   in that activity.

12:04:18 25   **Q.**    And all of these things that Mr. Darken showed you,

Catizone - Redirect (By Mr. Feran)

1    what I'm referring to, the Minnesota, Montana, North

2    Carolina, and on we go, does that change your testimony

3    regarding the requirements for pharmacists to distribute a

4    controlled substance in the usual course of business?

12:04:39  5    **A.**    No.

6    **Q.**    Can you tell us, can you explain that, sir?

7    **A.**    As I mentioned, the standard already existed, whether

8    it was an Internet pharmacy or traditional brick and mortar

9    pharmacy.  The difference with an Internet pharmacy was

12:04:49  10   these activities were occurring in cyberspace in terms of

11   the transfer of the prescriptions, patient information, so

12   there had to be some new regulations regarding how to

13   protect that information.  There was also questions of

14   identity theft, how to protect for that.

12:05:04  15        So the new regulations focused more on how do we

16   regulate this new entity; not the standard of care, not what

17   defined valid prescription.  That's existed, it existed

18   because of the state and federal laws and standards of

19   practice.  Internet pharmacies didn't change that.

12:05:20  20   **Q.**    Did the requirements for a pharmacist which you talked

21   about yesterday, criteria that the pharmacist must use prior

22   to dispensing a prescription, did any of this change that,

23   sir?

24   **A.**    No, it didn't.

12:05:30  25   **Q.**    Did the corresponding responsibility change, sir?

Catizone - Redirect (By Mr. Feran)

1    **A.**    No, it didn't.

2    **Q.**    Did the nature of a physician-patient relationship

3    change, sir?

4    **A.**    No, it didn't.  Just as a note, too, I did have a

12:05:45  5    chance to review the case the attorney asked me to review,

6    so whenever it's appropriate, I'd be glad to answer his

7    question on that, as well.

8    **Q.**    Let's talk about that, about the various laws you

9    reviewed, sir.  Can you talk about that?

12:05:57 10    **A.**    The court case that I reviewed?

11    **Q.**    Oh, no.  Strike that.  You stated that you looked at

12    some various laws last night?

13    **A.**    Correct.  I looked at the 20 states that I mentioned

14    earlier where these requirements were in place around 2001,

12:06:13 15    2005, and I actually found there were 22 states at that time

16    that had specific Internet requirements or dealt

17    specifically with questionnaires, required a face-to-face

18    consultation, or required our VIPPS program, or deferred to

19    NABP for standards we would develop in regard to Internet

12:06:33 20    practice.

21    **Q.**    Mr. Catizone, we talked about in 2004 most states had

22    not passed laws regarding Internet pharmacies.

23    **A.**    Yes.

24    **Q.**    Can you explain why?

12:06:43 25    **A.**    They didn't need to.

Catizone - Redirect (By Mr. Feran)

**Q.**    Why didn't they need to?

**A.**    The standards were already there whether it was
Internet or regular practice.  The states began addressing
some of the other issues that were emerging based upon
Internet practice with some new regulations and new
requirements, and then used that to further strengthen the
existing standards by specifically mentioning them or
mentioning them again.

**Q.**    Mr. Catizone, have Internet pharmacies ever been held
to a different standard than brick and mortar pharmacies?

**A.**    Not based upon my experience.

**Q.**    Can you explain that, sir?

**A.**    Again, it is the same standards, same standards of
care, same standards for validating prescriptions and
relationships.

**Q.**    VD-4, if you can pull that up, sir.  Do you see it's
talking about the North Carolina one?

**A.**    Okay.

**Q.**    And you were asked some questions on VD-4 about
electronic signatures, correct?

**A.**    Correct.

**Q.**    And when was the applicable time period relating
to -- can you explain electronic signatures and the time
period relating to them?

**A.**    I will explain it in the context of this document.  It

Catizone - Redirect (By Mr. Feran)

1    really doesn't matter what North Carolina passed.

2    **Q.**    Why doesn't it matter, sir?  Can you explain that, why

3    it doesn't matter what North Carolina passed?

4    **A.**    What they've said here is electronic signatures were

12:08:04  5    possible, but however, the DEA had a requirement that said

6    you could not engage in this activity, electronic signatures

7    weren't acceptable.

8         To give another example, the DEA says that medical

9    marijuana cannot be dispensed, it's illegal, but a number of

12:08:20 10    states have passed laws saying that you can have medical

11    marijuana, you can sell medical marijuana.  Those pharmacies

12    or those dispensaries are still in violation of federal law,

13    and at any time the DEA could go in and arrest those

14    individuals for using or selling medical marijuana.

12:08:37 15         The same situation existed here.  Even though North

16    Carolina said you could do it in North Carolina, the federal

17    law which was more stringent still stood, and if the DEA

18    wanted to go in and prosecute any of those pharmacies or

19    doctors using electronic signatures, they still had the

12:08:51 20    authority to do so regardless of state law.

21    **Q.**    And the federal law in effect at this time said what,

22    sir?

23    **A.**    That Internet signatures and electronic signatures

24    were not allowed; fax and oral prescriptions only.

12:09:04 25    **Q.**    Are they allowed now?

Catizone - Redirect (By Mr. Feran)

1    **A.**    Yes.  Electronic prescribing has just been approved by

2    the DEA.

3    **Q.**    And when was that, sir?

4    **A.**    Within the last year or so for controlled substances.

12:09:13  5    **Q.**    It was after 2009?

6    **A.**    Correct.

7    **Q.**    Let's talk about you have Government's Exhibit Number

8    VD-8 in front of you, and this is the letter.  Defense

9    Exhibit VD-8.  Do you have that in front of you?

12:09:39  10    **A.**    Yes, sir, I do.

11    **Q.**    And this is a letter dated August 24 of 2011.  Is that

12    correct, sir?

13    **A.**    Correct.

14    **Q.**    And in this letter you're talking about Schedule II

12:09:51  15    controlled substances, correct?

16    **A.**    Correct.

17    **Q.**    And this letter references corresponding

18    responsibilities and references to federal and state law,

19    correct?

12:10:02  20    **A.**    Correct.

21    **Q.**    And the last line of paragraph 2, "consequently," can

22    you read that, Mr. Catizone?

23    **A.**    Consequently, DEA expects that when information is

24    missing from or needs to be changed on a Schedule II

12:10:16  25    controlled substance prescription pharmacists use their

Catizone - Redirect (By Mr. Feran)

1    professional judgment and knowledge of state and federal

2    laws and policies to decide whether it's appropriate to make

3    changes to that prescription.

4    **Q.**   Can you explain what that means, sir?

12:10:26 5    **A.**   It's fairly clear, even though there's the ability for

6    pharmacists to use their professional judgment, it still has

7    to be in compliance with state and federal laws.

8    **Q.**   Let's talk about Mr. Darken talked about DEA knows if

9    you're distributing 100 controls and 100 noncontrols,

12:10:43 10   correct?  Do you remember that line of questioning?

11   **A.**   Yes.

12   **Q.**   DEA also knows if you're distributing 100 controls and

13   zero noncontrols; is that correct, sir?

14   **A.**   They know how many controls.

12:10:54 15   **Q.**   By the reporting requirements?

16   **A.**   They just know about controlled substances.

17   **Q.**   All right.  We talked about prescriptions with

18   insurance, and you said 97 percent of prescriptions are

19   filled with insurance; correct, sir?

12:11:09 20   **A.**   Yes.

21   **Q.**   We talked about fill fees.  Remember, Mr. Darken asked

22   you about fill fees?

23   **A.**   Yes, sir.

24   **Q.**   Is a pharmacist in your training and experience,

12:11:24 25   Mr. Catizone, does a pharmacist charge different fill fees

Catizone - Redirect (By Mr. Feran)

1    based upon whether a person has insurance or no insurance?

2    **A.**    I'm not -- I can't comment on that one.

3    **Q.**    You stated that you worked at Osco's between '78 and

4    '85, sir?

12:11:42  5    **A.**    Correct, as a full-time --

6    **Q.**    As a full-time pharmacist?

7    **A.**    As a technician, and a full-time pharmacist from '83

8    to '85.

9    **Q.**    And during that time period you had mechanisms in

12:11:51  10    place to make sure scripts did not go to the same address?

11    **A.**    Yes.

12    **Q.**    This was before the computer age, so to speak,

13    correct?

14    **A.**    Correct.

12:11:58  15    **Q.**    Back in the late '70s and mid-'80s?

16    **A.**    Correct.

17    **Q.**    And you were able to insure during that time period

18    without the aid of computers that scripts didn't go to the

19    same address?

12:12:07  20    **A.**    We worked hard to make sure it didn't happen.

21    **Q.**    Let's talk about there was questions, sir, between you

22    and Mr. Darken about this case.  He stated this case does

23    not involve the distribution of drugs solely based on

24    questionnaires.  Do you remember that?

12:12:27  25    **A.**    Yes.

232

Catizone - Redirect (By Mr. Feran)

1    **Q.**    And you would disagree with him on that.  Do you

2    remember that?

3    **A.**    Yes.

4    **Q.**    And can you explain what you're talking about there,

12:12:33  5    sir?

6    **A.**    I think the context there was that the medical records

7    that were being used were legitimate medical records, and

8    that's where the disagreement came in.  Medical records

9    provided by the patients instead of by a doctor or other

12:12:45  10    health care professional that's conducted that examination

11    and completed that medical record wouldn't constitute a

12    medical record, in my opinion, and therefore we're dealing

13    with a situation where medical records don't exist, and

14    we're dealing with just questionnaires.

12:12:59  15    **Q.**    You looked at the controlled buys in this case, didn't

16    you, Mr. Catizone?

17    **A.**    Yes.

18    **Q.**    And in some of those controlled buys were controlled

19    substances distributed based solely on a questionnaire?

12:13:13  20    **A.**    Yes.

21    **Q.**    And can you tell us your opinion on this, sir?

22    **A.**    They were distributed based on the questionnaire

23    without a valid relationship, without any other

24    documentation.

12:13:23  25    **Q.**    And what is your opinion on this type of activity,

Catizone - Redirect (By Mr. Feran)

1    sir?

2    **A.**    It's in violation of state and federal laws and

3    standards of practice.

4    **Q.**    Do you have Defendant's Exhibit VD-7 in front of you,

12:13:34  5    sir?  If you would look for that.

6    **A.**    Sure.

7    **Q.**    Let me know when you have it.

8    **A.**    Go ahead, I have it.

9    **Q.**    You have it in front of you?

12:13:43 10    **A.**    Yes.

11    **Q.**    And this is the Florida law, for the record,

12    64B16-27.813; correct?

13    **A.**    Yes, sir.

14    **Q.**    And it talks about standards of practice dispensing

12:13:56 15    controlled substances and treatment of pain?

16    **A.**    Yes.

17    **Q.**    It talks about the legitimacy of a prescription,

18    correct?

19    **A.**    Yes, sir.

12:14:01 20    **Q.**    And in subcategory 2 there are five things that are

21    listed for a pharmacist to determine whether or not a

22    prescription is legitimate.  Is that correct, sir?

23    **A.**    Yes.

24    **Q.**    All right.  Now, B is what?

12:14:20 25    **A.**    B is only controlled substance medications are

Catizone - Redirect (By Mr. Feran)

1   prescribed for a patient.

2   **Q.**   Did that exist in this case, sir?

3   **A.**   It existed, yes, it did.

4   **Q.**   And what was the controlled substance?

12:14:31  5   **A.**   Primarily hydrocodone.

6   **Q.**   All right.  We have E.  Can you read that, sir?

7   **A.**   Patients always pay cash and always insist on brand

8   name product.

9   **Q.**   Did that exist in this case, sir?

12:14:48 10   **A.**   The cash part did, yes.

11   **Q.**   D.  Can you talk about that, sir?

12   **A.**   Same or similar controlled substance medications

13   prescribed by two or more prescribers at the same time.  I

14   think we talked about some examples of that, where patients

12:15:09 15   were getting the same prescriptions from the same

16   prescribers and sometimes on the same date.

17   **Q.**   If -- and it says if any of the two criteria -- if any

18   of the criteria is met, which it does here, it says the

19   pharmacist shall do certain things.  Is that correct?

12:15:31 20   **A.**   Correct.

21   **Q.**   Mr. Catizone, in your practice, if you were confronted

22   with a situation like this, what would you do?

23   **A.**   I would immediately contact the doctor to determine if

24   it was a valid prescription.  If it wasn't a valid

12:15:43 25   prescription I wouldn't dispense it, and I would notify

Catizone - Redirect (By Mr. Feran)

1    authorities if there was a problem here occurring, probably

2    some fraud or diversion.

3    **Q.**    During questions, sir, by Mr. Darken, he talked about

4    IDs in this case.  Do you remember that line of questions?

12:16:04 5    **A.**    Yes.

6    **Q.**    Did you know that the government used fake IDs to

7    obtain drugs in this case?

8    **A.**    Yes.

9    **Q.**    If you were presented with an ID that you had

12:16:13 10    questions about, what would you do, sir?

11    **A.**    Again, it is the responsibility to question and

12    investigate that ID to the best ability of the pharmacist.

13    **Q.**    We talked about the Internet, and it started in 1999,

14    and it continues today.  Is that correct, sir?

12:16:29 15    **A.**    Yes.

16    **Q.**    Has the Internet changed throughout the years?

17    **A.**    Yes.

18    **Q.**    Did the practice of the online pharmacies change

19    throughout the years?

12:16:36 20    **A.**    Yes.

21    **Q.**    Did the practice of rogue pharmacies change throughout

22    the years?

23    **A.**    Yes.

24    **Q.**    Can you tell us how they changed over time, sir?

12:16:43 25    **A.**    Sure.  The first wave of the Internet were companies

236

Catizone - Redirect (By Mr. Feran)

1    like amazon.com that thought you could sell prescriptions

2    without -- medications without a prescription like you could

3    sell a CD or a book.  As soon as those entities were made

4    aware that that was illegal we moved into a different phase,

12:17:00  5    where a lot of senior citizens who couldn't afford

6    medication went to the Internet to try and buy products from

7    Canada and outside of the U.S.  And it became an issue with

8    states where states were passing or allowing this to occur,

9    in direct violation of their own laws and federal laws.

12:17:15  10    With the implementation of the Medicare drug plan,

11    that went away, and many seniors until they get into the

12    doughnut hole are able to get their medications now through

13    a Medicare plan, and they're more affordable.

14    The latest phase has been for the deliberate

12:17:30  15    acquisition of drugs without a prescription, and some of the

16    processes that were -- an example in this case -- for people

17    to just buy prescription medications without prescriptions

18    and to use the Internet to get drugs that they couldn't get

19    through any legitimate process or legitimate evaluation.

12:17:46  20    THE COURT:  Mr. Feran?

21    MR. FERAN:  Yes, Your Honor.

22    THE COURT:  To be fair, I would be thinking

23    three or four minutes.

24    MR. FERAN:  I'm going to have it wrapped up.

12:17:54  25    Thank you, Judge, just a couple more questions.

Catizone - Redirect (By Mr. Feran)

1    **Q.**    Let's move on, Mr. Catizone, and we'll finish up, sir.

2    You talked about legitimate telemedicine.  Do you remember

3    talking about that?

4    **A.**    Yes, sir.

12:18:05  5    **Q.**    What is legitimate telemedicine?

6    **A.**    That's where the patient has been seen by a doctor and

7    there's been a physical evaluation, and then there's a

8    relationship between that patient, the doctor, and the

9    covering doctor or referral doctor, where both doctors are

12:18:21 10    fully informed about the patient, their tests, their

11    diagnosis, and information.  Even though that second doctor

12    may not have conducted the physical evaluation there is that

13    communication and collaboration between all three parties,

14    the two doctors and the patient.

12:18:35 15    **Q.**    Mr. Catizone, based on your training and experience,

16    did legitimate telemedicine occur in this case?

17    **A.**    No.

18    **Q.**    Why not?

19    **A.**    Again, it was no valid relationship.  The

12:18:45 20    consultations weren't conducted with the doctors in many

21    cases, and the information reviewed, the medical records

22    that they claim are medical records, those evaluations

23    weren't conducted by a doctor or health care professional.

24    Information was self-reported, it wasn't reliable.  The

12:19:00 25    doctors didn't look at that information, didn't the conduct

Catizone - Redirect (By Mr. Feran)

1    the examinations, didn't have a relationship with a patient.

2    **Q.**    And lastly, Mr. Gorence talked about pharmacists being

3    fooled and how they would have no way of knowing the scripts

4    were altered.  Do you remember that line of questioning by

12:19:16  5    Mr. Gorence, sir?

6    **A.**    Yes, sir.

7    **Q.**    If you're a pharmacist, what would you look at to

8    determine a valid script?

9    **A.**    All the elements we talked about before, but that is

12:19:25  10    an issue that pharmacists are especially trained to deal

11    with.  The state boards and the DEA always sent out

12    information about how to deal with these situations, how to

13    know if there's a doctor involved or a patient that may be

14    trying to dupe the pharmacist.  So it's part of the training

12:19:39  15    and education that a pharmacist receives, and what's the

16    responsibility to look at the various red flags that we've

17    talked about earlier in this case.

18    **Q.**    And lastly, sir, did you review the numbers of the

19    hydrocodone scripts that went out in this case?

12:19:54  20              MR. DARKEN:  Your Honor, object.  Same

21    argument.  I think you sustained it yesterday.

22              THE COURT:  Did I?

23              MR. DARKEN:  Beyond the scope of the report.

24    Rule 16.  Same objection.

12:20:10  25              THE COURT:  I'm not for sure.

Catizone - Redirect (By Mr. Feran)

1          MR. GORENCE:  Your Honor, I would join.  And

2    the problem is we're getting into this, then he's going to

3    come back in a couple weeks, because it is a whole new area

4    we never had notice.

12:20:21  5          MR. FERAN:  Your Honor, let me --

6    **Q.**   Mr. Catizone, did you review the distribution pattern

7    of hydrocodone in this case?

8    **A.**   Yes.

9          MR. DARKEN:  Same objection.  Rule 16, beyond

12:20:34  10   the scope.

11         MR. FERAN:  Judge, he's a pharmacist.  It's

12   not beyond the scope.

13         MR. DARKEN:  It's beyond the scope.

14         MR. FERAN:  It is not beyond the scope.

12:20:41  15         MR. DARKEN:  It is beyond the scope of the

16   report we were given as an expert under Rule 16, Your Honor.

17         MR. FERAN:  Judge, he's a pharmacist.  He's

18   talking about pharmacy distribution patterns.

19         MR. DARKEN:  If we had gotten the

12:20:52  20   information --

21         THE COURT:  Just a minute.

22         MR. DARKEN:  -- that would be fine.

23         THE COURT:  Let me see the report again.

24         (Proceedings at side-bar:)

12:21:40  25         THE COURT:  Okay.  I have the report.  So

Catizone - Redirect (By Mr. Feran)

1    Mr. Feran, you want to ask him -- what's the question?

2              MR. FERAN:  I'm not asking him numbers, I'm

3    asking day after day the pharmacists are prescribing the

4    same prescription over and over again, is that a cause for

12:22:09 5   concern.

6              MS. LUTZKO:  To people located in different

7    states.

8              MR. DARKEN:  If that's the only question then

9    I don't have an objection.  I thought you were going into

12:22:16 10  the volume, the numbers.

11             MR. FERAN:  No, I'm talking about the day

12   after day repetitive nature of it.

13             THE COURT:  Let me be clear.  His report

14   supports a question of that type, right?

12:22:26 15            MR. DARKEN:  I thought we were going way

16   beyond that.

17             (Proceedings had in open court:)

18   BY MR. FERAN:

19   **Q.**    Lastly, Mr. Catizone, if day after day after day a

12:22:49 20  doctor is prescribing hydrocodone to patients located in

21   different states, is that a problem?

22   **A.**    It would be a red flag, yes.

23   **Q.**    And if it happens 5, 10, 15 or 20 times, is that

24   indicative of anything?

12:23:00 25  **A.**    There's a pattern there that's probably not patient

241

Catizone - Recross (By Mr. Darken)

1    care, probably some sort of drug scheme, drug trafficking,

2    some other reasons for distribution.

3                    MR. FERAN:  Judge, thank you.  I have no

4    further questions.

12:23:11  5                    THE COURT:  All right.

6              RECROSS-EXAMINATION OF CARMEN CATIZONE

7    BY MR. DARKEN:

8    **Q.**    Sir, we're going to try to do this pretty quick.  If I

9    go too fast, let me know.

12:23:23  10          Mr. Feran asked you how many times you've testified

11    for accused pharmacists.  Do you remember that?

12    **A.**    Yes, sir.

13    **Q.**    None of those were criminal cases, right?

14    **A.**    No, sir.

12:23:35  15   **Q.**    Mr. Feran asked you if it was unusual for a Florida

16    pharmacist to fill scripts from a Puerto Rican doctor.  Do

17    you remember that?

18    **A.**    Yes, sir.

19    **Q.**    You said it was unusual.  Do you remember that?

12:23:45  20   **A.**    Yes, sir.

21    **Q.**    Are you aware that the largest population of Puerto

22    Ricans in the United States outside of New York City is in

23    the Kissimmee area outside Orlando?  Are you aware of that?

24    **A.**    No, sir.

12:23:55  25   **Q.**    Mr. Feran asked you about a Louisiana statute or

Catizone - Recross (By Mr. Darken)

1    pharmacy board regulation from 1989, 21-1-5.  Do you

2    remember that?

3    **A.**    Yes, sir.

4    **Q.**    That was a questionnaire-based prohibition, correct?

12:24:14  5    **A.**    Yes, sir.  I think it was the board regulation was

6    25-1-5 that I reviewed yesterday, sir.

7    **Q.**    Okay.  Now, you said that you reviewed some material

8    last night, and you found 22 states between 2000 and 2005;

9    is that correct?

12:24:34  10    **A.**    2000 and 2007, sir.

11    **Q.**    2000 and 2007, okay.  How many of those were -- you

12    talked about VIPPS and face-to-face together.  How many of

13    those 22 states specifically prohibited or specifically

14    required face-to-face interaction of the 22?

12:24:55  15    **A.**    Between that time period all 22 did, sir.

16    **Q.**    All right.  Now, you testified in response to

17    Mr. Feran, he asked you some questions about electronic

18    signatures.  Do you remember that?

19    **A.**    Yes, sir.

12:25:20  20    **Q.**    And then you brought up this medical marijuana

21    analogy, and then you said that just because some state may

22    allow somebody to dispense medical marijuana, it's still a

23    federal crime.  Do you remember that?

24    **A.**    Yes, sir.

12:25:33  25    **Q.**    And you said you can be arrested for that, right?

Catizone - Recross (By Mr. Darken)

1    **A.**    Prosecuted by the DEA, yes.

2    **Q.**    Right.  Electronic signatures is an administrative

3    requirement, right?

4    **A.**    Yes, sir.

12:25:42 5    **Q.**    You don't get arrested for not complying with that?

6    **A.**    No, sir.

7    **Q.**    Correct?  So that was a little bit of a -- not an

8    exact analogy there, correct?

9    **A.**    It was just a misspeak of terms.  I apologize.

12:25:55 10    **Q.**    Okay.  You weren't trying to tell the jury that if you

11    don't do electronic signatures correct the DEA comes and

12    takes you off to jail, right?

13    **A.**    No, sir, I wasn't.

14    **Q.**    Okay.  And what we're talking about there is the

12:26:08 15    difference between a fax signature and an e-mail signature,

16    correct?

17    **A.**    Correct, sir.

18    **Q.**    All right.  So DEA up until a year ago was still in

19    the fax era, correct?

12:26:23 20    **A.**    Yes, sir.

21    **Q.**    All right.  Mr. Feran asked you about the 100 controls

22    versus 100 noncontrolled.  Do you remember that?

23    **A.**    Yes, sir.

24    **Q.**    And he asked you a question, and you said that DEA has

12:26:37 25    no ability to track noncontrols, right?

Catizone - Recross (By Mr. Darken)

1    **A.**    Yes, sir.

2    **Q.**    Okay.  You can't fool DEA about noncontrols because

3    they don't keep track of noncontrols, right?

4    **A.**    Typically, no, sir.

12:26:49 5    **Q.**    You said that medical records don't -- you don't

6    believe that medical records existed in this case because

7    they were submitted by patients, correct?

8    **A.**    Yes, sir.

9    **Q.**    All right.  So if I have a cardiologist and he

12:27:14 10    retires, he's going to go out of practice, and I go to my

11    cardiologist and I pick up my records, and then I go to my

12    new cardiologist and I give him my records, under your

13    scenario those medical records don't exist.  Is that

14    correct?

12:27:26 15    **A.**    I said they wouldn't be used as a basis for a valid

16    prescription.  Your new cardiologist would probably conduct

17    an examination on you to substantiate the records he

18    received and start a new patient profile on you, sir.

19    **Q.**    Didn't you say those medical records don't exist?

12:27:42 20    **A.**    In my opinion they weren't -- I wouldn't consider them

21    medical records.

22    **Q.**    I've got one thing to show you, and then I'm done.

23    Can I have the ELMO?  I'm not a math genius, so I did the

24    numbers myself, and I can show you.  If you have a phone you

12:28:34 25    can check it, or I can check it.  How do I zoom?  There.  So

Catizone - Recross (By Mr. Darken)

1    we have 50 states in the country, right?

2    **A.**    Correct.

3    **Q.**    And we have the District of Columbia, that's a member

4    of your organization, Commonwealth of Puerto Rico is a

12:28:46 5    member of your organization.  Guam you said is a member of

6    your organization, and you said the U.S. Virgin Islands is a

7    member of your organization?

8    **A.**    Correct.

9    **Q.**    Didn't you testify to that in response to Mr. Feran?

12:28:56 10    **A.**    Correct.

11    **Q.**    All right.  So that's 54 jurisdictions.  And you said

12    last night you found that 22 of them had some sort of laws

13    or standards or pharmacy board rules or something about

14    face-to-face between 2000 and 2007, correct?

12:29:13 15    **A.**    Correct.

16    **Q.**    Now, 22 over 54 is 40.7 percent; correct?

17    **A.**    I'll trust your math.  Yes.

18    **Q.**    Well, don't trust me.  Do you want my phone?

19    **A.**    No.

12:29:24 20    **Q.**    Okay.  Do you want to do the math?

21    **A.**    Yes.  Yes.  40.7.

22    **Q.**    And that's less than half.  40.7 percent is less than

23    half.  You agree with that?

24    **A.**    I agree.

12:29:37 25    **Q.**    And 54 minus 22 is 32 jurisdictions that did not have

Catizone - Recross (By Mr. Darken)

1    what you testified existed between 2000 and 2007, correct?

2    **A.**    No.  What I said is that the standards already

3    existed, these states took additional action to codify that

4    further, so my opinion and my statement would be the

12:30:00  5    requirement existed in all of the states just as the DEA

6    issued in their 2001 letter that the states have this in

7    place.  That would be my opinion, sir.

8    **Q.**    Let well ask you this.  You went back last night, and

9    you found 22 states that you testified had face-to-face

12:30:16  10   requirements of some sort between 2000 and 2007, correct?

11   **A.**    Yes, sir.

12   **Q.**    All right.  And isn't it true that 54 minus 22 is 32?

13   **A.**    Yes, sir.

14   **Q.**    Thank you.

12:30:28  15              THE COURT:  What happened with that case?  I'm

16   not telling you to show him that case, but you had a case

17   you said you wanted to show him.  I'm not telling you to do

18   it, I just didn't want --

19              MR. GORENCE:  While he's getting that can I

12:30:43  20   take three seconds, Your Honor?

21              MR. DARKEN:  Your Honor, there are two

22   exhibits I need to move in, VD-8 and VD-4.

23              THE COURT:  Any objection to those?

24              MS. LUTZKO:  No.

12:30:59  25              THE COURT:  They shall be admitted.

247

Catizone - Recross (By Mr. Gorence)

1          Go ahead, Mr. Gorence.

2              MR. GORENCE:  Your Honor, and I will be very

3     brief.

4          RECROSS EXAMINATION OF CARMEN CATIZONE

12:31:06  5    BY MR. GORENCE:

6     Q.   Mr. Catizone, again, I'm back on the DEA notice which

7     we've looked at, and you have said that every red

8     flag -- you told this to Mr. Feran -- every red flag was hit

9     in this case.

12:31:24 10        Now, I just want to focus on the slash on the side,

11    that at least in 2001 these are the indicators that an

12    Internet pharmacy may not be legitimate, at least in the

13    eyes of DEA.  First, no insurance accepted, and I'll concede

14    that Mr. Hazelwood did not take insurance.

12:31:40 15        But the next four are not applicable on the facts

16    that you have reviewed in this case.  That's a true

17    statement, isn't it?  You know that the software on the

18    website didn't require you to waive any rights in this case,

19    correct?

12:31:58 20    A.   Yes, sir.

21    Q.   You know that Hazelwood's website, USMeds, didn't say

22    that it advised about the status of the law and that it was

23    actually permissible.  That red flag is not present --

24    A.   Correct.

12:32:12 25    Q.   -- what the DEA calls red flags.  Next, the site did

Catizone - Recross (By Mr. Gorence)

1   not -- it says the site does not ask the name, address, or

2   phone number of your current physician.  That actually was

3   required in this case, you had to submit medical records or

4   a medical release naming the doctor.  You know that's

12:32:30  5   not -- that red flag doesn't exist here, right?

6   **A.**    Yes.

7   **Q.**    And then lastly, USMeds didn't advise that you had to

8   send it to some far off Post Office Box or some out of the

9   way location to avoid detection by U.S. authorities.

12:32:47  10            So at least on the five red flags the DEA thought

11   were important, four are not involved in this case.  Do you

12   agree with that?

13   **A.**    Yes, sir.

14   **Q.**    Do you want to change your testimony about every red

12:32:58  15   flag is hit?

16   **A.**    No, sir.

17            MR. GORENCE:  Fair enough.  That's all I have,

18   Your Honor.

19            THE COURT:  All right.  Mr. Feran, the time is

12:33:07  20   pretty much spent.  Is there anything else?

21            MR. FERAN:  Nothing on behalf of the

22   government, Your Honor.

23            THE COURT:  Okay.  Anything further?

24            MS. RHA:  No recross, Judge.

12:33:14  25            MR. DARKEN:  No, Your Honor.

```
 1                THE COURT:  All right.  That will be all.

 2          All right.  Tuesday morning, 9:00?

 3                  A JUROR:  Yay.

 4                THE COURT:  All right.  Have a good weekend.

 5                  A JUROR:  You, too.

 6                       -  -  -  -  -

 7

 8     DIRECT EXAMINATION OF CARMEN CATIZONE            3

 9     BY MR. FERAN:

10     CROSS-EXAMINATION OF CARMEN CATIZONE            90

11     BY MR. DARKEN

12     MORNING SESSION, THURSDAY, OCTOBER 11, 2012     106

13     8:40 A.M.

14     CROSS-EXAMINATION OF CARMEN CATIZONE (RESUMED)  106

15     BY MR. DARKEN

16     CROSS-EXAMINATION OF CARMEN CATIZONE            145

17     BY MR. GORENCE

18     CROSS-EXAMINATION OF CARMEN CATIZONE            172

19     BY MS. RHA

20     REDIRECT EXAMINATION OF CARMEN CATIZONE         214

21     BY MR. FERAN

22     RECROSS-EXAMINATION OF CARMEN CATIZONE          241

23     BY MR. DARKEN

24     RECROSS EXAMINATION OF CARMEN CATIZONE          247

25     BY MR. GORENCE:
```

12:33:26

1

2

3                        C E R T I F I C A T E

4

5          I certify that the foregoing is a correct transcript

6     from the record of proceedings in the above-entitled matter.

7

8              s/Heidi Blueskye Geizer        October 27, 2012

9              Heidi Blueskye Geizer, RMR-CRR          Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25